EXHIBIT F

```
                                                                 1
        64pWcooH
    1   UNITED STATES DISTRICT COURT
    1   SOUTHERN DISTRICT OF NEW YORK
    2   ------------------------------x
    2
    3   UNITED STATES OF AMERICA,
    3
    4              v.                      05 CR 1139 (DAB)
    4
    5   DAVID COOPER,
    5
    6                 Defendant.
    6
    7   ------------------------------x
    7
    8                                      New York, N.Y.
    8                                      April 25, 2006
    9                                      11:15 a.m.
    9
   10
   10   Before:
   11
   11                    HON. DEBORAH A. BATTS,
   12
   12                                      District Judge
   13
   13
   14                      APPEARANCES
   15
   15   MICHAEL J. GARCIA
   16        United States Attorney for the
   16        Southern District of New York
   17   REED M. BRODSKY
   17   JOCELYN STRAUBER
   18        Assistant United States Attorneys
   18
   19   ROBERT M. BAUM
   19        Attorney for Defendant
   20
   20
   21   ALSO PRESENT:  MICHAEL RODRIGUEZ, NYPD
   22
   23
   24
   25
            SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300
```

2

64pWcooH

```
1                (Case called)
2                (In open court)
3                THE COURT:  United States of America v. David Cooper.
4        Is the government ready?
5                MS. STRAUBER:  Yes.  Good morning, your Honor.
6        Jocelyn Strauber, for the government.
7                THE COURT:  Good morning, Ms. Strauber.
8                MS. STRAUBER:  With me at counsel table is Assistant
9        United States Attorney Reed Brodsky and Detective Michael
10       Rodriguez of the NYPD.
11               THE COURT:  And on behalf of Mr. Cooper, we have
12       Mr. Robert Baum.  Good morning.
13               MR. BAUM:  Good morning, your Honor.  We're ready to
14       proceed.
15               THE COURT:  Mr. Cooper, good morning to you.
16               THE DEFENDANT:  Good morning.
17               THE COURT:  We're here on the motion of Mr. Cooper to
18       suppress statements and evidence that were seized from him.
19       The government has agreed that a suppression hearing is
20       appropriate, and that is why we're here.  Now, I imagine the
21       way to proceed is perhaps to start with the government putting
22       on its case.
23               MS. STRAUBER:  Yes, your Honor.
24               THE COURT:  All right.  Who is your first witness?
25       Oh, excuse me.  Do you want to have an opening?
```

3

64pWcooH

```
 1              MS. STRAUBER:  Unless the Court would like the
 2    government to open, the government does not think it's
 3    necessary to open.
 4              THE COURT:  Good.  Okay.  All right.  So who is your
 5    first witness?
 6              MS. STRAUBER:  Your Honor, the government's first
 7    witness is Officer Ellis Deloren of the New York City Police
 8    Department.
 9              THE COURT:  All right.
10     ELLIS DELOREN,
11          called as a witness by the Government,
12          having been duly sworn, testified as follows:
13    DIRECT EXAMINATION
14    BY MS. STRAUBER:
15    Q.  Officer Deloren, who do you work for?
16    A.  New York City Police Department.
17    Q.  What is your present position with the New York City Police
18    Department?
19    A.  I'm a police officer assigned to the Bronx Anticrime Unit.
20    Q.  How long have you been a police officer?
21    A.  Approximately seven years.
22    Q.  How long have you been assigned to the Bronx Anticrime
23    Unit?
24    A.  Approximately one year.
25    Q.  And where were you assigned before that?
```

4

64pWcooH                        Deloren - direct

1    A.   To the 40th Precinct.
2    Q.   And what were your responsibilities, just briefly, when you
3    worked in the 40th Precinct?
4    A.   First I was assigned to uniform patrol, and then for two
5    years I was assigned to the 40th Precinct Anticrime Unit.
6    Q.   In the anticrime unit, what did you do?
7    A.   Plain clothes patrol in the confines of the 40th Precinct.
8    Responsibilities were to respond to crimes in progress, as well
9    as concentrate on narcotics and firearms.
10   Q.   Please briefly describe your current responsibilities in
11   the Bronx Anticrime Unit.
12   A.   The same as they were when I was in the 4-0 anticrime unit
13   except now it's boroughwide.
14   Q.   During your years as an officer, approximately how many
15   arrests have you made?
16   A.   Upwards of 200.
17   Q.   And how many of those arrests, approximately, were for
18   offenses involving drugs?
19   A.   I would say approximately three dozen.
20   Q.   And how many of those arrests, approximately, were for
21   offenses involving firearms?
22   A.   Probably about two dozen.
23   Q.   Officer, directing your attention to the night of September
24   6, 2005, were you working that evening?
25   A.   Yes.

        SOUTHERN DISTRICT REPORTERS, P.C.              (212) 805-0300

5

64pWcooH                          Deloren - direct
1    Q.   And at what time did you start your tour of duty?
2    A.   9:30 p.m.
3    Q.   Where were you working?
4    A.   In the confines of the 47th Precinct.
5    Q.   And what were you doing?
6    A.   Plain clothes anticrime patrol.
7    Q.   Were you on patrol on foot or in a car?
8    A.   No.  An unmarked car.
9    Q.   And were you alone or were you with others?
10   A.   I was with two other officers, Officer Michael Parchen and
11   Officer Sean Lynch.
12   Q.   At around 11 p.m. that evening, where were you?
13   A.   At about that time, I was stopped at a red light, heading
14   westbound on East 233rd Street at Bronx Boulevard.
15   Q.   And in what seat of the car were you sitting?
16   A.   I was driving.
17   Q.   The area that you were in, are you familiar with that area?
18   A.   Yes.
19   Q.   And how are you familiar with it?
20   A.   I've worked there before.
21   Q.   And can you describe that area for the Court?
22   A.   It's a residential area.  However, it is high crime in that
23   it is, has a lot of robberies, a lot of shootings, and also a
24   lot of drugs, especially with its proximity to White Plains
25   Road.
              SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

6

64pWcooH                         Deloren - direct
1   Q.  And as your car was stopped at the intersection, what did
2   you observe?
3   A.  Northbound on Bronx Boulevard, I observed a dark red Honda
4   travelling in the left lane, going to the right lane around a
5   stopped car in the intersection, which was attempting to make a
6   left turn.  And then also go back into the left lane as it
7   continued north on Bronx Boulevard, all the while without
8   signalling.  In addition, I'm sorry, in addition, the windows
9   were tinted out.
10  Q.  After you observed that, where did you go next?
11  A.  I then turned right and followed that car northbound on
12  Bronx Boulevard.
13          THE COURT:  Let me just ask you a question.  What is
14  the significance of the fact that the windows were tinted out?
15          THE WITNESS:  I'm just indicating that that's also a
16  Vehicle and Traffic Law infraction.  If the windows are blacked
17  out, there's a vehicle and travel law, it says that only the
18  rear windows can be tinted out.
19          THE COURT:  Only the rear window?
20          THE WITNESS:  Yes, rear passenger and rear windshield,
21  I guess, can be tinted out.  But not the driver's side.  There
22  has to be a certain amount of light let in.  You have to be
23  able to see into the car through the front windows.
24          THE COURT:  What license plate did the car have; what
25  state?

        SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

7

64pWcooH                        Deloren - direct
1               THE WITNESS:  New York.
2               THE COURT:  Okay.  You may proceed.
3               MS. STRAUBER:  Thank you, your Honor.
4    Q.  What, if anything, did you do to signal to the car that you
5    were following?
6    A.  I put on our, the lights and the siren in my car.
7    Q.  And what happened next?
8    A.  The driver pulled over to the right.
9    Q.  And after that, what did you do?
10   A.  I pulled in behind him, I got out, approached on the
11   driver's side.  Officers Parchen and Lynch approached on the
12   passenger's side.
13   Q.  Officer, as you approached the car, were you armed?
14   A.  Yes.
15   Q.  And where was your weapon?
16   A.  In my holster.
17   Q.  And how was it holstered?
18   A.  It was snapped shut.
19   Q.  And as you approached the car, what did you do?
20              THE COURT:  Let me ask you, where do you wear your
21   holster?
22              THE WITNESS:  On my right side.
23              THE COURT:  So, at your waist?
24              THE WITNESS:  Yes.
25              THE COURT:  Okay.

