64pWcooH                    Parchen - recross                    54

1           THE COURT:  You may proceed, Mr. Baum.
2    DIRECT EXAMINATION
3    BY MR. BAUM:
4    Q.  Mr. Cox, do you own a car?
5    A.  Yes.
6    Q.  What kind of car?
7    A.  '94 Honda Accord.
8    Q.  And where were you on the evening of September 6, 2005?
9    A.  I was in the Bronx.
10   Q.  At approximately 11 p.m.?
11   A.  I was in the Bronx on, I think it was about 233rd Street.
12   Q.  And when you say you were in the Bronx at 233rd Street,
13   were you walking, driving?
14   A.  I was driving.
15   Q.  And what car were you in?
16   A.  In my, in my vehicle.
17   Q.  And did there come a time when you got stopped?
18   A.  Yes.
19   Q.  And, by the way, what kind of windows are on that car?
20   A.  I have tinted windows.  They're black like limo tint.
21   Q.  And when you say they're black, can someone see inside the
22   car from the outside?
23   A.  No, you can't.
24   Q.  I'd like to show you what I've marked for identification as
25   Defense Exhibits collectively A, B, and C, and ask you if you

            SOUTHERN DISTRICT REPORTERS, P.C.
                                        (212) 805-0300

64pWcooH                    Cox - direct                              55

1    can identify those photographs.
2    A.  Yeah, this is my car.
3    Q.  Are those a fair and accurate representation of your car,
4    the way it looked on the evening of September 6, 2005?
5    A.  Yes.
6              MR. BAUM:  I now offer them into evidence.
7              MR. BRODSKY:  Could we take a look at them first?
8              MR. BAUM:  Yeah, sure.
9              MS. STRAUBER:  Your Honor, I'd like to voir dire on
10   Exhibit C.
11             THE COURT:  Certainly.
12   VOIR DIRE EXAMINATION
13   BY MS. STRAUBER:
14   Q.  Mr. Cox, I'm showing you what's been marked for
15   identification as Defense Exhibit C.
16             MS. STRAUBER:  Your Honor, may I stand up here with
17   the witness, so I may question him about this photograph.
18             THE COURT:  Why don't you go back to the lectern,
19   unless -- or, Mr. Baum, why don't you approach, too, so you can
20   make sure you hear what Ms. Strauber is saying.
21             MR. BAUM:  No problem.
22   BY MS. STRAUBER:
23   Q.  Can you describe what this photograph is depicting?
24   A.  Somewhere like the pillow of the passenger seat of my
25   vehicle, but the window's down.

          SOUTHERN DISTRICT REPORTERS, P.C.
                                        (212) 805-0300

64pWcooH                          Cox - direct                              56

1    Q.  And when was this pillow that's in the passenger's seat
2    placed in the vehicle?
3    A.  I don't know.
4    Q.  Did you take that photograph, sir?
5    A.  No, I didn't.
6    Q.  Did you place that pillow --
7    A.  No, I didn't.
8    Q.  -- in that vehicle?
9           MS. STRAUBER:  Your Honor, I would object to the
10   admission of Defense Exhibit C.  I'm not sure what it is a
11   representation of.
12          MR. BAUM:  May I ask a question.
13   BY MR. BAUM:
14   Q.  Other than the pillow, is that a fair and accurate
15   representation of the passenger's seat and the seat belts in
16   that vehicle, as it existed September 6?
17   A.  Yes.
18          MR. BAUM:  I now offer it into evidence.
19          MS. STRAUBER:  Same objection.
20          THE COURT:  Do you have any objection to A and B?
21          MS. STRAUBER:  I don't have an objection to A and B,
22   your Honor.
23          THE COURT:  Defense Exhibits A and B received in
24   evidence.
25          (Defendant's Exhibits A-B received in evidence)
             SOUTHERN DISTRICT REPORTERS, P.C.
                                          (212) 805-0300

64pWcooH                          Cox - direct                              57

1           THE COURT:  Where is the pillow?  Is it on the seat?
2           MR. BAUM:  Yes, Judge, so you can close the seat belt.
3    You can't close the seat belt, unless --
4           THE COURT:  May I see it.
5           MR. BAUM:  Of course.  Your Honor, it's being offered
6    only for the purpose of demonstrating that the passenger's seat
7    had a seat belt that covers the chest and the lap.
8           THE COURT:  I don't know that that was ever an issue.
9           MR. BAUM:  Well, it may come out in the defense case.
10   I'm not sure it's an issue either, but it's going to, obviously
11   it's just an issue that we're going to bring out.
12          THE COURT:  All right.  I'm not going to receive this
13   in evidence at this time.  I also notice that the seat is in a
14   full upright position, which may or may not be the way it was
15   at the time.  It's not particularly helpful, plus, is this
16   through the window with the door closed?
17          MR. BAUM:  With the door closed and the window open.
18          THE COURT:  Okay.
19          MR. BAUM:  I'll let your Honor look at these if you
20   wish.
21          THE COURT:  A and B are received in evidence.
22          MR. BAUM:  Thank you, your Honor.
23   BY MR. BAUM:
24   Q.  Now, when the car was stopped, did an officer approach the
25   car on your side of the car?

          SOUTHERN DISTRICT REPORTERS, P.C.

                                        (212) 805-0300

```
      64pWcooH                    Cox - direct                        58
 1    A.  Yes.
 2    Q.  And, at that time, was your window up or down?
 3    A.  Window was up when he approached.  When he first approached
 4    me it was up.
 5    Q.  And what happened after he got up to your side of the car?
 6    A.  I rolled the window down and asked him what was he stopping
 7    me for.  I rolled the window down and asked him why, what was
 8    the reason for stopping me.
 9    Q.  And what did he say?
10    A.  My windows tints and I think improper lane change, or
11    something.
12    Q.  And did he ask you any other questions?
13    A.  Yes.
14    Q.  Tell the Court what he asked you and what you responded.
15    A.  He asked me, have I, have I been incarcerated before.
16    Q.  And what did you say?
17    A.  I told him yes.
18    Q.  And what else did he ask you?
19    A.  He asked me for what.
20    Q.  And what did you say?
21    A.  And I hesitated and I told him for possession.
22    Q.  And what happened after that?
23    A.  Then he proceeded to tell me to get out of the car so he
24    could search me.
25          THE COURT:  Possession of what?
       SOUTHERN DISTRICT REPORTERS, P.C.
                                              (212) 805-0300
```

64pWcooH                    Cox - direct                         59

1      THE WITNESS:  What I was -- of a weapon.
2      THE COURT:  Okay.
3  BY MR. BAUM:
4  Q.   And when that occurred, prior to that happening, had you
5  heard that officer on your side of the car ask any questions of
6  anyone else in the car?
7  A.   Not at all.
8  Q.   Who else was in the car?
9  A.   Tyrone.
10  Q.   You know him as Tyrone?
11  A.   Yes, David.
12  Q.   And are you, how do you know him?
13  A.   He's my cousin.
14  Q.   And where was he seated in the car that night?
15  A.   About a few inches across in the passenger's seat.
16  Q.   So prior to the officer asking you to get out of the car,
17  had you heard him ask anything of Tyrone Cooper?
18  A.   Not at all.
19  Q.   And, by the way, when the officer asked you to get out of
20  the car, did you get out of the car?
21  A.   Yes.
22  Q.   Before you got out of the car, did you see Mr. Cooper
23  seated next to you?
24  A.   Did I -- repeat that.
25  Q.   Could you see him seated next to you?
       SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

```
      64pWcooH                    Cox - direct                    60
 1    A.  Yes.
 2    Q.  Were his hands moving in any direction?
 3    A.  No.  It wasn't moving.
 4    Q.  Did he appear to you to be nervous?
 5          THE COURT:  No.  How did he appear to you.  This is
 6    direct examination.
 7          MR. BAUM:  Yes.
 8    BY MR. BAUM:
 9    Q.  How did he appear to you?
10    A.  I wasn't actually paying too much attention.  I'm not too
11    for sure, but he was, you know, being his self.  You know, he
12    was his self.
13    Q.  Did you hear him say anything to the officer?
14    A.  There was no communication at all.
15    Q.  After the officer asked you out of the car, what happened
16    with Mr. Cooper, did you notice?
17    A.  I'm not for sure.
18    Q.  After you were asked out of the car, what did you observe,
19    if anything?  What happened?
20    A.  Well, they just started to search me up, and I wasn't
21    really paying so much attention to what was going on from the
22    other officers, you know, from what the other officers was
23    doing.  But they proceeded to search me.
24    Q.  Prior to getting out of the car, do you know whether
25    Mr. Cooper's window on the passenger's side was up or down?
          SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