SOUTHERN DISTRICT REPORTERS, P.C.              (212) 805-0300

```
                                                               8
     64pWcooH                    Deloren - direct
1    BY MS. STRAUBER:
2    Q.   As you approached the car, what did you do?
3    A.   As I was approaching the car, I told the driver to put down
4    the windows.  When I got up to the car, I asked him for his
5    license and registration.
6    Q.   And from where you were standing, what could you see?
7    A.   I could see the driver sitting in the passenger's seat,
8    and, as he handed me his license, and he was looking for the
9    registration, I then, with my flashlight, bent down and looked
10   over at the passenger.
11   Q.   And do you see the person who was sitting in the
12   passenger's seat in the courtroom today?
13   A.   Yes.
14   Q.   If you would, please identify him by where he's sitting and
15   a piece of clothing that he's wearing.
16   A.   He's seated there to your left, wearing a white shirt.
17           MS. STRAUBER:  Your Honor, may the record please
18   reflect that the witness has identified the defendant.
19           THE COURT:  The record will so reflect.
20   BY MS. STRAUBER:
21   Q.   What, if anything, did you observe about the defendant?
22   A.   I noticed that as I was asking the driver for his license,
23   the defendant was repeatedly looking over his left shoulder and
24   his right shoulder to see where I was and where my partners
25   were.  In addition, I noticed that the driver was breathing
            SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

9

64pWcooH                        Deloren - direct

1   heavy.  He was acting nervous.  He was sweating.  And he was
2   also seated in an awkward position in the front seat.  He was
3   leaning forward.  Meanwhile, the seat back of the seat was in a
4   backward position.  In addition, he had his seat belt on, but
5   he had his T-shirt or his shirt pulled out over the seat belt,
6   the lap portion of the belt, in what I thought was an attempt
7   to conceal something.
8   Q.  Can you describe more specifically how the T-shirt was with
9   respect to the seat belt?
10  A.  It was pulled out to his right side.
11  Q.  After making these observations, what did you do?
12  A.  Well, because he was breathing the way he was breathing and
13  sweating, I bent down and I asked him if he was all right.
14  Q.  How did the defendant respond?
15  A.  Looking straight ahead, he started shaking his head back
16  and forth, saying no.  And then he, I saw him mouth the word
17  no.
18  Q.  What did you do next?
19  A.  I then looked up over the car at my partner, and I gave him
20  a look, at which point my partner then asked the defendant to
21  step out of the car.
22  Q.  What happened next?
23  A.  I observed the defendant starting to get out of the car,
24  and the door was open, and my partner asked him, Do you have
25  anything on you, do you have any weapons.

         SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

10

64pWcooH                          Deloren - direct

1   Q.  And what did you hear next?
2   A.  I heard the defendant respond, I don't know what he fully
3   said, but he said something to the effect of having a gun or
4   something like that.
5   Q.  When you heard that, what did you do next?
6   A.  Well, when I heard that, Officer Parchen was, told the
7   defendant to turn around, and he started to pat him down.  And
8   I observed.
9   Q.  What else, if anything, did you do?
10  A.  I then asked the driver to step out of the car.
11  Q.  And just stepping back a minute, when you said that you
12  observed what Officer Parchen was doing, what actually did you
13  see him do?
14  A.  I observed Officer Parchen reach around from the rear of
15  the defendant.  He was standing behind the defendant.  He
16  reached around on his right side, and I observed him remove
17  something from an area near his right pants pocket or his
18  waistband area.  And he then, I'm sorry.  He then took that
19  object and handed it to Officer Lynch who was standing behind
20  him.
21  Q.  Did there come a time that you saw what it was that Officer
22  Parchen had recovered from the defendant?
23  A.  Yes.
24  Q.  When was that?
25  A.  About 30 seconds later, at the rear of the car, both the

            SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

11

64pWcooH                        Deloren - direct

1   defendant and the driver were there, and Officer Lynch handed
2   me a firearm.
3           MS. STRAUBER:  Your Honor, may I approach.
4           THE COURT:  You may.
5   BY MS. STRAUBER:
6   Q.  Officer Deloren, I'm showing you what's been marked as
7   Government's Exhibit 1 for purposes of identification.  Could
8   you please take a look at that.
9           Officer Deloren, do you recognize Government's Exhibit 1?
10  A.  Yes, I do, actually.
11  Q.  What is it?
12  A.  This is the firearm that was recovered from the defendant.
13  Q.  And how do you recognize it?
14  A.  It has my initials scratched in it as well as the lead seal
15  that I placed around the trigger guard.
16  Q.  And what else, if anything, do you recognize that's
17  contained within Exhibit 1?
18  A.  Yeah.  The magazine that was removed from the gun and the
19  two rounds of ammunition that were removed from it as well.
20  Q.  Officer, when did you carve your initials into the firearm?
21  A.  Later on when we, when I was processing the arrest back at
22  the station house.
23          MS. STRAUBER:  Your Honor, I offer Government's
24  Exhibit 1 in evidence.
25          MR. BAUM:  No objection for purposes of this hearing

12

64pWcooH                          Deloren - direct

1   only?
2               THE COURT:   Government's Exhibit 1 received in
3   evidence.
4               (Government's Exhibit 1 received in evidence)
5   BY MS. STRAUBER:
6   Q.   After you saw Officer Parchen recover the first item from
7   the defendant, what else, if anything, did you see Officer
8   Parchen do?
9   A.   He cuffed up the defendant, and then he continued to pat
10  him down and search his pockets, at which point he repeatedly
11  asked him, or asked him at least more than once if he had
12  anything else on him, at which point I heard the defendant
13  respond that he had some work on him.
14  Q.   And after the defendant so responded, what happened next?
15  A.   I saw Officer Parchen from the left side of the defendant
16  remove a plastic bag from him.
17  Q.   And did there come a time when Officer Parchen gave you
18  that bag that he recovered from the defendant?
19  A.   Yes.   At the same time I was handed the firearm from
20  Officer Lynch, Officer Parchen handed me a bag of crack
21  cocaine.
22  Q.   And you looked at the bag that Officer Parchen gave you?
23  A.   Yes.
24  Q.   And what did you observe?
25  A.   I observed a clumpy rock-like substance, which I believed
           SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

13

64pWcooH                          Deloren - direct

1   to be crack cocaine.
2            MS. STRAUBER:  Your Honor, may I approach.
3            THE COURT:  You may.
4   BY MS. STRAUBER:
5   Q.  Officer Deloren, I'm showing you what's been marked as
6   Government's Exhibit 2 for purposes of identification.  Please
7   take a look at that.
8        Officer, do you recognize Government's Exhibit 2?
9   A.  Yes.
10  Q.  What is it?
11  A.  This is the narcotics that were removed from the defendant
12  as well as the packaging that I placed it in when I sent it to
13  the lab.
14  Q.  Are the narcotics in substantially the same condition that
15  they were in when they were given to you?
16  A.  They're a little different, actually.  It seems to be a
17  little bit more crushed up here.  When I, when they were
18  retrieved from the defendant, it was more clumpy, more rock
19  like.
20  Q.  And how do you recognize Government's Exhibit 2?
21  A.  My signature and my shield number are there, across the
22  envelope.
23  Q.  Is there any other way in which you can identify
24  Government's Exhibit 2?
25  A.  Yes.  Clearly displayed here is the number of the security
            SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

14

64pWcooH                           Deloren - direct

1   envelope that the narcotics were placed in, which is the same
2   as the number that I placed on the voucher.
3   Q.  And how do you know that that number is the same number as
4   the one that you placed on the voucher?
5   A.  Because I've seen the voucher.
6           MS. STRAUBER:  Your Honor, I offer Government's
7   Exhibit 2 in evidence.
8           MR. BAUM:  No objection, for purposes of the hearing,
9   your Honor?
10          THE COURT:  Government's Exhibit 2 received in
11  evidence.
12          (Government's Exhibit 2 received in evidence)
13  BY MS. STRAUBER:
14  Q.  Officer Deloren, what, if anything, did you hear the
15  defendant say after the bag with the white substance was
16  recovered from him?
17  A.  I heard the defendant say that the drugs were his for
18  personal use.
19  Q.  Now, did there come a time when you left the vicinity where
20  the car was stopped that evening?
21  A.  Yes.
22  Q.  And where did you go?
23  A.  To the 47th Precinct.
24  Q.  Who was with you?
25  A.  Officers Parchen and Officer Lynch.

          SOUTHERN DISTRICT REPORTERS, P.C.           (212) 805-0300

15

64pWcooH                        Deloren - direct

1    Q.  Who else was with you at that time?
2    A.  Well, we called to the -- I'm sorry.  The defendant was
3    also with me.
4    Q.  Did there come a time when you returned to the precinct?
5    A.  Yes.
6    Q.  And when you reached the precinct, what did you do?
7    A.  The defendant was placed in a holding cell, and I began to
8    process the arrest.
9    Q.  Did there come a time that you spoke to the defendant?
10   A.  Yes.
11   Q.  Tell me what you did.
12   A.  Prior to speaking to the defendant, I read him his Miranda
13   warnings, and which he signed.  He initialled after each
14   warning was read to him that he understood it, and then he
15   signed it.  And then he proceeded to discuss with me the events
16   of what happened that night.
17   Q.  Tell me what you said to him and what he said to you.
18   A.  Before he actually wrote down his statement, I, I believe I
19   asked him where he was going, where he was coming from, at
20   which point he said again, he reiterated that the drugs were
21   for his personal use and that the gun, he said that he had some
22   problems with some people in his neighborhood in Mount Vernon,
23   and that the gun was for protection.
24   Q.  What else, if anything, did he say to you about the drugs?
25   A.  He told me that he had purchased a specific amount of
            SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

16

64pWcooH                         Deloren - direct

1    narcotics, specific amount of crack.  He gave me a number.  I
2    don't recall what that number was at this time.
3               MS. STRAUBER:  Your Honor, may I approach.
4               THE COURT:  You may.
5    BY MS. STRAUBER:
6    Q.  Officer Deloren, I'm showing you what's been marked as
7    Government's Exhibit 3 for purposes of identification.  Please
8    take a look at that.
9          Officer Deloren, do you recognize Government's Exhibit 3?
10   A.  Yes.
11   Q.  What is it?
12   A.  This is a copy of the Miranda warnings and the statement
13   that the defendant wrote.
14   Q.  And how do you recognize it?
15   A.  Well, from -- one, from my signature on the bottom, and I
16   also remember it from that night.
17              MS. STRAUBER:  Your Honor, I offer Government's
18   Exhibit 3 in evidence.
19              MR. BAUM:  No objection.
20              THE COURT:  Government's Exhibit 3 received in
21   evidence.
22         (Government's Exhibit 3 received in evidence)
23              MS. STRAUBER:  I have nothing further -- actually,
24   excuse me.  I'd like to just step back to one thing.
25   Q.  When you said, when you testified previously that after you
              SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

17

64pWcooH                          Deloren - direct

1   spoke to the defendant and asked him if he was all right, I
2   believe you testified that he was shaking his head back and
3   forth.
4           MR. BAUM:  Objection as to form as to what he
5   testified to.
6           THE COURT:  Yes.  Right.  Let's get to the question.
7   BY MS. STRAUBER:
8   Q.  When you spoke to -- withdrawn.
9       Did there come a time when you, after you approached the
10  car, when you spoke to the passenger?
11  A.  Yes.
12  Q.  And what did you ask him?
13  A.  Again, I asked him if he was all right.
14  Q.  And how did he respond?
15  A.  He shook his head no and mouthed the word no.
16          MS. STRAUBER:  Thank you.  Nothing further.
17  CROSS-EXAMINATION
18  BY MR. BAUM:
19  Q.  Officer Deloren, when you first began your testimony, you
20  said that you had been involved in upwards of 200 arrests, or
21  you had made upwards of 200 arrests, is that correct?
22  A.  Yes.  Approximately.
23  Q.  Well, what you're saying, actually, is that you were
24  involved in upwards of 200 arrests, not that you personally
25  made the arrests, correct?

18
64pWcooH                       Deloren - cross

1    A.  No.  That's incorrect.  I personally made the arrests of
2    somewhere between I would say 180 and 200 arrests, and I've
3    been involved in three, maybe four or five times that.
4    Q.  In this particular case, you didn't search Mr. Cooper, did
5    you?
6    A.  No.
7    Q.  You didn't recover the weapon, did you?
8    A.  No, I did not.
9    Q.  You didn't recover narcotics, did you?
10   A.  Correct.
11   Q.  But you are the arresting officer, correct?
12   A.  Correct.
13   Q.  Now, you testified that this area was a high-crime area.
14   Do you recall that?
15   A.  Yes.
16   Q.  Would it be fair to say that a substantial portion of the
17   Bronx is a high-crime area?
18   A.  You know what?  Honestly, I don't know how to qualify that,
19   so substantial portion of the Bronx.  A lot of the Bronx, yes,
20   is a high-crime area.  That specific area where I was, 233rd
21   Street near White Plains Road is even more of a high-crime area
22   than the average street in the Bronx.
23   Q.  There are other areas in the Bronx which you would
24   characterize as even more of a high-crime area than the area
25   you just described, correct?

           SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