```
      64pWcooH                    Cox - direct                    61
 1    A.   Repeat that.
 2    Q.   Prior to you getting out of the car --
 3    A.   It was up.  Before, all the windows were up when they
 4    stopped me.
 5    Q.   Did you see Mr. Cooper roll down the window at any time
 6    prior to you getting out of the car?
 7    A.   No.  I'm not too for sure.  I don't remember.  I can't
 8    remember.
 9    Q.   When you were asked out of the car, what happened to you,
10    exactly?
11    A.   They brought me to the back and proceeded to search me,
12    and, that was it.  They just started searching me.
13    Q.   Did you hear Mr. Cooper saying anything?
14    A.   No.  I wasn't, no.
15    Q.   Have you ever been convicted of a crime?
16    A.   Yes.
17    Q.   And what crime was that?
18    A.   Illegal possession.
19    Q.   Of what?
20    A.   Of a weapon.
21    Q.   And is that what you said to the officer?
22    A.   Yes.
23    Q.   Was it immediately after making that statement that the
24    officer ordered you out of the car?
25    A.   Yes.
          SOUTHERN DISTRICT REPORTERS, P.C.         (212) 805-0300
```

62

64pWcooH                          Cox - direct

1   Q.   And when you got out of the car, were you searched
2   immediately, or was there a period of time before being
3   searched?
4            THE COURT:  Yes.  Don't answer it.  Please.
5            MS. STRAUBER:  Objection.
6   BY MR. BAUM:
7   Q.   How long elapsed after you got out of the car before they
8   began to search?
9   A.   Before I got out of the car, they told me to put my hands
10  up and proceeded to search me.
11           MR. BAUM:  I have no further questions.
12           MS. STRAUBER:  Your Honor, if I could just have a
13  moment.
14           THE COURT:  Yes.  In fact, why don't we take a brief
15  morning recess, about ten minutes.  We'll come back after that.
16           (Recess)
17           THE COURT:  Please be seated.
18           MR. BAUM:  Your Honor, I'd like to ask just one more
19  question.
20           THE COURT:  You're still under oath, Mr. Cox.
21           Mr. Baum.
22  BY MR. BAUM:
23  Q.   Mr. Cox, when you were ordered out of the car, where was
24  Mr. Cooper?
25  A.   I think they told him to get out too, as soon as they told
        SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

```
64pWcooH                        Cox - direct
```
1   me to get out.
2              MR. BAUM:  Thank you, your Honor.
3              THE COURT:  Ms. Strauber.
4              MS. STRAUBER:  Yes, your Honor.  I have just a few
5   questions.
6   CROSS-EXAMINATION
7   BY MS. STRAUBER:
8   Q.  Mr. Cox, Mr. Cooper is your cousin, right?
9   A.  Yes.
10  Q.  And you've known him for a long time, haven't you?
11  A.  Yes.
12  Q.  And is it fair to say that you're close to him?
13  A.  Yeah.
14  Q.  And is it also fair to say that you don't want to see
15  anything bad happen to your cousin?
16  A.  Yes.
17  Q.  Now, that night, September 6, you were driving your car, is
18  that right?
19  A.  Yes.
20  Q.  And when did Mr. Cooper get into your car?
21  A.  I can't remember --
22              MR. BAUM:  Objection.  Beyond the scope.
23              THE COURT:  Yes.  Sustained.
24  BY MS. STRAUBER:
25  Q.  When the car was stopped that evening, one officer

64

64pWcooH                    Cox - cross
1    approached the driver's side window, right?
2    A.   Yes.
3    Q.   And that officer was standing right next to where you were
4    sitting in the car, right?
5    A.   I can't -- yeah.  Yeah, he was standing right there.
6    Q.   And that officer talked to you, didn't he?
7    A.   Yes.
8    Q.   And he asked you questions, right?
9    A.   Yes.
10   Q.   And you spoke to him, right?
11   A.   Yes.
12   Q.   You answered his questions, didn't you?
13   A.   Yes.
14   Q.   And you looked at him when you were answering his
15   questions, didn't you?
16   A.   Yes.
17   Q.   And you were focused on him, right?
18   A.   Yes.
19   Q.   You were paying attention to him because he was asking you
20   the questions, right?
21   A.   Yes.
22        MS. STRAUBER:   I have nothing further, your Honor.
23   REDIRECT EXAMINATION
24   BY MR. BAUM:
25   Q.   How far away was David Cooper from you while you were
         SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

65

64pWcooH                          Cox - redirect

1   seated in the front passenger's seat?
2   A.  It's about five or six inches wide, if that, right next to
3   me, like right here.  Right here.
4   Q.  And when the officer on your side was asking you questions,
5   were you looking at the officer the entire time he was asking
6   you questions?
7   A.  I was like, I can't remember really what I was doing, but I
8   was just, you know, answering whatever he was asking me, kind
9   of happened quick.
10              MR. BAUM:  No further questions.
11              THE COURT:  Mr. Cox, what did the officer ask you to
12   show him or give to him?
13              THE WITNESS:  My driver's license and registration.
14              THE COURT:  Where is the registration?
15              THE WITNESS:  Where was the registration?
16              THE COURT:  Where do you keep the registration?
17              THE WITNESS:  It was in the armrest.
18              THE COURT:  And what about your license?
19              THE WITNESS:  In my back pocket.
20              THE COURT:  So in order to get the registration, what
21   did you have to do?
22              THE WITNESS:  I just lifted up and dig inside and --
23              THE COURT:  Did you look at it?
24              THE WITNESS:  Yeah.
25              THE COURT:  Or did you just dig inside hoping you

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