```
                                                              19
     64pWcooH                      Deloren - cross
 1   A.  Not necessarily, no.
 2   Q.  So is it your testimony that this is the highest crime area
 3   in the Bronx?
 4   A.  No.  That's not my testimony at all.
 5   Q.  Okay.  So would it be fair to say that there are other
 6   areas that are more of a high-crime area than this area?
 7   A.  I honestly wouldn't know.  Honestly.
 8   Q.  Now, you testified that one of the reasons you stopped the
 9   car was, as you said, the windows were tinted out; they were
10   blackened, is that correct?
11   A.  Yes.
12   Q.  And, in fact, you said that the reason that you give a
13   ticket for a traffic infraction is that you have to be able to
14   see inside the car, correct?
15   A.  Typically, that's the standard that we use on the street,
16   yes.
17   Q.  Okay.  And isn't it therefore accurate that you gave a
18   ticket in this situation because you could not see inside the
19   car through the driver's or the passenger's side windows when
20   the windows were up?
21   A.  Yes.  In addition to the summons for failing to signal when
22   they went around the car.
23   Q.  Okay.  I just asked one question.
24        Is it fair to say then when the windows are up on this
25   vehicle that you stopped, you cannot see through the windows
          SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

20

64pWcooH                        Deloren - cross

1   into the interior of the car?
2   A.   As far as I remember, yes.
3   Q.   Now, you mentioned that when you approached the car, you
4   had a weapon and it was in a holster.  Do you recall?
5   A.   Yes.
6   Q.   And were you wearing a jacket or no jacket?
7   A.   I don't recall my, what I was wearing.  I don't think I was
8   wearing a jacket.
9   Q.   And was the weapon and the holster clearly visible to
10  anyone who would observe your person that night?
11  A.   Yes, probably.
12  Q.   And when you approached the car, did you have your hand on
13  your weapon, as standard procedure?
14  A.   That's not standard procedure.  However, I don't remember.
15  Q.   Now, you testified that you approached on the driver's
16  side, is that correct?
17  A.   Yes.
18  Q.   And you asked the driver's side to roll down his window
19  because you couldn't see in the car, correct?
20  A.   Yes.
21  Q.   And do you recall how far he rolled down the window?
22  A.   All the way.
23  Q.   And after he rolled down the window, I believe you
24  testified that you had to use a flashlight to look inside the
25  car on the passenger's side, is that accurate?