```
                                                                    66
        64pWcooH                     Cox - redirect
1    would hit it?
2              THE WITNESS:  No.  It's a compartment right on top of
3    the armrest.  Once it lifts up, it's like right there, and you
4    can pull it right out.
5              THE COURT:  All right.  Any further questions?
6              MR. BAUM:  Nothing further, your Honor.
7              MS. STRAUBER:  Nothing further, your Honor.
8              THE COURT:  Thank you, Mr. Cox.  You may step down.
9              (Witness excused)
10             MR. BAUM:  Your Honor, we'd like to call David Tyrone
11   Cooper to the witness stand.
12      TYRONE DAVID COOPER,
13          Defendant, called as a witness, having
14          been duly sworn, testified as follows:
15   DIRECT EXAMINATION
16   BY MR. BAUM:
17   Q.  Mr. Cooper, do you recall where you were on the evening of
18   September 6, 2005, at about 11 p.m.?
19   A.  Bronx Boulevard.
20   Q.  And specifically, where were you, on the street?
21   A.  On the street, in a car.
22   Q.  And whose car were you in?
23   A.  In my cousin's car.
24   Q.  And what's the name of your cousin?
25   A.  James Cox.
           SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

```
                                                                67
      64pWcooH                       Cooper - direct
1     Q.  What kind of car is it?
2     A.  Honda Accord.
3     Q.  And did there come a time when the car was stopped?
4     A.  Yes.
5     Q.  Could you tell the judge what happened when the car was
6     stopped?  Try and speak a little bit into the microphone.
7               THE COURT:  Yes, that would be good.
8     A.  We was pulled over around, I think, 236 Street and Bronx
9     Boulevard.  And we saw some of the flashes behind us.  As soon
10    as the flashes, my cousin pulled over to the right.  I seen the
11    officer come to his side and I seen the officer come to my
12    side.  I didn't see the third officer.  Then the officer asked
13    my cousin, tapped on the window, asked him to bring the window
14    down.
15    Q.  And did you hear the officer say anything to your cousin?
16    A.  He asked for his license and registration.
17    Q.  Did you hear your cousin respond in any way?
18    A.  I seen him going and go reach for his license and
19    registration.
20    Q.  And what else did you hear the officer say?
21    A.  Then I asked, he asked him if he was ever incarcerated
22    before.
23    Q.  And what did you hear your cousin say?
24    A.  He didn't say it at first, but then -- but then the officer
25    pursued again saying we going to find out when we search the
              SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

68

64pWcooH                           Cooper - direct

1    license, and he told him he's been incarcerated for a weapon.
2    Q.   And what happened after that?
3    A.   As soon as he said he'd been incarcerated for a weapon, the
4    officer on his side asked him to get out the car.
5    Q.   And where were you at that point?
6    A.   I was in the front passenger seat.
7    Q.   And prior to the driver, Mr. Cox, getting out of the car,
8    had the officers said anything to you?
9    A.   No.
10   Q.   Had he asked you any questions?
11   A.   No.
12   Q.   And I'm asking about the officer on the driver's side.  Had
13   he asked you any questions?
14   A.   No.
15   Q.   Was there another officer on the passenger's side where you
16   were?
17   A.   Yes.
18   Q.   By the way, when you were seated in the passenger seat, can
19   you describe to the Court how you were seated?
20   A.   I wasn't really sitting too straight up, but I was leaning
21   back a little bit with my seat belt on.
22   Q.   And --
23   A.   With my hand to my lap.
24   Q.   Would you describe the seat belt, what kind of seat belt?
25   A.   The seat belt was a shoulder, over my shoulder strap.

                SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

69

64pWcooH                          Cooper - direct
1   Q.  Were there any other straps from the seat belt to cover
2   your body?
3   A.  From my waist.
4   Q.  And how did you have your shirt in relation to the seat
5   belt?
6   A.  My shirt was over my lap because I have a large shirt, so
7   it just went, my seat belt just went right over it.
8   Q.  From the time that you were stopped, did there come a time
9   when you were ordered out of the car, when someone ordered you
10  out of the car?
11  A.  I was ordered out of the car after the officer on my side
12  opened the door and he asked me to get out the car.
13  Q.  Prior to that happening, had the officer on your side asked
14  you any questions?
15  A.  No.
16  Q.  What was your physical condition that night as you sat in
17  the car?
18  A.  I was stable.  I was normal.  I was calm.  I was just
19  looking upon what was the reason for them to ask my cousin out
20  the car.
21  Q.  Where were your hands?
22  A.  On my lap.
23  Q.  Were they moving in any direction?
24  A.  No.
25  Q.  How did you feel in terms of your physical condition?
        SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

70

64pWcooH                          Cooper - direct

1    A.  I was normal.  I was fine.  I wasn't nervous.  I wasn't
2    sweating.  My condition was all right.
3    Q.  Tell the Court what happened after your cousin was asked
4    out of the car.  Exactly what happened?
5    A.  Well, after a minute, he was asked out the car.  The
6    officer on my side opened the car door and asked me to get out.
7    As soon as I exited to get out the car and I stood up, I seen
8    there was an officer to my right side in front of me.  And the
9    car door was still open so I had nowhere to move, so I felt
10   like I was being detained.  And then he asked me to turn
11   around, put my hands on top of the roof of the car.
12   Q.  At that point, when he asked you to put your hands on top
13   of the roof of the car, had you said anything to him?
14   A.  No.
15   Q.  Had he asked you any other questions at that point?
16   A.  No.
17   Q.  What happened then?
18   A.  He proceeded to search me.  He came from my, up to my
19   shoulders, around my underarms, and as soon as he came to my
20   waist, patted to my waist down, he patted to my pocket and felt
21   something and asked me if I had anything on me.  And that's
22   when I told him I have a gun on me.
23   Q.  And when you made that statement, had he already begun to
24   pat you down?
25   A.  Yes.

         SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

71

64pWcooH                              Cooper - direct

1    Q.   And what happened after you made that statement?
2    A.   After I made that statement, he asked me where the gun was
3    at.  I said that he had felt it in my pocket.  He knew it was
4    in my right pocket, and he pulled it out my right pocket.
5    Q.   And did he ask any questions, any other questions after
6    that?
7    A.   He continued to pat me down, asked if I had anything else
8    on me, and I told him I had in my left back pocket, I had, I
9    had a substance of crack.
10   Q.   Did there come a time later that night when you were given
11   your Miranda warnings?
12   A.   Yes.
13   Q.   And did there come a time when you gave a written
14   statement?
15   A.   Yes.
16   Q.   I'd like to show you Government's Exhibit 3, which is in
17   evidence, and ask you if that's the statement that you gave.
18   A.   Yes.
19   Q.   Was that statement truthful?
20   A.   Yes.
21   Q.   Did anybody tell you what to say?
22   A.   No.
23   Q.   And in reference to the, your search and your being --
24   withdrawn.
25        Did you write part of that statement --
          SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

72

64pWcooH                    Cooper - direct

```
 1              THE COURT:  No, no, no, no.
 2              MS. STRAUBER:  Objection.
 3              THE COURT:  It's already objectionable.
 4              MR. BAUM:  Okay.
 5              THE COURT:  Rephrase the question.
 6              MR. BAUM:  I will.  Thank you, Judge.
 7    Q.  What did you write in that statement concerning when the
 8    gun was found on your person?
 9    A.  I wrote in the process of him searching me, he asked me a
10    question, if I had anything on me, and I told him that I had a
11    gun on me.
12    Q.  Have you ever been convicted of a felony?
13    A.  No.
14    Q.  Have you ever been convicted of a misdemeanor?
15    A.  Yes.
16    Q.  What have you been convicted of?
17    A.  A misdemeanor for a weapon.  And for selling to an
18    undercover officer.
19    Q.  What kind of, when you say selling, selling drugs?
20    A.  Yes.
21    Q.  What kind of drugs?
22    A.  Weed.
23    Q.  Was that a misdemeanor or felony?
24    A.  Misdemeanor.
25    Q.  When you say "weed," you mean --
```

SOUTHERN DISTRICT REPORTERS, P.C.              (212) 805-0300

73

```
64pWcooH                        Cooper - direct
 1   A.  I mean marijuana.
 2            MR. BAUM:  Okay.  No further questions, your Honor.
 3            THE COURT:  Ms. Strauber.
 4            MS. STRAUBER:  Your Honor, if I could have a moment.
 5            THE COURT:  Yes, you may.
 6            MS. STRAUBER:  Your Honor, the government is ready and
 7   has a few questions.
 8   CROSS-EXAMINATION
 9   BY MS. STRAUBER:
10   Q.  Mr. Cooper, on September 6, 2005, you were stopped by the
11   police while you were driving in the Bronx, correct?
12   A.  Yes.
13   Q.  And it was at night, right?
14   A.  Yes.
15   Q.  And you were in the area of Bronx Boulevard and 236th
16   Street when you were stopped, right?
17   A.  Yes.
18   Q.  You weren't alone, were you?
19   A.  No.
20   Q.  Your cousin was in the car, right?
21   A.  Yes.
22   Q.  And that's James Cox, correct?
23   A.  Yes.
24   Q.  He was driving the car?
25   A.  Yes.
            SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

74

64pWcooH                         Cooper - cross

1    Q.  You were sitting in the front passenger's seat, right?
2    A.  Yes.
3    Q.  And the car you were in was a red Honda, right?
4    A.  Yes.
5    Q.  And it had dark tinted windows, didn't it?
6    A.  Yes.
7    Q.  And those tints were on the front, passenger, and driver
8    windows as well as the back windows, correct?
9    A.  Yes.
10   Q.  And right before your car was stopped, the car swerved
11   around another car that was waiting at an intersection, didn't
12   it?
13   A.  No.
14   Q.  Your car didn't swerve around another car that was stopped
15   at the intersection immediately before you were pulled over, is
16   that your testimony?
17   A.  Yes, it is.
18   Q.  After your car was pulled over, two officers approached
19   your side of the vehicle, right?
20   A.  Not that I know of.  I only noticed that it was one.  I
21   didn't know that there was another one until I got out the car.
22   Q.  One officer approached the driver's side, right?
23   A.  Yes.
24   Q.  And you put the front passenger side window down as the
25   officers approached, isn't that right?