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

```
                                                              21
         64pWcooH                    Deloren - cross
1                  MS. STRAUBER:  Objection.
2                  THE COURT:  Yes.  Sustained as to form.
3        BY MR. BAUM:
4        Q.  Did you use a flashlight to view the passenger's side of
5        the car?
6        A.  Yes.
7        Q.  And the time that you made all the observations that you
8        testified to, was the flashlight on for that entire period of
9        time?
10       A.  Yes.
11       Q.  Or did you turn the flashlight on and shut it off for some
12       periods of time?
13       A.  It was on the whole time.
14       Q.  Now, when you approached the car, did you begin a
15       conversation with the driver?
16       A.  Yes.
17       Q.  That was the first thing you did, correct?
18       A.  Yes.
19       Q.  And at that point, were you standing directly beside the
20       driver at the passenger's door, at the driver's side door?
21       A.  No.  I was slightly behind his left shoulder.
22       Q.  And when you say slightly behind his left shoulder, how far
23       from the front passenger door would you say you were, a foot,
24       less than a foot, more than a foot?
25       A.  I believe I was standing right at the seam of the front
                  SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

22

64pWcooH                              Deloren - cross

1   door.
2   Q.  And in order to speak with you, would it be fair to say
3   that the driver had to look over his shoulder?
4   A.  Or just turn to his left.
5   Q.  Okay.  And did you notice whether the officers approached
6   from the other side of the car?
7   A.  Did I notice what?  I'm sorry.
8   Q.  Other officers approaching from the other side of the car,
9   the passenger's side?
10  A.  Yes.
11  Q.  And did you notice where they stood while you talked to the
12  driver?
13  A.  Officer Lynch was more towards the rear of the car.  And
14  Officer Parchen was standing next to the passenger door.
15  Q.  Now, you testified that you had a look in the car with your
16  flashlight, correct?
17          MS. STRAUBER:  Objection.
18          THE COURT:  Sustained as to form.
19          MR. BAUM:  Okay.
20  Q.  When you made the observations that you testified to on
21  direct exam, had you moved closer to the driver's position in
22  the car, or were you standing at the location that you just
23  described off a little to the side of the front door?
24  A.  I had to move up because I had to retrieve the driver's
25  license.

        SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

23

64pWcooH                        Deloren - cross

1    Q.  And how much time did you actually spend at the location a
2    little to the side of the front door before you moved up?
3    A.  Five seconds, just enough to see where the driver's hands
4    were.
5    Q.  And what was the conversation you had with the driver?
6    A.  I don't recall exactly what we talked about.  I think I
7    just asked him for his license and registration.
8    Q.  Did you ask him any other questions?
9    A.  I don't remember.
10   Q.  You don't remember?
11   A.  No, I don't.
12   Q.  While you were asking him questions, were you looking at
13   him or the passenger?
14   A.  Both.
15   Q.  So you were asking the driver questions.  At that point,
16   aren't you concerned that you need to keep your eyes on the
17   driver for purposes of your own safety?
18   A.  The driver's hands are completely visible at this point.
19   Q.  Where were his hands?
20   A.  In front of him.  I don't know if they were exactly on the
21   steering wheel or on his lap, but they were in front of him.
22   Q.  You had to be looking at him to know that they were
23   completely visible, correct?
24   A.  Yes, but I don't have to stare at them.
25   Q.  And there came some period of time when you testified that

24

64pWcooH                          Deloren - cross

1    you asked a question of the passenger, is that right?
2    A.  That's correct.
3    Q.  How long after you stood at the side of the car door by the
4    driver did you ask this question of the passenger?
5    A.  20 seconds, perhaps.  30 seconds.  I can't be certain, but
6    it wasn't long.
7    Q.  And what was the question that you say you asked him?
8    A.  Based on his demeanor, I asked him if he was all right.  I
9    asked him if he was okay.
10   Q.  Well, what was his demeanor?
11   A.  To me, he was behaving very nervously.  He was breathing
12   extremely heavy.  His chest was visibly moving up and down.  I
13   could see beads of sweat on his forehead and the way he was
14   seated in the car to me was also very odd.
15   Q.  Well, how was he seated in the car?
16   A.  Again, he was seated in a forward position, much like I'm
17   seated right now, despite the fact that the back portion of the
18   seat was set back as if to say that previously he was leaning
19   backwards in the car.
20   Q.  So --
21   A.  In addition --
22   Q.  Go ahead.
23   A.  In addition, he had his seat belt on.  But what I thought
24   was very odd was that his shirt was pulled out over the seat
25   belt on his right side.

         SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

25

64pWcooH                              Deloren - cross

1   Q.  Now, you didn't see him pull his shirt out over his seat
2   belt, did you?
3   A.  No, I did not.
4   Q.  So is it your testimony that you found it odd that someone
5   is seated in the front, in the passenger's seat with his seat
6   belt on and his shirt is outside over the seat belt?  You find
7   that odd?
8   A.  Coupled with the fact that he was acting extremely nervous,
9   yes, I find that very odd.
10  Q.  No, Officer.  Did you just testify that you found it odd
11  that his shirt was out over the seat belt?
12            MS. STRAUBER:  Objection.
13            THE COURT:  I'll allow it.
14  BY MR. BAUM:
15  Q.  Isn't that what you just said?
16  A.  Yes.
17  Q.  Do you find it odd that someone seated in a car and that
18  they don't have their shirt tucked under the seat belt, they
19  have it tucked over the seat belt, do you think that's odd?
20  A.  I think that is a little odd, yes.
21  Q.  And is that one of the reasons that you decided that
22  perhaps he should be searched?
23  A.  That was one of many reasons, yes.
24  Q.  Now, you said he was breathing heavy.  Did you think he was
25  ill?

            SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

26

64pWcooH                         Deloren - cross

1    A.   No.  I thought he was nervous.
2    Q.   Did he say anything to you?  Did he speak to you?
3    A.   Except to say that he wasn't okay, no, he didn't say
4    anything.
5    Q.   Did he say he was okay?
6    A.   He shook his head no and mouthed the word no.
7    Q.   Now, as the arresting officer, you filled out a bunch of
8    forms pursuant to this arrest, is that correct?
9    A.   Yes.
10   Q.   And on one of the forms that you filled out, did you fill
11   out -- well, withdrawn.
12        Did you fill out a prisoner pedigree card?
13   A.   Yes.
14   Q.   And on the prisoner pedigree card, did you ever indicate
15   the physical condition of Mr. Cooper?
16   A.   Yes.
17   Q.   And do you recall what you indicated on the prisoner
18   pedigree part as to the physical condition of Mr. Cooper?
19   A.   If I remember correctly, I put down that he was apparently
20   normal.
21   Q.   Now, after you made these observations, was it at that
22   point that -- well, withdrawn.
23        Did you ever order Mr. Cooper or Mr., or the driver out of
24   the car?
25   A.   I asked the driver to step out, yes.

27

64pWcooH                          Deloren - cross

1    Q.  And was that before or after Mr. Cooper was asked out of
2    the car?
3    A.  That was after.
4    Q.  And did you order Mr. Cooper out of the car?
5    A.  No, I did not.
6    Q.  Did you hear your partner order Mr. Cooper out of the car?
7    A.  Yes.
8    Q.  And do you know when your partner ordered Mr. Cooper out of
9    the car, was he, did he have a weapon withdrawn?  Was he
10   holding a weapon?
11   A.  My partner?
12   Q.  Yes.
13   A.  No.
14   Q.  And when your partner ordered Mr. Cooper out of the car,
15   did he open up the car door for Mr. Cooper to get out of the
16   car?
17   A.  That, I don't know.
18   Q.  Well, weren't you looking in the car that whole period of
19   time?
20   A.  No.  At that point, I'm not looking in the car anymore.
21   Now I'm standing upright.
22   Q.  So, is it your testimony that after Mr. Cooper was ordered
23   out of the car, you no longer looked in the car?
24   A.  Not in the manner that I was, bent over.  I'm still looking
25   in the car, but I'm no longer bent down.  Now I'm standing
           SOUTHERN DISTRICT REPORTERS, P.C.           (212) 805-0300

28

64pWcooH                    Deloren - cross

1   upright.
2   Q.  And did you see Mr. Cooper get out of the car?
3   A.  Yes.
4   Q.  And after Mr. Cooper got out of the car, didn't one of the
5   officers on the other side begin to pat him down?
6   A.  I'm sorry.  I'm not quite following you.  Can you repeat
7   the question?
8   Q.  Yes.  After Mr. Cooper was ordered out of the car, after
9   you made your observations, didn't your partner or one of the
10  two police officers on the passenger's side begin to pat him
11  down?
12  A.  Yes, after he was asked if he had anything on him.
13  Q.  Are you sure, Officer, that he was asked before he was
14  patted down, or was he asked during the pat down?
15  A.  He was asked before the pat down.  He was still halfway
16  seated in the car, getting out of the car, when Officer Parchen
17  asked him, Do you have anything on you, do you have any
18  weapons.
19  Q.  Now, you've spoken to the prosecutor about this case
20  before, haven't you?
21  A.  Yes.
22  Q.  And, in fact, on one or more occasions, you spoke to her by
23  cell phone, didn't you?
24  A.  Yes.
25  Q.  And do you specifically recall having a conversation with

29

64pWcooH                        Deloren - cross