          SOUTHERN DISTRICT REPORTERS, P.C.
                                    (212) 805-0300

64pWcooH

Cooper - cross                                    75

1    A.  No.
2    Q.  You put the front passenger side window down at some point
3    after the officers had approached the car, right?
4    A.  No.
5    Q.  Did you put the, you put the front passenger side window
6    down at some point prior to exiting the car, didn't you?
7    A.  No.
8    Q.  So is it your testimony, sir, that you sat in the car with
9    the window rolled up as the officers stood outside?
10   A.  Yes.
11   Q.  Is that your testimony?
12   A.  Yes.
13   Q.  The driver's side window was rolled down, is that correct?
14   A.  Yes.
15   Q.  But it's your testimony that that was the only window that
16   was rolled down in the car?
17   A.  Yes.
18   Q.  And so as you were sitting in the car, you couldn't see --
19   did you see any officers on your side of the car?
20   A.  All I could see is one.  I can't see out the tints.  The
21   tints was too dark, so I couldn't see the second officer
22   because I wasn't moving, looking around.  I just seen to my
23   right and I seen somebody standing right there.
24   Q.  And those officers never knocked on the window and asked
25   you to roll the window down, did they?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

76

64pWcooH                          Cooper - cross

1   A.  No.
2   Q.  And it's your testimony that the officer on the driver's
3   side of the car didn't request that the passenger side window
4   be rolled down?  Is that your testimony?
5   A.  Yes, it is.
6   Q.  So no officer said anything to you or indicated in any way
7   that you should roll down your window, is that your testimony?
8   A.  Yes, it is.
9   Q.  Now, you testified on direct examination that when the car
10  was stopped, you weren't nervous, is that right?
11  A.  Yes.  I wasn't.
12  Q.  In fact, you testified that you felt calm?
13  A.  Yes.
14  Q.  You testified that you felt normal, is that right?
15  A.  Yes.
16  Q.  And when the officers approached your car, one officer on
17  the driver's side, one on the passenger's side that you could
18  see, you still didn't feel nervous, did you?  Is that your
19  testimony?
20  A.  Yes, I didn't feel nervous.
21  Q.  In fact, you continued to feel calm?
22  A.  Exactly.
23  Q.  Is that right?
24  A.  Yes.
25  Q.  Now, you knew that your car had just been stopped by the

            SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

64pWcooH                        Cooper - cross                          77

1   police, didn't you?
2   A.  Yes.
3   Q.  You knew that the officer who was at the driver's side was
4   a police officer, right?
5   A.  Yes, I did.
6   Q.  And you knew that you had drugs in your pocket, didn't you?
7   A.  Yes, I did.
8   Q.  In fact, you knew that you had crack in your pocket, right?
9   A.  Yes.
10  Q.  And you knew that you had a specific amount of crack in
11  your pocket, didn't you?
12  A.  Yes.
13  Q.  In fact, you had 17 grams of crack in your pocket, right?
14  A.  Yes.
15  Q.  And you knew that it wasn't legal for you to have 17 grams
16  of crack in your pocket, right?
17  A.  Yes.
18  Q.  You also knew that you had a gun on you, right?
19  A.  Yes.
20  Q.  And you knew that that gun had a scratched off serial
21  number, didn't you?
22  A.  Yes.
23  Q.  And you knew that that gun was loaded, didn't you?
24  A.  I don't know.  There was one in the chamber.  I didn't see
25  nothing in the chamber, but I knew it was loaded.  There was

64pWcooH                    Cooper - cross                          78

1    bullets in the clip.
2    Q.  And you knew that it was working, right, that it could be
3    fired?
4    A.  No, I didn't.
5    Q.  You didn't know whether that gun could be fired or not?
6    A.  No, I didn't.
7    Q.  You knew it wasn't legal for you to have that gun on you,
8    didn't you?
9    A.  Yes.
10   Q.  And you knew that you could be arrested for having that gun
11   on you, right?
12   A.  Yes.
13   Q.  And you knew you could be arrested for having crack on you,
14   right?
15   A.  Yes.
16   Q.  And you know that police officers can make arrests, right?
17   A.  Yes.
18   Q.  And you were on probation at the time that your car was
19   stopped, weren't you?
20   A.  Yes.
21   Q.  But it's your testimony that when these officers approached
22   your car, you were completely calm?
23   A.  Yes.
24   Q.  Now, you told the officers who arrested you that the crack
25   that you had on your person was for personal use, right?

64pWcooH                    Cooper - cross                          79

1   A.  Yes.
2           MR. BAUM:  Objection, your Honor.  There was no
3   testimony of this from Mr. Cooper.  There was testimony brought
4   out on the government's case that there was a statement made
5   about that.  So I object to him being asked about this.  It
6   goes beyond the scope of the hearing and beyond the scope of
7   his direct examination.
8           THE COURT:  Well, if there's a good faith basis for
9   the government to ask it, I will permit it.
10  BY MS. STRAUBER:
11  Q.  Had you used crack in the past 24 hours before your car was
12  stopped, Mr. Cooper?
13          MR. BAUM:  Objection.
14          THE COURT:  Yeah.  That is a little bit beyond.
15  BY MS. STRAUBER:
16  Q.  Had you used crack at any time before your car was stopped?
17          MR. BAUM:  Objection.
18          THE COURT:  I'll allow that.
19          MR. BAUM:  Judge, this is going to, I think, what may
20  be the ultimate issue at trial, and I think the government's
21  trying to do a trial cross-examination here, which would
22  otherwise be inadmissible and has no bearing on the facts of
23  this case and certainly goes beyond the direct.
24          MR. BRODSKY:  Your Honor, if I may, it goes directly
25  to his perception at the time that these events are taking
           SOUTHERN DISTRICT REPORTERS, P.C.
                                          (212) 805-0300

64pWcooH                              Cooper - cross                              80

1    place.
2              THE COURT:  I'll allow it.  You may answer.
3    BY MS. STRAUBER:
4    Q.  In fact, before you went to, before you were incarcerated
5    on this charge, you used crack frequently, didn't you,
6    Mr. Cooper?
7              MR. BAUM:  Objection.
8              THE COURT:  I'll sustain an objection as to the form.
9    BY MS. STRAUBER:
10   Q.  Mr. Cooper, at any time prior to the time that your car was
11   stopped, had you used crack?
12             MR. BAUM:  Objection.
13             THE COURT:  Six years ago, five years ago, two years
14   ago?  When are you talking about here?  Let's put a time frame
15   on that.
16   BY MS. STRAUBER:
17   Q.  Within the week prior to the stop of your car on September
18   6, had you used crack?
19   A.  Within the week, yes.
20   Q.  You used crack a few times a week, Mr. Cooper, is that
21   right?
22             MR. BAUM:  Objection.
23             THE COURT:  I'll sustain that.
24   BY MS. STRAUBER:
25   Q.  Mr. Cooper, you would agree that crack is addictive,
              SOUTHERN DISTRICT REPORTERS, P.C.
                                      (212) 805-0300

64pWcooH                          Cooper - cross                            81

1    wouldn't you?
2              MR. BAUM:  Objection.
3              THE COURT:  I'll sustain that.
4    BY MS. STRAUBER:
5    Q.  Mr. Cooper, were you high on crack at the time that the
6    officers stopped the car?
7    A.  No.
8    Q.  Mr. Cooper, had you been using marijuana the day that the
9    officers stopped the car?
10             MR. BAUM:  Objection.  There's absolutely no
11   testimony.
12             THE COURT:  I'll sustain it.
13   BY MS. STRAUBER:
14   Q.  Mr. Cooper, the crack that you had on you when you were
15   arrested sells for about $400, is that right?
16             MR. BAUM:  Objection.
17             THE COURT:  I'll sustain that.
18   BY MS. STRAUBER:
19   Q.  This wasn't your first arrest for a gun offense, was it,
20   Mr. Cooper?
21   A.  No.
22   Q.  In fact, you were arrested on January 23, 2001, weren't
23   you?
24   A.  Yes.
25   Q.  And that arrest was in Mount Vernon, wasn't it?
            SOUTHERN DISTRICT REPORTERS, P.C.
                                          (212) 805-0300

64pWcooH                           Cooper - cross                           82

1    A.  Yes.
2    Q.  You were at Tenth Avenue and First Street, weren't you?
3    A.  Yes.
4    Q.  And you had a gun in your left coat pocket, didn't you?
5    A.  Yes.
6    Q.  And that gun had six rounds of ammunition in it, correct?
7    A.  Yes.
8    Q.  And it had the serial number scratched off, correct?
9    A.  Not that I remember.
10           MS. STRAUBER:  Let me show you something to see if it
11   refreshes your recollection.
12           MR. BAUM:  Judge, it would be collateral.
13           THE COURT:  Right.
14   BY MS. STRAUBER:
15   Q.  You also had drugs on you when you were arrested for that
16   offense, didn't you?
17   A.  Yes.
18   Q.  In fact, you were smoking marijuana when you were arrested,
19   weren't you?
20   A.  Yes.
21   Q.  And you also had 14 Ziploc bags of marijuana in your pocket
22   on that day, didn't you?
23   A.  Yes.
24   Q.  And when the officers tried to arrest you, you tried to run
25   away, didn't you?