```
 1   her on September 12?
 2   A.  No, I don't remember it specifically.
 3   Q.  Okay.  But you recall having a conversation with her about
 4   the facts of this case on her cell phone, correct, on your cell
 5   phone, excuse me?
 6   A.  Yes.
 7   Q.  And on one of these occasions, did you tell her that
 8   Parchen patted him down and says, Do you have a weapon?
 9   A.  I don't --
10   Q.  Do you recall telling her that?
11   A.  I don't recall that.
12   Q.  What did you hear Officer Parchen say to Mr. Cooper?
13   A.  At which point?
14   Q.  At the point he was told, that Mr. Cooper was told to leave
15   the vehicle.
16   A.  He asked the defendant to step out of the car, and, as he
17   was getting out, Officer Parchen asked him if he had any
18   weapons on him, if he had anything on him.
19   Q.  Okay.  Now, in your seven years on the police force, you
20   received training in street stops and search and seizures,
21   correct?
22   A.  Yes.
23   Q.  And you received training in the academy about street stops
24   and search and seizures, didn't you?
25   A.  Yes.
```

SOUTHERN DISTRICT REPORTERS, P.C.                (212) 805-0300

30

64pWcooH                        Deloren - cross
1    Q.   And as part of the anticrime unit, I assume that you
2    received follow-up training about stops, street stops and
3    search and seizures, correct?
4    A.   No, that's not correct.
5    Q.   So the only time you've ever received training was at the
6    academy on search and seizures?
7    A.   No.   You're also learning from veteran officers and
8    supervisors as street encounters occur.
9    Q.   Do you receive memos from the legal department about stops
10   and how to participate in a street stop?
11   A.   Yes.
12   Q.   Now, Officer, it's fair to say that you know as part of
13   your training, that in order to pat someone down, you have to
14   have some suspicion of criminal activity, correct?   You know
15   that, don't you?
16           MS. STRAUBER:   Objection.
17           THE COURT:   Sustained.
18           MR. BAUM:   Judge, I think it's proper cross.
19           THE COURT:   Maybe I don't.
20           MR. BAUM:   I'm sorry?
21           THE COURT:   Maybe I don't.
22           MR. BAUM:   Obviously you don't, Judge.
23   Q.   Do you know what the procedure is for a pat down from your
24   training?
25   A.   Yes.

         SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

31
64pWcooH                    Deloren - cross
1    Q.   And do you know whether or not prior to a pat down you need
2    to have some suspicion of criminal activity?
3              MS. STRAUBER:  Objection, your Honor.
4              THE COURT:  I'll allow that.
5    A.   Repeat the question.  I'm sorry.
6    Q.   Do you know that prior to a pat down on the street, you
7    need to have some suspicion of criminal activity?
8              MS. STRAUBER:  Objection.
9              THE COURT:  Basis?
10             MS. STRAUBER:  I think it misstates the law, your
11   Honor.
12             THE COURT:  That would be a problem.
13   BY MR. BAUM:
14   Q.   What is it that you believe needs to occur prior to a pat
15   down to be consistent with constitutional --
16             THE COURT:  Whoa, whoa.
17             MS. STRAUBER:  Objection, your Honor.
18             MR. BAUM:  It's the officer's state of mind.
19             THE COURT:  Wait a second.  Wait a second.  How about,
20   What is it you believe needs to occur prior to a pat down,
21   period.
22             MR. BAUM:  Okay.
23             THE WITNESS:  Is that the question?
24             THE COURT:  That's the question.
25             THE WITNESS:  The answer, I guess, then is I believe
         SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

32

64pWcooH                          Deloren - cross

```
 1     that there needs to be reasonable grounds that a crime is about
 2     to be committed or was committed.
 3     BY MR. BAUM:
 4     Q.   And is it fair to say that without that, you know that
 5     you're not permitted to search someone?
 6              MS. STRAUBER:  Objection.
 7              THE COURT:  I'll sustain it as to form.
 8     Q.   If that doesn't occur prior to a pat down, are you
 9     permitted to search someone?
10              MS. STRAUBER:  Objection.
11              THE COURT:  Sustained.
12     BY MR. BAUM:
13     Q.   Did you ever ask the driver if he'd ever been arrested
14     before, at the car?
15     A.   I don't remember.
16     Q.   Do you recall whether the driver told you that he had been
17     arrested before, while you were at the car?
18     A.   I'm sorry.  Again, I don't remember.
19     Q.   Did you search the driver?
20     A.   Yes, I did.  I patted him down.
21     Q.   And would you tell the judge what basis you had to search
22     the driver?
23     A.   Because a firearm was just recovered from the person who
24     was sitting right next to him in the car.
25     Q.   And you testified that Mr. Cooper made some statements
```

SOUTHERN DISTRICT REPORTERS, P.C.              (212) 805-0300

```
                                                           33
       64pWcooH                    Deloren - cross
  1    later on, correct?
  2              MS. STRAUBER:  Objection.
  3              THE COURT:  As to form, yes.
  4    BY MR. BAUM:
  5    Q.  Government's Exhibit, I believe it's Government's Exhibit 3
  6    is a written statement made by Mr. Cooper, is that correct?
  7    A.  That is correct.
  8    Q.  Did you tell him what to say in that statement?
  9    A.  Absolutely not.
 10    Q.  Did you read that statement when he wrote it?
 11    A.  After he wrote it?
 12    Q.  Yeah.
 13    A.  Yes.
 14    Q.  Did you tell him that the statement was incorrect or that
 15    he should change it in any way?
 16    A.  Not at all.
 17    Q.  And you signed that statement, didn't you?
 18    A.  Yes.
 19    Q.  Did you discuss your testimony or the events of this case
 20    with Officer Parchen at any time prior to today?
 21    A.  No.
 22    Q.  Did you meet with someone from the government to discuss
 23    your testimony, meet personally?
 24    A.  With the assistant U.S. Attorney, yes.
 25    Q.  And when you met with the assistant U.S. Attorney was
           SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