          SOUTHERN DISTRICT REPORTERS, P.C.
                                        (212) 805-0300

```
64pWcooH                        Cooper - cross                    83
 1            MR. BAUM:  Objection.
 2            THE COURT:  Yes.  Let's stick with the current issue
 3    before the Court.
 4            MS. STRAUBER:  I have just a few more questions, your
 5    Honor.
 6            THE COURT:  I hope that they're not about the prior
 7    arrest.
 8    BY MS. STRAUBER:
 9    Q.  You were arrested for selling marijuana on July 9 of 2003,
10    isn't that right?
11    A.  Yes.
12    Q.  And that was also in Mount Vernon, wasn't it?
13    A.  Yes.
14    Q.  And you pled guilty to that offense, didn't you?
15    A.  Yes.
16            MS. STRAUBER:  I have nothing further, your Honor.
17            THE COURT:  Thank you, Ms. Strauber.
18            Mr. Baum.
19            MR. BAUM:  Nothing further, your Honor.
20            THE COURT:  All right.  You may step down, Mr. Cooper.
21            (Witness excused)
22            THE COURT:  Any further witnesses, Mr. Baum?
23            MR. BAUM:  Nothing further from the defense, your
24    Honor.
25            THE COURT:  Anything further witnesses from the
          SOUTHERN DISTRICT REPORTERS, P.C.
                                            (212) 805-0300
```

84

64pWcooH                          Cooper - cross
1  government?
2              MS. STRAUBER:  Nothing further from the government,
3  your Honor.
4              THE COURT:  All right.  We're going to take our
5  luncheon recess.  At 2:30, we will reconvene.  I will hear your
6  arguments, and, at that point, if I feel it is appropriate, I
7  will make my ruling.
8              MR. BAUM:  Would your Honor like to have a posthearing
9  memo from the parties?  I'm prepared to go forward.
10             THE COURT:  No, I wouldn't.  Unless, of course, I
11 change my mind after I hear your stirring summations.
12             MR. BAUM:  I promise it will be stirring.
13             THE COURT:  Enjoy your lunch.
14             (Luncheon recess)
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.              (212) 805-0300

64pWcooH                    Cooper - cross                         85

1                          AFTERNOON SESSION
2                               2:40 p.m.
3              THE COURT:  Good afternoon.  Please be seated.
4              Mr. Baum, would you like to start?
5              MR. BAUM:  Of course, your Honor.
6              I believe that your Honor's decision in this case
7    rests heavily on what facts you adopt.  There were two
8    conflicting versions of events on that night.  I submit to your
9    Honor that the defense version offered through two witnesses
10   was not only consistent with itself but highly credible, more
11   so than the government's version, which was inconsistent in
12   many respects between the two police officers'.
13             The most compelling evidence of the defense version of
14   events, which is as follows, to briefly summarize the defense
15   version, as testified to by the two witnesses:  The car is
16   stopped for a traffic infraction.  We do not contest that there
17   was a traffic infraction;
18             That upon being stopped, that the officer, one officer
19   approached the driver and asked the driver numerous questions;
20             That at some point in the questioning of the driver,
21   he was asked whether he'd ever been arrested or convicted.
22   When the driver said that he had been arrested for possession
23   of a weapon, the officers decided to remove everybody out of
24   the car and search them.  Our version of the events is just
25   that simple.

             SOUTHERN DISTRICT REPORTERS, P.C.

                                          (212) 805-0300

86

64pWcooH

1    It's during the course of the search of Mr. Cooper
2    that he's asked a question as to whether he has anything on
3    him.  And to which he responds.  If your Honor finds that
4    version to be credible, you must suppress not only the physical
5    evidence but the statements as to proof of the initial
6    illegality because if that version is believed, then there was
7    a detention, there was an arrest, and there was a search
8    without probable cause.  Even if the government argues that, if
9    that version of the facts is accepted, even if the government
10   argues that this was a Terry stop, there's an insufficient
11   basis on the defense version of the facts to justify a Terry
12   stop because both defense witnesses said that Mr. Cooper was
13   not asked any questions.  And Mr. Cooper testified he was not
14   evasive, he was not questioned, he was not sweating.  He was
15   not nervous.  He sat in the car.  His seat belt was on, and he
16   was asked to get out when the driver said he'd been previously
17   arrested.
18        At that point, he testified that he believed he was
19   under arrest.  He was told to get against the car, and he was
20   searched, and I submit that that is a very credible set of
21   circumstances that would occur had the officers asked the
22   driver about any prior incidents.  I think it's credible to
23   believe that the officers would have asked by removing the
24   passengers and searching him upon learning that the driver had
25   a prior record for possession of a weapon.

64pWcooH                                                              87

1       But what makes the defense version certainly more
2   credible is one simple compelling piece of evidence that your
3   Honor has.
4           THE COURT:  Government's Exhibit 3.
5           MR. BAUM:  Government's Exhibit 3.
6           At a time when there was no motive to lie, no contact
7   with an attorney, no, I would have to submit to your Honor, of
8   course I'm submitting this as a fact for your Honor to infer,
9   at a time when he has no knowledge of the legal consequences of
10  what has transpired that night, he writes in his statement,
11  when he's asked tell us what happened tonight, he writes, In
12  the process of being searched, I was asked if I had anything on
13  me and I confessed that I have a gun.  That is, I believe,
14  overwhelming evidence that the defense version is accurate and
15  credible.
16          Looking at the government version, I think there were
17  serious inconsistencies between the two officers, most notably
18  on statements, what was said.  The first officer testified that
19  he asked Mr. Cooper certain questions about whether he was
20  feeling okay, Mr. Cooper nodded and mouthed certain words.  The
21  second officer said he never heard that.  Not only that, but
22  the second officer said he asked Mr. Cooper a bunch of
23  questions, and the first officer said that that never happened.
24  That is a major inconsistency in the events.  I submit to your
25  Honor that the testimony about Mr. Cooper covering his pants,

            SOUTHERN DISTRICT REPORTERS, P.C.
                                            (212) 805-0300

88

64pWcooH

1    being nervous, sweating is also inconsistent with the questions
2    I asked the officer about a form he filled out, where it asked
3    him to write down what the physical condition of Mr. Cooper
4    was, and he put down normal.
5           Now, I know that perhaps that can be explained in many
6    different ways.  Nonetheless, it is inconsistent with the
7    testimony that was given.  And as I stated, your Honor, I think
8    it's clear that the two officers' testimony is inconsistent
9    with each other in very major ways.
10          What I think happened here, and it's sad for me to
11   assert this, is that it happened exactly the way the defense
12   said.  Having found the weapons, the officers sought to justify
13   the search, and the way that they sought to justify the search
14   was one of two ways, to say that there was enough basis for a
15   pat down, when Mr. Cooper exited the car, and then just to be
16   sure, to say that Mr. Cooper said "I have a gun."  Not only is
17   that illogical, having seen Mr. Cooper on the witness stand,
18   having heard that he's not a novice to the criminal justice
19   system, that is illogical to believe that he would step out of
20   the car and say I have a gun.  He's been arrested before, and,
21   as I said, he's not a novice.  That doesn't make sense, and
22   it's inconsistent with the testimony the government presented.
23          What we then have is you can adopt part of the
24   government's case and still find that this evidence has to be
25   suppressed.  In what way?  I don't believe that the credible