34

```
        64pWcooH                    Deloren - cross
 1   Officer Parchen present?
 2   A.   Not during the interview, no.
 3   Q.   Did you go to the meeting with Officer Parchen?
 4   A.   Yes.
 5   Q.   Did you leave with Officer Parchen?
 6   A.   Yes, I did.
 7   Q.   And on the way down, did you talk about the case at all?
 8   A.   No.  We were expressly told not to.
 9   Q.   Were you told that after the meeting or before the meeting?
10   A.   Both.
11              MR. BAUM:  No further questions.
12              THE COURT:  All right.
13              MS. STRAUBER:  The government has no questions, your
14   Honor.
15              THE COURT:  Don't move.  Do you have other witnesses?
16              MS. STRAUBER:  Yes, your Honor.  The government has
17   one additional witness.
18              THE COURT:  Who is that?
19              MS. STRAUBER:  That's Officer Parchen.
20              THE COURT:  Okay.  Thank you, you may step down.
21              (Witness excused)
22              MS. STRAUBER:  Your Honor, may the government call
23   Officer Parchen.
24              THE COURT:  Yes.
25              MS. STRAUBER:  Thank you, your Honor.
```

          SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

```
                                                                   35
      64pWcooH                    Deloren - cross
 1     MICHAEL PARCHEN,
 2         called as a witness by the Government,
 3         having been duly sworn, testified as follows:
 4   DIRECT EXAMINATION
 5   BY MS. STRAUBER:
 6   Q.  Officer Parchen, who do you work for?
 7   A.  New York City Police Department.
 8   Q.  What's your title?
 9   A.  Police officer.
10   Q.  How long have you been a police officer with the New York
11   City Police Department?
12   A.  Approximately seven years.
13   Q.  Where are you currently assigned?
14   A.  Bronx Anticrime Unit.
15   Q.  How long have you been assigned there?
16   A.  A little over a year.
17   Q.  And prior to being assigned to the Bronx Anticrime Unit,
18   where were you assigned?
19   A.  The 40th Precinct.
20   Q.  What were your responsibilities, just briefly, when you
21   were assigned to the 40th Precinct?
22   A.  I was assigned to the anticrime unit.
23   Q.  And what are your current responsibilities in the Bronx
24   Anticrime Unit?
25   A.  We're a plain clothes unit.  We try to catch criminals
           SOUTHERN DISTRICT REPORTERS, P.C.       (212) 805-0300
```

36

64pWcooH                          Parchen - direct

1  before they're about to commit crimes and while they're
2  committing crimes.
3  Q.  In the course of your work as a police officer,
4  approximately how many arrests have you made?
5  A.  Approximately 200.
6  Q.  And approximately how many of those arrests were for
7  offenses relating to drugs?
8  A.  Between 50 and a hundred.
9  Q.  And how many of those arrests approximately were for
10 offenses relating to firearms?
11 A.  Approximately 30.
12 Q.  Directing your attention to the night of September 6, 2005,
13 Officer, were you working that evening?
14 A.  Yes.
15 Q.  And what time did your tour of duty start?
16 A.  2130, which is 9:30 at night.
17 Q.  And what were you doing?
18 A.  Bronx anticrime.
19 Q.  Can you describe more specifically what you were doing on
20 duty that evening?
21 A.  We were in an unmarked police car patrolling the confines
22 of the 47 Precinct.
23 Q.  And when you say "we," who were you with?
24 A.  I was with Officer Deloren and Officer Lynch.
25 Q.  And where were you sitting in the car?

37

64pWcooH                          Parchen - direct

1    A.   Front right passenger.
2    Q.   And approximately where within the precinct was your car
3    located?
4    A.   We were stopped at a traffic light facing westbound on East
5    233rd Street and Bronx Boulevard.
6    Q.   And at approximately what time were you at that location?
7    A.   About 11:00.
8    Q.   Are you familiar with that area?
9    A.   Yes.
10   Q.   How are you familiar with it?
11   A.   I've patrolled there numerous times.
12   Q.   Can you describe that area for the Court, please?
13   A.   It's a high-crime area.  Get a lot of robberies over there.
14   Q.   And I may have asked you this question already, forgive me
15   if I have.  What seat of the car were you sitting in?
16   A.   Front right passenger.
17   Q.   And as you were stopped at the intersection, what, if
18   anything, did you observe?
19   A.   I witnessed a burgundy colored Honda Accord travelling
20   northbound on Bronx Boulevard.  It made an erratic turn.  It
21   changed lanes without signalling, and it was speeding.
22   Q.   What else, if anything, did you notice about the car?
23   A.   Had tinted windows.
24   Q.   After you observed that, where did your car go next?
25   A.   We pulled in immediately behind the vehicle and we

          SOUTHERN DISTRICT REPORTERS, P.C.           (212) 805-0300

38

64pWcooH                         Parchen - direct

1    conducted a car stop.
2    Q.  And what, if anything, did you do to signal to that vehicle
3    that you were behind it?
4    A.  Somebody in the vehicle, I don't know if it was me or
5    Officer Deloren, did initiate the lights in the car to conduct
6    the car stop.
7    Q.  And after you pulled that car over, where did you go?
8    A.  I approached the front right passenger, in the front seat
9    of the vehicle.
10   Q.  And at that time, did you have your weapon drawn?
11   A.  No, I did not.
12   Q.  Was your weapon visible?
13   A.  Yes.
14   Q.  And was it, where was it located?
15   A.  On my hip, on my right side.
16   Q.  And was it holstered?
17   A.  Holstered, yes.
18   Q.  As you approached the car, where were you standing in
19   relation, or when you -- withdrawn.
20       When you reached the car, where were you standing in
21   relation to the front passenger side window?
22   A.  Just right off to the spot where I could see into the
23   vehicle, and it's basically where the door and the window meet
24   and the front right door.
25   Q.  And at that time, were the windows of the vehicle closed?

39

64pWcooH                              Parchen - direct

1   In the front passenger's seat, was the window closed, or was it
2   open?
3   A.   I believe the window was down already by the time I
4   approached the car.
5   Q.   And when you reached the passenger's side, what did you do?
6   A.   I asked the front right passenger what his name was, where
7   he was coming from.   He answered me that they were coming from
8   Manhattan.   I asked them where they were headed, where he
9   lives, and whose car it was.   And at that point, he stopped
10  answering my questions.
11  Q.   As you asked these questions, what, if anything, did you
12  observe about the passenger?
13  A.   He had a blank stare on his face.   He was staring straight
14  ahead, and he was breathing heavily.
15  Q.   What else, if anything, did you notice about the passenger?
16  A.   He had on a longer T-shirt, and he had the T-shirt pulled
17  out over beneath the bottom part of the belt, the seat belt,
18  the lap portion.   It was covered, covering his right, his right
19  leg area.
20  Q.   As you stood there, what, if anything, did you hear Officer
21  Deloren say to the passenger?
22  A.   I heard Officer Deloren ask the passenger if he was okay,
23  and --
24  Q.   And how did the passenger respond?
25  A.   I didn't hear the passenger say anything, but I saw him

SOUTHERN DISTRICT REPORTERS, P.C.                (212) 805-0300

40

64pWcooH                          Parchen - direct

1   shaking his head side to side like he was gesturing no.
2   Q.   And what did you do next?
3   A.   I then looked at Officer Deloren and he gave me a look that
4   something was wrong, wrong with the passenger in the right
5   front.  And --
6               MR. BAUM:  Objection.  Move that that be stricken.
7               THE COURT:  Well, it won't be stricken.  But that's
8   what you took his look to be?
9               THE WITNESS:  Yes.
10  BY MS. STRAUBER:
11  Q.   What did you do next, Officer?
12  A.   I asked the front right passenger to exit the vehicle.
13  Q.   And what else, if anything, did you say to the passenger at
14  that time?
15  A.   As he was exiting the vehicle, he said to me, he said,
16  Officer, he said something like "I have a gun on me," something
17  to that effect.
18  Q.   And what, if anything, had you said to him before he got
19  out of the car?
20  A.   I asked him to exit the vehicle.
21  Q.   When you heard him, when you heard him respond to you, what
22  did you do?
23  A.   At first, I, as he was exiting the vehicle, I stayed as
24  close to him as possible.  I then told him to relax.  I
25  physically turned him around and placed him up against the