SOUTHERN DISTRICT REPORTERS, P.C.              (212) 805-0300

89

64pWcooH

1   testimony makes out a sufficient basis, assuming that
2   Mr. Cooper never said I have a gun, assuming he said it just
3   the way he wrote in his statement, that that statement was made
4   during the pat down.  You can adopt that and adopt part of the
5   government's case, but I submit to your Honor the fact that
6   they say he was nervous, sweating, and had a shirt over his
7   pants, does not provide any basis for a pat down, on that
8   alone.
9           I point your Honor to the decision of Judge Motley in
10  United States v. Baptiste, which was in my memo of law.  It's
11  cited at 556 F.Supp. 284.  There are similar facts there, and
12  Judge Motley suppressed the evidence.
13          In Baptiste, the defendant was a passenger in a
14  vehicle.  The vehicle was stopped for a traffic infraction.
15  The passenger was asked to exit from the vehicle.  The
16  testimony at the hearing was that, and I'm quoting, "the
17  passenger was nervous, was fumbling with papers in his hand,
18  and his hands were shaking."  Thereafter, the passenger dropped
19  some of the papers and attempts to hide it by putting his foot
20  over it.  The papers are retrieved.  They find out that there's
21  evidence in the papers.  They then search the car and find
22  drugs, and Judge Motley found that the facts that I just gave
23  to you -- nervous, fumbling with papers, handshaking -- were
24  insufficient basis for a Terry stop.
25          I might add that Judge Motley also said that

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

64pWcooH                                                                    90

1   nervousness, at page 289 of her decision, "nervousness on the
2   part of one stopped by a police officer is not at all unusual."
3   I would submit the second part of what the officer said, which
4   is the shirt over the belt, there is absolutely no basis to
5   believe that that gives suspicion of criminal activity.  If you
6   believe, again, part of the government's witnesses, well, then
7   you have to believe the second officer, that he was, in this
8   sense, that he asked him a question.  I submit this didn't
9   happen, but if your Honor wants to adopt part, he asked him a
10  question, Where are you coming from.  He responded.  He asked
11  him other questions, he didn't respond.  That's not enough for
12  a Terry stop and a search.
13          He made no furtive movements.  He did not pull his
14  shirt over his pants to try and hide something.  There is no
15  testimony of a bulge in his pants.  There's no testimony of
16  fear of any danger of the police officers.  I think on the
17  entire record here, that the defense case is credible.  Again,
18  Government's Exhibit 3 says it all.  It should be totally
19  uncontested.  There is no way to believe that when he wrote
20  that statement, that anything he said there was false and
21  tailored to set himself up for this hearing.  And I submit to
22  your Honor, based on all the evidence, that your Honor should
23  suppress not only the physical evidence but the statements that
24  were made as the fruit of the physical evidence.
25          On the statement part, I would only submit to your
        SOUTHERN DISTRICT REPORTERS, P.C.
                                            (212) 805-0300

91

64pWcooH

 1  Honor that there are certain circumstances under which
 2  statements may be admissible, statements made later, following
 3  a Fourth Amendment violation.  But the government presented no
 4  evidence that would justify the Court to find that the
 5  statements are admissible.  In other words, the government
 6  would have had to show evidence of attenuation or that some way
 7  the taint had been dissipated.  They presented no evidence
 8  whatsoever in that regard.  So we're asking for suppression of
 9  both the physical evidence and the statements.
10          THE COURT:  Thank you, Mr. Baum.
11          Ms. Strauber.
12          MS. STRAUBER:  Yes, your Honor.
13          It's the government's position that the testimony that
14  was heard by the Court this morning established that the
15  officers had reasonable suspicion to believe that the defendant
16  was either involved in or had been involved in criminal
17  activity, or that there was a threat to the officers' safety,
18  as necessary to conduct a brief investigatory detention and
19  pat-down search of the defendant.
20          As the Court is well aware, a police officer can
21  conduct such a detention by stopping an individual to
22  investigate potentially criminal behavior, as long as at the
23  time the officer effects the stop, the officer has reasonable
24  suspicion to believe that criminal activity has occurred or is
25  about to occur.  That type of suspicion is measured by an
        SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

64pWcooH                                                      92

1    objective test and by reviewing the circumstances as a whole,
2    not simply looking at discrete parts of the evidence.  And this
3    is also a test that the Second Circuit has described as not a
4    difficult one to satisfy and sufficiently less demanding than
5    that that's required for probable cause.
6          The evidence that establishes that there was
7    reasonable suspicion here includes the officers' testimony,
8    which, if credited by the Court, makes clear that there was
9    reasonable suspicion here.  The fact that the defendant's
10   testimony was wholly incredible, and the fact that the
11   testimony of Mr. Cox simply does not go to the issues that, the
12   critical facts that establish whether or not there was
13   reasonable suspicion here.
14         So starting with the officers' testimony, both
15   officers testified not only that Mr. Cooper seemed nervous but
16   that he was behaving in a way that gave rise to reasonable
17   suspicion.  First, they testified that he had his shirt pulled
18   up over the lap belt of the seat belt.  Now, it's simply
19   logical to recognize that when you put on a seat belt that has
20   a shoulder belt and a lap belt, it goes over your clothes.  So
21   if an article of clothing that you're wearing that's under your
22   shoulder belt is over the lap belt, it has to be because it was
23   deliberately placed in that position.
24         Second, both of the officers, and both of the officers
25   testified that they observed the defendant's clothing in that

93

64pWcooH

1    position over the lap belt, and specifically that it was, that
2    the article of clothing was primarily over the right side of
3    the lap belt.  And that is consistent with someone who is
4    trying to hide something under that clothing.
5             Second, both of the officers testified that the
6    defendant was breathing heavily.  They also both testified and
7    this is, one testified that he asked the defendant if he was
8    okay, and the defendant said he was not okay.  And my
9    understanding of the record, I think this is contrary to what
10   Mr. Baum said, is that the other officer testified that he
11   heard Officer Deloren ask the defendant if he was okay, and
12   that he saw, he observed the defendant shake his head no.
13            Officer Deloren also testified that he could see sweat
14   on the defendant's forehead and that he was moving his head
15   from side to side, and Officer Parchen testified that when he
16   asked the defendant certain basic questions, questions that the
17   defendant did not have an obligation to answer, but certain
18   basic questions, the defendant failed to answer those basic
19   questions after answering the first one, which involved where
20   he was coming from.
21            Courts have recognized that experienced law
22   enforcement officers like these officers are well positioned to
23   make judgments about the individuals that they encounter and
24   about whether those individuals are behaving in a way that
25   indicates that they could be armed and dangerous, that they

SOUTHERN DISTRICT REPORTERS, P.C.                    (212) 805-0300

94

64pWcooH

1    could have been or could currently be involved in criminal
2    activity.  There's also testimony before the Court that this
3    defendant and this car was stopped in a high-crime area, an
4    area where gun offenses and drug offenses are common, and that
5    too is part of the circumstances that the Court should consider
6    in evaluating whether there was reasonable suspicion here.
7           But, in addition to all of that evidence about how the
8    defendant behaved in the car when the car was stopped, both
9    officers testified that the defendant said at some point before
10   he was patted down that he had a weapon on him, that he had a
11   gun, that he had a gun.  And on these critical facts, the
12   officers' testimony was entirely consistent and it was
13   credible.
14          Now, the defendant's testimony obviously contradicted
15   the officers' account of events.  It's the government's
16   position that the defendant's testimony was simply not
17   credible.  It wasn't credible on small things, such as whether
18   his car had swerved before it was pulled over.  But more
19   importantly, it wasn't credible on two important issues, one,
20   whether the defendant was nervous or not when he was stopped,
21   when his car was stopped by the police, and, two, whether he
22   was asked to or did roll his window down prior to being ordered
23   out of the car.
24          Taking the defendant's testimony about the window,
25   simply, first of all, it's contradicted by the testimony of

         SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

95

64pWcooH

1    both officers.  It's also contradicted by the detailed
2    information that Officer Parchen testified about that he
3    observed through the window as he stood next to the passenger's
4    side of the car.
5             It also simply defies common sense that officers would
6    stop a car, approach on both sides of the car and allow the
7    passenger's side window to remain up so that the officers on
8    the passenger's side of the car would not be able to view the
9    passenger, see what he was doing.  They have arguably a better
10   vantage point than the officer on the driver's side.  It simply
11   makes no sense that they would allow the window to remain
12   raised during the period of that stop.
13            I'll also note that the defendant contends that he was
14   ordered out of the car.  If he was ordered out of the car by
15   Officer Parchen and the window was closed, it's not clear how
16   the defendant could have heard that he was being asked to get
17   out of the car.
18            I think, more importantly, the defendant's testimony
19   that he was entirely calm, appeared normal, was not nervous
20   when the car was stopped is simply incredible.  The defendant
21   acknowledges that he was in possession of crack, that he knew
22   he was in possession of crack, that he was in possession of a
23   gun, it was in his pocket.  For the defendant to say that
24   notwithstanding the fact that he knew he could be arrested, he
25   knew he was engaged in illegal behavior and he knew he was

         SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

96

64pWcooH

1  being stopped by the police, to say that that did not cause him
2  to be nervous and that he remained completely calm just defies
3  common sense.
4       Mr. Baum has pointed to the fact that certain pedigree
5  information described the defendant's physical condition as
6  normal.  It indicates that that casts some doubt on the
7  officers' version of events.  First of all, the fact that
8  someone is breathing heavily and sweating is consistent with a
9  feeling of extreme nervousness, not necessarily with a physical
10 abnormality.  But, more importantly, there's no evidence, and
11 indeed, again, the officers' testimony about doing arrest
12 processing after he returned to the precinct is consistent with
13 the view that that pedigree information, as is typically the
14 case, was not filled out at the scene; it was filled out back
15 at the precinct.  And there's no evidence that the defendant's
16 heavy breathing or sweating continued throughout the period
17 when he was arrested and then brought back to the precinct.
18       Finally, with respect to Mr. Cox's testimony, that
19 testimony is simply not material to the critical facts that the
20 Court has to assess and determine in deciding whether there was
21 reasonable suspicion here.  As Mr. Cox acknowledged repeatedly,
22 he simply didn't pay attention to what was happening with
23 Mr. Cooper.  When he was being asked questions by the officer
24 who was on his sided of the car, he answered those questions.
25 He talked to the officer, he paid attention to him.  When he

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

64pWcooH                                                                97

1    was ordered out of the car and being searched, he said he
2    didn't know what was going on with Mr. Cooper.  He wasn't
3    really paying attention to that.  And, therefore, for all those
4    reasons, it's the government's position that there was
5    reasonable suspicion here, and that the evidence should not be
6    suppressed.
7              THE COURT:  Thank you, Ms. Strauber.
8              I want to ask counsel a few questions.  Ms. Strauber,
9    is it the government's position that when you say that the
10   shirt was pulled over that the shirt was actually outside of
11   the lap part of the belt and over that and over the pants?
12             MS. STRAUBER:  Yes, your Honor.  It's the government's
13   position that the shirt was covering the lap belt which
14   ordinarily would be visible.  And that it was covering, yes,
15   that it was covering the belt and also the defendant's pants
16   would be underneath that, it would be covering the pants as
17   well, and then that it was -- it appeared to be covering
18   primarily the right side of the lap belt.
19             THE COURT:  What kind of pants was he wearing, just
20   out of curiosity?
21             MS. STRAUBER:  Your Honor, I recognize and the Court
22   is aware there was no testimony in the record about the kind of
23   pants that the defendant was wearing.  And actually, I'm just
24   looking at the arrest report, where clothing is described.
25   This is in your Honor's binder, it's the second page of 3501H.
        SOUTHERN DISTRICT REPORTERS, P.C.
                                              (212) 805-0300

64pWcooH                                                                98

1    And I don't see a description there of the type of pants that
2    the defendant was wearing.
3              Your Honor, could I just add some additional remarks?
4         THE COURT:  Sure.
5         MS. STRAUBER:  With respect to Government's Exhibit 3,
6    Mr. Baum has argued that that statement was made
7    contemporaneously with the events that occurred at the arrest
8    and, therefore, that the defendant had no motive to lie.  It's
9    the government's position that that is simply not the case.
10   The defendant, as defense counsel also acknowledged, is not a
11   novice with respect to the criminal justice system.  He has had
12   two prior convictions.  And he had every motive to suggest that
13   there was something possibly deficient about the way that he
14   was searched, though the fact that he made that statement given
15   his experience with the criminal justice system is simply not
16   an indication that the search occurred and the events of this
17   incident occurred as he has said that they did.
18        THE COURT:  Of course, that would mean that he knows
19   the law better than the two officers do.
20        MS. STRAUBER:  Well, only, I suppose, if his version
21   of events, only if his version of events is credited.  But I
22   think the fact that he does have some experience with the
23   criminal justice system suggests that his statement cannot
24   necessarily be taken as simply at face value or without any
25   motive to lie.
         SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

99

64pWcooH

1          MR. BAUM:  May I respond to that.
2          THE COURT:  Not yet.  I have a few more questions.
3      At least one was a misdemeanor.  What was the other
4  one?
5          MS. STRAUBER:  Your Honor, I believe they were both
6  misdemeanors.  One was a criminal sale of marijuana and one was
7  a criminal possession of a loaded firearm.
8          THE COURT:  And he pleaded guilty to both?
9          MS. STRAUBER:  Yes, your Honor.  That was my
10  understanding from reviewing the criminal history.
11          THE COURT:  Mr. Baum.
12          MR. BAUM:  Just on this last point, the government
13  can't have it both ways.  To suggest that he knew what he was
14  doing when he wrote that statement would also suggest that,
15  therefore, he wouldn't be nervous because he would know that
16  they don't have a basis to search him.  It would mean that he
17  wouldn't walk out of the car saying I have a gun on me.
18          You can't just have it both ways, and I think that my
19  argument certainly is, is certainly credible.  He doesn't know,
20  he doesn't know the law.  He just knew this is what happened,
21  and I'm going to write it down.
22          MS. STRAUBER:  Your Honor, if I could just briefly
23  respond to that, on the point that it would be illogical to
24  suggest that he would get out of the car and say I have a gun,
25  that's not illogical.  It's consistent with the defendant's

          SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

64pWcooH                                                              100

1   recognition that he was caught, that he would have been stopped
2   by police, that he was in a car, that he was in possession of a
3   gun and of crack, and that this was a very serious situation
4   for him.  It's the same reason why it's entirely logical to
5   conclude that he was nervous and entirely logical to conclude
6   or to see why he would say I have a gun when he got out of the
7   car, because he knew that he was in trouble.
8              MR. BAUM:  Judge, one word.  Not one word, but one
9   sentence, perhaps.
10             If that is the government's argument, then they're
11  saying he lied when he wrote this statement.  If he accepted
12  that, you got me, I'm caught, I walk out of the car, say I have
13  a gun on me, why does he write in the statement that the gun --
14  he was asked during the process of the search.  They're arguing
15  that he knew he was caught and he was honest.  If he knew he
16  was caught and he was honest, how could he lie in a statement?
17             THE COURT:  All right.  I'm going to take a brief
18  recess.
19             (Recess)
20             MS. STRAUBER:  Your Honor, the government just wanted
21  to put something on the record.  We'd be happy to repeat this
22  when the defendant comes out.  But the government just wanted
23  to offer, if it would be useful to the Court, to submit
24  additional briefing in light of the discussion that we had,
25  just prior to the break.

SOUTHERN DISTRICT REPORTERS, P.C.              (212) 805-0300

101

64pWcooH

1      THE COURT:  No.
2          (Pause)
3          THE COURT:  The Court has reviewed the record.  There
4  are certain inconsistencies that are of note.
5          Officer Parchen testifies they stopped the car because
6  they were speeding.  Officer Deloren did not give a ticket for
7  speeding or testify anything about speeding.
8          Officer Deloren does not seem to recall asking the
9  defendant or asking Mr. Cox anything about his prior arrest
10 record, and I don't believe that Officer Parchen heard anything
11 about that either.  I understand the position of the officers
12 is that they only took him out of the car, that is, Mr. Cox,
13 after they had found the weapon and the drugs on Mr. Cooper.
14 It is not clear to the Court that Officer Deloren, from his own
15 testimony, was in a position to observe what he said he
16 observed on Mr. Cooper; that is, if he's looking into the car
17 from the left with only a flashlight, and Mr. Cooper is sitting
18 up hunched over as Officer Deloren said, and the seat back is
19 back, it is not clear to me how Officer Deloren could see the
20 T-shirt only on the right side was pulled over the lap belt of
21 the seat belt.
22         Government's Exhibit 3, of course, is quite troubling.
23 It is clear that the defendant wrote that out himself.  There
24 seems to be no contradiction of the fact that no one told him
25 what to put in it.  And it quite clearly says that he confessed

        SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

102

64pWcooH

1  about the gun during the pat down:  "The process of being
2  searched I was asked if I had anything on me.  I confessed that
3  I have a gun which was for protection and drugs."
4          The government suggests that Mr. Cooper is such a
5  sophisticated and experienced defendant, having had two prior
6  misdemeanor convictions, that at the time that he wrote this,
7  he knew to throw in a questionable practice in order to
8  challenge the gun and the drugs.  I think that the purported
9  sophistication of the defendant has been belied by his
10 testimony on the stand under oath today where he says that he
11 was not nervous, despite the fact there were policemen standing
12 there, he knew he had a gun, and drugs on him.
13         Mr. Cooper also denies that they were stopped because
14 they swerved, which Mr. Cox acknowledges was the case.
15 However, whether that nervousness was something that could have
16 been seen by Officer Deloren from his side of the car, at 11:00
17 or so at night, when at this point, the only illumination would
18 have been his flashlight, but I believe Officer Deloren
19 testified that he was only leaning down for a matter of
20 seconds, and that he was standing up, but I must say that the
21 incredibility of Mr. Cooper's or part of Mr. Cooper's testimony
22 here would suggest that he is not the sophisticated individual
23 that the government would have the Court believe, who, under
24 the pressure of having been arrested and writing out a
25 statement in his own hand, would have the foresight to stick in

103

64pWcooH

1    that the process of being searched was when he was asked if he
2    had anything on him, because that would require a level of
3    sophistication that the Court does not believe Mr. Cooper has.
4              It is also clear from Officer Parchen's testimony that
5    at the time he inquired about the drugs, the defendant was
6    already in handcuffs.  It is plausible that the defendant, with
7    the two policemen standing right there, did believe that he was
8    in custody and was not free to leave.  It is not credible to
9    the Court that Mr. Cooper would just voluntarily say as he's
10   getting out of the car to be searched anyway, I have a gun,
11   even if he did not say that until after he was being patted
12   down, believing that he was in custody.
13             This is troublesome.  In terms of public safety or
14   danger, if the police can't remember that they asked Mr. Cox
15   whether he had had an arrest, they would have no reason to fear
16   from him, if the only thing that they thought was a problem was
17   the demeanor of the individual seated in the passenger's seat,
18   it is not clear why they asked him to get out of the car in
19   that short period of time in those circumstances.  And so, it
20   seems to the Court that it's merely or it comes down to whether
21   or not the Court believes the police officers or whether it
22   believes part of the defendant's testimony.  And what the Court
23   does believe is Government's Exhibit 3, which indicates that he
24   was asked about the gun in the process of being searched.  And
25   as a result of that, having been honest and telling them yes, I

104

64pWcooH
1   have a gun, when asked, while being searched, and then once in
2   cuffs, saying that he did have drugs when asked, the Court
3   finds this very troubling.
4          Ms. Strauber.
5          MS. STRAUBER:  I'd like to make a point about the
6   statement, your Honor, specifically where the defendant says in
7   Exhibit 3, "The process of being searched I was asked if I had
8   anything on me, I confessed that I have a gun which is for
9   protection and drugs."  I just want to make clear to the Court
10  that in many respects, that's not inconsistent with the
11  testimony of the officers who said, Officer Parchen, that is,
12  after he found the gun and as he continued to pat down the
13  defendant, he continued to ask him, do you have anything on
14  you, do you have anything else that I should know about, and
15  that, also, this statement does not purport to be a
16  comprehensive description of everything that happened at the
17  scene.
18         For example, the defendant said that the drugs were
19  for personal use.  The officers testified to that after they
20  were found.  This statement doesn't say that.  This statement
21  doesn't say that the only time, the first time that he was
22  asked anything was while he was being searched.  So, I just
23  want to make clear to the Court to the extent that the
24  government did not make this clear before, I don't think this
25  statement necessarily can be read to say that it was only when
           SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

105

64pWcooH

1   the defendant was being searched that he was first asked these
2   questions and that he first said that he had a gun.  I just
3   wanted to make that point.
4         THE COURT:  I hear what you're saying.  But in a prior
5   sentence, he says, "We both myself and cousin was asked to come
6   out of the car to be searched.  The process of being searched,
7   I was asked if I had anything on me.  I confessed that I have a
8   gun, which is for protection and drugs."  This would not
9   suggest that this is the second, third, or fourth time that he
10  mentioned that he had a gun.
11        MS. STRAUBER:  I think it's just not clear from the
12  statement.  I mean, it certainly doesn't say that it was the
13  first time.  And as to the additional sentence that your Honor
14  just read, "Both myself and my cousin was asked to come out of
15  the car to be searched," that does not say the officers said,
16  Come out of the car, we're going to search you.
17        I think this could be reasonably read to reflect the
18  defendant's understanding of what in fact happened.  He was
19  asked out of the car and thereafter he was searched.  The
20  statement doesn't say I was asked to come out of the car and
21  told I was going to be searched or said that that was for the
22  purpose of being searched.  So I just think the statement
23  doesn't do as much work as all of that.
24        THE COURT:  I can certainly see your point of view,
25  but I just don't agree with it.  And so, under the

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

106

64pWcooH

1    circumstances, it seems to me that the gun and the drugs, once
2    having been turned over, there has not been a sufficient
3    attenuation for this statement to be free of taint.  If they
4    already had the gun and the drugs, this doesn't seem to me to
5    be anything but an acknowledgement of the fact that he did have
6    them.  But I believe that the way that the drugs and the gun
7    were obtained taints the statement, and therefore, I am
8    suppressing the gun.  I'm suppressing the drugs.  I'm
9    suppressing the statement.
10            Is there anything else we need to do?
11            MR. BAUM:  Bail application, your Honor.  In light of
12   the Court's decision, I'd ask that he be released on a bond to
13   be cosigned by his father, who is present here today.  I don't
14   know if the government would seek to appeal or not, but based
15   upon your Honor's decision, I think he warrants at least at
16   this point being released on bail.
17            THE COURT:  Ms. Strauber.
18            MS. STRAUBER:  Your Honor, the government has no
19   objection, in light of the Court's decision, to the defendant
20   being released on bail at this time.
21            THE COURT:  All right.  Then the conditions are
22   actually to be strict pretrial supervision, a bond to be signed
23   by the defendant's father.  I think that a $50,000 PRB is
24   requested, cosigned by three financially responsible persons,
25   the father -- who are the other two?

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

107

64pWcooH

1            MR. BAUM:  Well, Judge, I would ask that -- their
2    family, they would propose to be family members, but in light
3    of the Court's decision, granting suppression, I would ask that
4    you allow him to be released just on his father's signature,
5    who is here today, so he can be released at this time.
6            THE COURT:  All right.  Then that will be a $75,000
7    PRB signed by his father.
8            MR. BAUM:  Thank you, your Honor.
9            THE COURT:  All right.  Anything else?
10           MR. BAUM:  Nothing further.
11           THE COURT:  All right.  This matter is adjourned.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

108

INDEX OF EXAMINATION

Examination of:                                          Page
ELLIS DELOREN
Direct By Ms. Strauber . . . . . . . . . . . . . . 3
Cross By Mr. Baum  . . . . . . . . . . . . . . .17
MICHAEL PARCHEN
Direct By Ms. Strauber . . . . . . . . . . . . .35
Cross By Mr. Baum  . . . . . . . . . . . . . . .43
Redirect By Ms. Strauber . . . . . . . . . . . .50
Recross By Mr. Baum  . . . . . . . . . . . . . .51
JAMES TERRELLE COX
Direct By Mr. Baum . . . . . . . . . . . . . . .54
Cross By Ms. Strauber  . . . . . . . . . . . . .63
Redirect By Mr. Baum . . . . . . . . . . . . . .64
TYRONE DAVID COOPER
Direct By Mr. Baum . . . . . . . . . . . . . . .66
Cross By Ms. Strauber  . . . . . . . . . . . . .73

GOVERNMENT EXHIBITS

Exhibit No.                                         Received
    1   . . . . . . . . . . . . . . . . . . . .12
    2   . . . . . . . . . . . . . . . . . . . .14
    3   . . . . . . . . . . . . . . . . . . . .16

DEFENDANT EXHIBITS

Exhibit No.                                         Received
    A-B   . . . . . . . . . . . . . . . . . . .56

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300