41

64pWcooH                        Parchen - direct

1    vehicle, and then I asked him where he had his firearm or gun.
2    He was --
3    Q.  And how did he respond?
4    A.  He responded that he had it in his front right pocket.
5    Q.  After you heard that, what did you do?
6    A.  I reached down towards his front right pocket.  I patted
7    down the pocket area, felt something hard.  I reached in, and I
8    removed a .25 caliber firearm.
9    Q.  And after you removed it, what did you do with it?
10   A.  I immediately handed it to Officer Lynch, who was standing
11   to my left and then I proceeded to put handcuffs on the
12   defendant.
13            MS. STRAUBER:  Your Honor, may I approach.
14            THE COURT:  You may.
15   BY MS. STRAUBER:
16   Q.  Officer, I'm showing you what's marked as Government's
17   Exhibit 1 in evidence.  Please take a look at that.
18        Officer, do you recognize Government's Exhibit 1?
19   A.  Yes.
20   Q.  What is it?
21   A.  That is the gun I pulled from the defendant's front right
22   pocket.
23   Q.  And how do you recognize it?
24   A.  I remember it, the size of it, the color.  It had tape on
25   the handle.  And it has my partner's initials in it.

42

64pWcooH                       Parchen - direct

1   Q.  After you recovered that, what did you do next?
2   A.  After I recovered that, I handed it to Officer Lynch.  I
3   placed the handcuffs on the defendant.  And I started to walk
4   him to the rear of the vehicle, getting him away from where he
5   could reach inside the car.  I didn't know what else was in
6   there.  I then asked him if he had anything else illegal on
7   him, any other weapons, drugs.  He stated, "I have work on me."
8   Q.  What did you understand that to mean?
9   A.  Some type of narcotics.
10  Q.  What did you do after you heard that?
11  A.  I asked him where it was, and he said it was in his front
12  left pocket.
13  Q.  What did you do next?
14  A.  I reached down, I patted down the outside of his front left
15  pocket.  I reached in, and I removed approximately a quarter to
16  a half ounce of crack cocaine.
17  Q.  What, if anything, did the person, what, if anything, did
18  he say to you after you removed it?
19  A.  He kept on stating to me that he was nervous.  I told him
20  he did the right thing by not reaching for his gun.  He said
21  that the drugs he had on him were for personal use.
22  Q.  After you recovered the drugs, what did you do with them?
23  A.  I gave them to Officer Deloren.
24  Q.  And, Officer Parchen, just stepping back to when you
25  observed the passenger in the car, what, if anything, did you

43

64pWcooH                    Parchen - direct

1   observe that indicated to you that he was breathing heavily?
2           MR. BAUM:  Objection to form.
3           THE COURT:  Yes.  Sustained.
4   BY MS. STRAUBER:
5   Q.  Can you describe when you observed the defendant, when you
6   observed the passenger in the car, how he appeared to you?
7   A.  He appeared nervous to me.
8           MS. STRAUBER:  I have nothing further, your Honor.
9           THE COURT:  How did he appear nervous?  Why did he
10  appear nervous?
11          THE WITNESS:  His breathing was unusual for somebody
12  who was sitting in a passenger's seat of a vehicle.  His
13  breaths were more erratic.  His chest was heaving up and down.
14  That's about it.
15          THE COURT:  All right.  Mr. Baum.
16          MR. BAUM:  Thank you, ma'am.
17  CROSS-EXAMINATION
18  BY MR. BAUM:
19  Q.  Officer Parchen, you testified that you conducted a number
20  of arrests.  Do you recall that?
21  A.  Yes.
22  Q.  Would you consider your activity in this case one of those
23  numbers of arrests?
24  A.  No.
25  Q.  And you recovered the drugs, correct?
            SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

44

64pWcooH                          Parchen - cross

1    A.  Yes.
2    Q.  You recovered the weapon, correct?
3    A.  Yes.
4    Q.  You searched Mr. Cooper, correct?
5    A.  Yes.
6    Q.  Were you the arresting officer?
7    A.  No.
8    Q.  What is the criteria for someone to be an arresting
9    officer?
10            THE COURT:  No.  Forget it.  Move on.
11            MR. BAUM:  Okay.  It just, the government offered
12   this, I assume, on the issue of credibility, and that's why I'm
13   inquiring.  If your Honor wants me to move on, I'd be happy to.
14            THE COURT:  Move on.
15            MR. BAUM:  Okay.
16   Q.  You said that the car was speeding.  Do you recall saying
17   that?
18   A.  Yes.
19   Q.  Was the driver issued a ticket for speeding?
20   A.  I do not know.  I know he was issued a summons or two, but
21   I don't know what they exactly are for.
22   Q.  You didn't issue a ticket for speeding, did you?
23   A.  No, I did not.
24   Q.  When you approached the car, you approached from the
25   passenger's side?

45

```
     64pWcooH                    Parchen - cross
 1   A.  Yes.
 2   Q.  And Officer Deloren approached from the driver's side,
 3   correct?
 4   A.  Yes.
 5   Q.  Who spoke first to an occupant of the car, you or Officer
 6   Deloren?
 7   A.  I can't recall.
 8   Q.  Did you hear Officer Deloren say anything to the driver?
 9   A.  I did hear him in conversation.  I heard him asking for his
10   license, driver's license.  At that point, I was attempting to
11   engage a conversation with the front right passenger.  So I
12   don't really know what he said.
13   Q.  And that front right passenger was Mr. Cooper?
14   A.  Yes.
15   Q.  And when you say you were attempting to engage in a
16   conversation, could you tell me what you were asking him?
17   A.  I asked him where they were coming from.  He answered me
18   they're coming from Manhattan.  I asked him where they were
19   heading.  I asked him whose vehicle it was.  I asked him what
20   his name was.
21   Q.  And did he answer those questions?
22   A.  No.
23   Q.  The only --
24   A.  Just the first one.
25   Q.  Just the first one.  And when you asked that question,
```

46

64pWcooH                      Parchen - cross

1  where were you standing?
2  A.  Right where the door and the window meet, on the front
3  right passenger door.
4  Q.  And, again, do you know whether you spoke to him before
5  Officer Parchen said anything, after Officer Parchen, or at the
6  same time?
7           MS. STRAUBER:  Objection.
8           THE COURT:  As to form.  Sustained.
9  BY MR. BAUM:
10  Q.  When you spoke to him, had you heard Officer Parchen ask
11  anybody in the car anything?
12  A.  I am Officer Parchen.
13  Q.  Excuse me.  I apologize.
14        Had you heard Officer Deloren ask anyone in the car
15  anything?
16  A.  I heard it in the conversation, I believe he asked for the
17  passenger's license.  And that's all I really heard him say.
18  Q.  Okay.  And you know that the car has blackened windows,
19  correct?
20  A.  They were tinted.
21  Q.  And is it fair to say that you cannot see in the car with
22  the windows rolled up?
23  A.  At that time of night, it's fair to say.
24  Q.  And do you know whether the window on the passenger's side
25  was rolled up or down?

            SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

47

64pWcooH                          Parchen - cross

1    A.   When I approached the vehicle?
2    Q.   Yes.
3    A.   I recall it being down.  He could have been rolling it down
4    as I was approaching, but by the time I got up to the vehicle,
5    I remember the window being, being down.
6    Q.   And did you ask him to roll the window down?
7    A.   No, I did not.
8    Q.   When you approached the vehicle, did you have your hand on
9    your holster?
10   A.   No, I did not.
11   Q.   Where was the other officer when you were having this
12   conversation with Mr. Cooper?
13   A.   I was with two other officers.  Which one are you talking
14   about?
15   Q.   The one on your side.
16   A.   Officer Lynch was standing approximately three to five feet
17   behind me.
18   Q.   Is it fair to say your weapon was clearly visible at the
19   time?
20   A.   It was visible to me, probably not to Mr. Cooper.
21   Q.   Why is that?
22   A.   Because it's on my right side, and I'm standing looking to
23   my left.
24   Q.   And after you had this conversation that you described with
25   Mr. Cooper, did there come a time when you ordered him out of

             SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

48

64pWcooH                          Parchen - cross

1    the car?
2    A.  Yes.
3    Q.  And when you ordered him out of the car, had he said
4    anything other than what you've already described to the Court?
5    A.  I remember him stating that he was nervous.  I believe it
6    was, it was after I asked him to exit the vehicle.  He kept on
7    saying he was scared, when I was removing the firearm and when
8    I was placing cuffs on him.
9    Q.  Okay.  Let's back up a little bit.  You've testified that
10   you engaged him in some small talk, where are you coming from,
11   what are you doing, things like that, correct?
12   A.  Correct.
13   Q.  And you testified that during the period of time you were
14   engaging him in this conversation, he was seated in the car,
15   correct?
16   A.  Correct.
17   Q.  And he responded to one of your questions, correct?
18   A.  He responded to the first question I asked him, yes.
19   Q.  Did there come a time when you asked him to step out of the
20   car?
21   A.  When he was exiting, before he exited the vehicle, I asked
22   him to exit the vehicle.
23   Q.  So prior to you asking him to exit the vehicle, the only
24   conversation you had had with him was what you have just
25   described, correct?

        SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

49

64pWcooH                          Parchen - cross

1    A.  Correct.
2    Q.  And then you asked him to get out of the car, right?
3    A.  Yes.
4    Q.  And did you open the car door for him?
5    A.  No.  He was opening the door himself.
6    Q.  And when you asked him to get out of the car, were you
7    standing right there at the door where he gets out?
8    A.  Yes.
9    Q.  And was Officer Lynch also standing right there at the door
10   where he gets out?
11   A.  I wasn't looking behind me.  I'm assuming Officer Lynch was
12   standing a few feet behind me.
13   Q.  And as soon as he got out, did you begin to pat him down?
14   A.  Yes.
15   Q.  And after you patted him down, did you ask him if he had
16   anything on him?
17   A.  I quite possibly could have.  I don't recall.
18   Q.  Is it fair to say that it was during the pat down that
19   there was a conversation about a gun?
20   A.  During the pat down?
21   Q.  Yes.
22   A.  Yes, there was.
23   Q.  Now, you testified that his shirt was out over the lap belt
24   of the seat belt, correct?
25   A.  Correct.

          SOUTHERN DISTRICT REPORTERS, P.C.              (212) 805-0300

50

64pWcooN                          Parchen - cross

1    Q.   And you didn't see him pull his shirt out and pull it over
2    the lap belt, did you?
3    A.   No, I did not.
4    Q.   In other words, when you got there, his shirt was already
5    out over the lap belt?
6    A.   Yes.
7    Q.   Were you present when Mr. Cooper wrote out a written
8    statement?
9    A.   No, I was not.
10             MR. BAUM:   I have no further questions, Judge.
11             MS. STRAUBER:   Your Honor, if I could just have a
12   moment.
13             THE COURT:   Sure.
14             MS. STRAUBER:   Your Honor, I have only a few
15   questions.
16             THE COURT:   Fine.   You can ask as many as you want.
17   REDIRECT EXAMINATION
18   BY MS. STRAUBER:
19   Q.   Officer Parchen, on cross-examination, you were asked some
20   questions regarding a discussion with the defendant during the
21   pat down, is that right?   Do you remember that?
22   A.   Correct.
23   Q.   Prior to the pat down, did the defendant --
24             THE COURT:   No, no.   No "did the."
25   BY MS. STRAUBER:

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

51

64pWcooH                        Parchen - redirect
1    Q.  Prior to the pat down, what, if anything, did the defendant
2    say to you?
3    A.  He said something to the effect that he had a gun on him.
4    While I was patting him down, he stated the gun was in his
5    right pocket, because I asked him where it was.
6            MS. STRAUBER:  Nothing further.  Thank you.
7    RECROSS-EXAMINATION
8    BY MR. BAUM:
9    Q.  The statement that you testified to prior to the pat down,
10   did that occur after you ordered him out of the car?
11   A.  Which statement are you talking about?
12   Q.  Well, you said that prior to the -- you just said that
13   prior to the pat down, Mr. Cooper said something about having a
14   weapon.
15   A.  Correct.
16   Q.  And did that occur after you had ordered him out of the
17   car?
18   A.  Correct.
19   Q.  And after you had ordered him out of the car, was that
20   statement and the pat down simultaneous, at the same time?
21   A.  He had to exit the vehicle first, before I could pat him
22   down.
23   Q.  Okay.  So after he exited the vehicle, and you began to pat
24   him down, was that when he made this statement, I have a weapon
25   on me?
          SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

52

64pWcooH                              Parchen - recross

1   A.  No.  He was exiting the vehicle.  He had one foot on the
2   pavement.  He was stepping out, and he kind of gestured with
3   his hands halfway up.  And he says, Officer, something to the
4   effect that he had a gun on him.  I said okay, calm down.
5   Q.  At that point, did you withdraw a weapon?
6   A.  Which --
7   Q.  Did you take out your weapon?
8   A.  No, I did not.
9   Q.  Did you take, did you throw him against the car?
10  A.  No, I did not.
11  Q.  Did you ask him to do anything?
12  A.  I asked him to turn around.
13  Q.  So, Mr. Cooper exits the vehicle and says, I have a weapon,
14  and you did not place your hands on him or take any actions to
15  take him into custody, is that what you're saying?
16  A.  I physically, as I'm asking him to turn around, I'm close
17  to him.  I have my arms around him so he can't reach for any
18  weapons, and as he's -- he's complying with me totally, he's
19  turning around, I'm right next to him with my arms next to his
20  so, God forbid, he reached down I could hold his arms up.
21  Q.  Prior to Mr. Cooper exiting the vehicle, did you hear
22  Officer Deloren ask the driver whether he had ever been
23  arrested before?
24          MS. STRAUBER:  Objection.  It's beyond the scope of
25  redirect.

53

64pWcooH                    Parchen - recross

1              THE COURT:  It certainly is, but I'll allow it.
2              THE WITNESS:  Can you repeat that, please.
3              MR. BAUM:  Can it be read back, your Honor?
4              THE COURT:  Prior to Mr. Cooper exiting the vehicle,
5    did you hear Officer Deloren ask the driver whether he had ever
6    been arrested before.
7    A.  I don't recall.
8              MR. BAUM:  No further questions.
9              THE COURT:  All right.  Anything else?
10             MS. STRAUBER:  No, your Honor.
11             THE COURT:  You may step down, Officer Parchen.  Thank
12   you.
13             (Witness excused)
14             THE COURT:  Ms. Strauber.
15             MS. STRAUBER:  The government rests.
16             THE COURT:  Mr. Baum, do you wish to --
17             MR. BAUM:  Yes, I have a witness, Judge.
18             THE COURT:  All right.
19             MR. BAUM:  We'd like to call James Cox.  I believe
20   he's in the hall.  May I get him.
21             THE COURT:  Yes.  Ms. Strauber, may I see Government's
22   Exhibits 1 and 2, please.
23   JAMES TERRELLE COX,
24        called as a witness by the Defendant,
25        having been duly sworn, testified as follows:

          SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300