UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

UNITED STATES OF AMERICA,

      -against-                                       No. 14-Cr-555(GBD)

RALPH NOLAN,

      Defendant.

------------------------------------------------------------ X

## SENTENCING MEMORANDUM

Vladeck Raskin & Clark, PC<br>
By: Susan J. Walsh<br>
565 Fifth Avenue, 9th Floor<br>
New York, New York 10017<br>
SWalsh@vladeck.com

776085 v5

VLADECK, RASKIN & CLARK, P.C.

SUSAN J. WALSH
212-403-7300
SWALSH@VLADECK.COM

September 8, 2016

**HAND DELIVERED and ECF**

Hon. Judge George B. Daniels
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

RE: *United States v Ralph Nolan,* 14-Cr-555(GBD)

Dear Judge Daniels:

      I write on behalf of Ralph Nolan, in advance of his sentencing, which is presently scheduled for September 21, 2016. I seek the minimum sentence legally permissible for this 28 year old man under all of the circumstances of this case because it most appropriately reflects the sentencing factors as described by Title 18 USC § 3553(a). While sentencing is not the appropriate vehicle to attack a flawed conviction, I would be remiss were I not to address that this conviction is fundamentally flawed. Ralph Nolan's trial was permeated by the ineffective assistance of counsel which deprived him his right to a fair trial. Trial counsel acknowledged but one aspect of his ineffectiveness in a written letter to this Court and his subsequent request to be relieved as counsel. The full panoply of his ineffectiveness will be forthcoming by petition for a writ of habeas corpus.

      The Court must sentence Ralph Nolan as a result of this conviction. Although the errors from investigation through the jury charge which tainted the fairness of the conviction are difficult to set aside as his advocate, as is the very real likelihood that he is factually innocent, based on the factors detailed below, I urge the Court to extend every mercy to this young man who has been isolated at the MCC and MDC since July 2014.[1]

---

[1] In addition, annexed at the end of this memorandum about sentencing is a motion to dismiss count three of the indictment. Although this Court is bound by the United States Court of Appeals decision in *United States v Hill*, No 14-3872 Cr, for the purposes of preservation the defense respectfully submits that the *Hill* Court's decision was incorrectly decided and specifically, the 5th, 6th, 7th and 9th circuits recognition that a comparable statute is void for vagueness after *Johnson v. United States, 135 S.Ct. 2551 (2015)* were correctly decided. *See United States v. Gonzalez-Longoria*, 813 F.3d 225 (5th Cir. 2016); *Shuti v. Lynch*, __F.3d__. 2016 WL 3632539 (6th Cir. July 7, 2016); *Dimaya v. Lynch*, 803 F.3d 1110, 1119 (9th Cir. 2015); *United States v. Vivas-Ceja*, 808 F.3d 719, 722-23 (7th Cir. 2015). Moreover, the facts of this case are distinguishable in as much as this case charges the inchoate crime of *attempted* Hobbs Act robbery which was not before the court in *Hill*. *See United States v. Barrett,* No. 14-2641 (challenging conspiracy to commit Hobbs Act robbery under *Johnson*).



Hon. Judge George B. Daniels
September 8, 2016
Page 2

## Preliminary Statement

On April 10, 2015 a jury convicted Ralph Nolan of all three counts of this indictment. In short, they found beyond a reasonable doubt from the evidence before them that Ralph conspired and attempted to commit an armed robbery of drug dealers and brandished a weapon during the course of the robbery. While the quality of the evidence and the quality of the defense left much to be desired and the conviction ultimately will be ripe for attack, this proceeding is not the forum for that challenge. Instead, for now the nature and circumstances of the offense must be evaluated in light of the verdict just as each and every § 3553 (a) factor must, in reaching an individualized sentence. The gravamen of the charge should not alone define this Court's sentence any more than the conviction will define a person for all time. Hope, rehabilitation and mercy are necessary conditions for life after punishment and the prolonged warehousing of a damaged individual is not prescribed for a young man like Ralph Nolan who will return to society and whose imperfect life still has value and potential.

This Court's "overarching statutory mandate" is to impose the minimum sentence sufficient to serve the purposes of sentencing. *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). I write to aid and inform the Court's decision pursuant to that statutory mandate and to urge an end to a cycle of self-destructive, social isolation for Ralph; just 25 years of age at the time of this crime and hopefully, help salvage a young life who has now demonstrated an ability to learn, reflect and redeem himself especially in the eyes of those who have known him best.

## Context

Ralph Nolan will stand before this Court to face judgment for having been convicted of a federal robbery. The verdict suggests that Lorraine Scroggins and Christopher Martinez were the targets of robbers who sought them out due to their drug dealing from their home which as they admitted through immunized testimony, before the robbery contained illegal drugs and cash proceeds. To be sure, they were terrorized as were the loved ones who lived together with them in their household into which they brought and from which they sold drugs. No one, no matter how illegal their livelihood, should ever have to confront such fear. Lorraine Scroggins, herself having already suffered a paralyzing spinal injury from her involvement with drug dealing years prior so severe that she is bed-ridden for life, nevertheless chose to help her son-in-law out by supplying him with a marijuana connection from New Jersey to store and sell from the home. It was Lorraine Scroggin's home they shared with her grandchild and child; Martinez's toddler and his own mother – all of whom were living or staying there and present the days robbers came to steal their stash and money.

Four of five adult victims of this crime testified under a grant of immunity, save the one home attendant who made her living caring for the quadriplegic Scroggins. If one credits the Government's theory, two of those immunized witnesses withheld information from law

Hon. Judge George B. Daniels
September 8, 2016
Page 3

enforcement that a co-conspirator to the robbery, Shawn Odiot, their own repeat felony offender relative had inquired about the drug sales and was present in the building outside the door of the Scroggin's apartment the very day of the robbery. If one credits the Government's law enforcement witnesses, for weeks these witnesses, the Martinez's, dodged the case Detective, (Tr. 467), and were uncooperative in his investigation. ( Tr 479; 488).[2] And, although as the evidence demonstrated, Ralph Nolan was given the opportunity to cooperate against that man to save himself, he did not and has not because, as he emphatically stated on tape, he couldn't because he was not there. Instead, he requested a lie detector test to prove his veracity. (*See* Gov't Trial Exhibit 402, (DVD of taped Post-Arrest Exculpatory Statement at minute 16:46)); (Tr 395-397).

None of this is to suggest, that the Scroggins or Martinez's, much less that home health attendant and the child, are unworthy of police protection or safety in their home. Having been granted total immunity for their testimony they may well be completely on a path free from drug sales, counterfeit check passing and bagging "bud" and the myriad criminal wrongs they admitted to at trial today. Indeed, there are far worse things than selling drugs and even drug dealers should not be robbed at gun point. But, this is the life some of them chose which made them the intended targets – not particularly vulnerable victims. There is no evidence to suggest that it was a home health attendant or a child the robbers intended to target or that they should even suspect that those folks would be home. This was not a random rip-off but of folks capable of evading a Detective, withholding information from the investigation and what was eventually revealed, with every reason to curry favor with law enforcement. Gratefully no one was seriously injured in the robbery and while they may have been frightened when a weapon was brandished, there was no evidence that it was fired or proof that it was even capable of being fired.

Finally, there is nothing in Ralph Nolan's background that suggests he was capable of an armed home invasion, including his sealed juvenile adjudication for robbery which was displayed before the jury in his video taped statement, without redaction or incredibly, without defense objection much less explanation. The jury was never told that the sealed juvenile conviction used in the post-arrest interrogation by the police on that tape occurred ten years ago when Ralph was just 15 years old; that it did not involve a weapon but fisticuffs between two groups of feuding boys who were known to each other. (Govt Exhibit 402, at 16;46)(Exhibit E and E4 Family Court Adjudication).

Ralph Nolan may be damaged and have committed wrongs in his past, as his own father acknowledged on the witness stand and in his letter to the Court, but he is hardly beyond redemption. And, regardless of how sure Lorraine Scroggins or any witness may have wanted to be by the time she testified at trial, we know all too well in the criminal justice system that even witnesses who are certain may just as certainly be wrong. *See eg, Criminal Law, 2.0, Hon. Alex Kozinski, 44 Geo. L. J. Ann. Rev. Crim. Proc .iii (2015) (*providing an in-depth review of wrongful convictions and concluding that more than one third of wrongful convictions are the result of mistaken identifications and citing . The National Registry of Exonerations, % Exonerations by Contributing Factors (http.//www.law.umich.edu/

---

[2] "Tr" refers to pages of the trial transcript of this matter.

776085 v5

Hon. Judge George B. Daniels
September 8, 2016
Page 4

special/exoneration/Pages/ExonerationsContribFactorsbyCrime).

Whether one believes the verdict was true, or that Ralph was the victim of mistaken or worse, purposeful misidentification what is readily apparent is that he carries enormous guilt for the suffering he has caused his family; accepts responsibility for his mistakes and works every day at overcoming his personal short-comings. (Exhibit A, Letter from Ralph Nolan). He is a young man worthy of redemption and has long been on the road to it.

## Personal History

Ralph Nolan is the eldest son of his family, third generation Irish-American laborers who settled in the Bronx, New York. His father, also Ralph Nolan, Jr., married his wife and my client's mother, Dawn Nolan, nee Murray as a teenager. His twin brother, John Nolan married my client's maternal aunt; his mother's sister, not long thereafter. At the age of 21 Ralph and Dawn welcomed their first born son into the world. They were a young, proud working class family living in an apartment in the Bronx and their marriage struggled as the family grew. When Ralph was eight years old his brother Chris was born and six and seven years later his two other siblings now aged 14 and 13.

Ralph recalls spending his early childhood in the Bronx but by the time he was 10 or 11 his family was evicted from their first apartment after falling behind in rent. The family of four moved into a home in Yonkers with a friend and what should have been a temporary stay lasted almost two years. After the family was evicted a second time, Ralph moved with his father into his Uncle John's apartment in the Bronx while his mother and younger siblings moved in with his maternal grandmother. The family was separated and it was especially difficult on Ralph to be away from his mother. His Uncle John and father were old fashioned and strict and a missed curfew meant teenaged Ralph was locked out on the street for the night. At around the age of 16 or 17, Ralph was homeless for the better part of a year. Ralph's mother and the children relocated to a shelter and then into NYCHA Housing. His mother and father remain married but since their eviction when Ralph was a boy, his father has never lived with the family. Instead, he would visit for periods of time. Ralph's mother worked for as long as Ralph can remember as a waitress until her legs failed her and she was unable to do the long shifts on her feet in recent years.

Through the NY shelter system the family was relocated to a temporary government housing projects in the Bronx. Half-way between a boy and a man and physically separated from his family quite often, the second half of Ralph's childhood was a painful one. With minimal intellectual or emotional resources to draw from, as a Caucasian Ralph felt that he was not integrated into the predominantly black and Hispanic schools he attended or blocks where they lived. Instead, he felt isolated and picked on for being different and attributed much of his loneliness and alienation to racial tensions in the neighborhoods where he lived. He moved from school to school with an emerging learning disability and borderline low I.Q. which increased his frustration. Ralph was often truant to care for his siblings at his parents' instruction. His parents had zero tolerance for marijuana use and their parenting philosophy can only be described as old

Hon. Judge George B. Daniels
September 8, 2016
Page 5

fashioned, tough love especially where their first born boy was concerned. They locked Ralph out and kicked him out altogether to live on the street first as a teenager and more than once. Without a high school diploma, skills or shelter, Ralph was arrested for sleeping in the park near the family home (Exhibit B, Complaint and Sealed Disposition); and several times during those years for marijuana possession. The PSR notwithstanding, Ralph never had a felony conviction until he was arrested upstate for criminal mischief to a police patrol car – an E felony; the lowest felony. All of his prior criminal conduct were violations or misdemeanors at worst.

The oldest boy in his family growing up almost his entire life in the projects, Ralph found it to be isolating and lonely as a white kid in predominantly Hispanic and black neighborhoods. Ralph often felt picked on and challenged for his difference both at school, where he was placed in special education, or at home in the neighborhood where he spent all of his formative years. On top of his social isolation and poverty, Ralph struggled enormously in school. He had much difficulty simply holding still in class and his reading levels were always below average and his math skills well below. (Exhibit C, 2002 School Records). He never made it much past the first year of high school. PSR ¶ 72 Recent psychological testing indicates that Ralph is "in the lowest 4th percentile in comparison to similarly aged peers" in the borderline range of intellectual functioning. (Exhibit D, Psychological Report on Intelligence and Cognitive Function). Tests measure his IQ at 74 and confirms that he may well have suffered from Attention Deficit Hyperactivity Disorder as a child. *Id.* The Family Court records involving his juvenile adjudication reflect a family that was surviving on the margins, dependent on Ralph to care for the younger siblings and the parents themselves were unable to manage appointments and obligations. (Exhibit E, Family Court).

Such was the foundation upon which this young man was to build his life.

By his late teens and early twenties Ralph was travelling more upstate, at first to visit cousins and then to see a young woman with whom he believed he had fallen in love. Although older than Ralph, she was uneducated, poor and had three small children from other men but that did not frighten Ralph away from moving in with her and marrying her within a year. Ralph fell for Jessica Port hard, but he adored her children and still does to this day. He embraced the role of father to these little ones and relished being needed by them. (Exhibit F, Facebook photograph of Ralph and Jessica's youngest). Ralph believed Jessica was the love of his life and what is more, he embraced her three little ones as if they were his very own. (See Exhibit A) Their love, their life and their marriage was a reckless and tumultuous series of fights and reconciliations as reflected in Ralph's arrest record from Gloversville. They grew tired of Ralph's back and forth to NYC and being apart. When the two tried to make a permanent move in with Ralph's parents to save up while Ralph worked for his Dad as a freelancer, Ralph's mother and wife could not get along in the small two bedroom apartment on Union Ave in the Bronx. Ralph Senior had work for his son and relished teaching him, spending time with him and watching him mature before his eyes into a capable young man. But, at that time, there were three adults and six children living in a two bedroom 6 floor walk- up in the Bronx. The two men were often working and Ralph's siblings all in school while his mother and wife were home with Ralph's youngest step-children. Unable to make a go of it after a few months in the Bronx,

Ralph's wife moved back up-state with the three little ones Ralph adored and later he followed her. He was arrested in his wife's home-town of Gloversville, New York on July 28, 2014. She has never visited him since his arrest. She is without a phone and efforts to locate her were unsuccessful.

Ralph has been in custody in the urban jails of the MCC and the MDC ever since.

## The Sentencing Guidelines

The Probation Report calculates the advisory sentencing guidelines as follows:

1. A base offense level of 20 pursuant to U.S.S.G. §2B3.1 (a)

   20

2. The offense level was increased by three levels because a victim sustained "serious bodily injury" according to probation U.S.S.G. §2B3.1(b)(3)(D)   +3

3. A two level enhancement because the victims were physically restrained U.S.S.G. § 2B3.1)b)(6)   +2

4. A one-level enhancement is warranted because the taking of a controlled substance was an object of the offense U.S.S.G. 2B3.1(b)(6)   +1

5. The defendant knew or should have known one of the victims of the robbery was a vulnerable victim U.S.S.G. 3A1.1(b)(1).   +2

   **28**

However, the defense objects to a number of the enhancements applied by Probation as inappropriate and/or inapplicable in this case.

### The Offense Level Only Should Be Increased by Two for Desiree Scroggins' Injury

First the defense respectfully submits that the offense level should only be increased by two levels not three under USSG § 2B3.1(b)(3) because there was no proof that Desiree Scroggins sustained "serious bodily injury" but instead she sustained "bodily injury," as a result of the blow to her head. Clearly, a blow to the head with a weapon is a bodily injury, but there is not enough evidence to support a greater enhancement. Application Note 1. of this Guideline references Commentary to §1B1.1 for the definition of both "bodily injury" and "serious bodily injury. " Serious bodily injury means injury involving extreme physical pain or the protracted impairment of a function of a bodily member; organ or mental faculty; or requiring medical intervention such as surgery, hospitalization or physical rehabilitation. USSG. § 1B1.1 *Application Note* 1 (L). In contrast, ""bodily injury" means any significant injury: e.g., an injury that is painful and obvious or is of a type for which medical attention ordinarily would be sought." USSG §1B1.1. The injury that Desiree Scroggins suffered was not a "serious" one under the guidelines. Although she was brought for treatment after the robbery, she testified that

Hon. Judge George B. Daniels
September 8, 2016
Page 7

she refused the two sutures to the cut on her head. (Tr. 136). She was not admitted to the hospital for her injury, her medical records were not admitted as evidence. There were no photos of her injury nor evidence that the injury was incapacitating, caused "protracted impairment" or caused her to miss any work or other obligations. True there was testimony that she was bleeding, as is not uncommon with head injuries, and surely the injury was a painful and obvious one, however, she was home again that evening and did not indicate there was extreme or lasting pain on the contrary, she testified she declined two sutures. *Id.*,

Accordingly, the offense level should be increased by 2 not 3 points here.                    **27**

### The Vulnerable Victim Enhancement Should Not Apply

Secondly, the defense objects to the two level enhancement under USSG 3A1.1(b)(1) because the robber "knew or should have known one of the victims of the robbery was a vulnerable victim." USSG 3A1.1(b)(1). There was insufficient evidence to conclude that the robber identified as Nolan that afternoon in search of money and drugs knew that Lorraine Scroggins was a "vulnerable victim," much less that she was "selected" as a victim for the crime as opposed to the others able bodied victims in the apartment like Chris Martinez or her daughter Desiree, or any other individual storing or selling illegal drugs from their apartment would have been. See, Application Note 2. USSG § 3A1.1 (…a robbery in which the defendant selected a handicapped victim…). On the contrary, it is this victim's wrongful conduct which contributed significantly to her and the three others who were granted immunity for their testimony that made them vulnerable to robbers and thieves. See, USSG § 5K2.10 (authorizing downward departure if victim's wrongful conduct contributed to the offense behavior). [3]

---

[3] §5K2.10.  Victim's Conduct (Policy Statement)
If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense. In deciding whether a sentence reduction is warranted, and the extent of such reduction, the court should consider the following:
(1)     The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant.
(2)     The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation.
(3)     The danger reasonably perceived by the defendant, including the victim's reputation for violence.
(4)     The danger actually presented to the defendant by the victim.
(5)     Any other relevant conduct by the victim that substantially contributed to the danger presented.
(6)     The proportionality and reasonableness of the defendant's response to the victim's provocation.
Victim misconduct ordinarily would not be sufficient to warrant application of this provision in the context of offenses under Chapter Two, Part A, Subpart 3 (Criminal Sexual Abuse). In addition, this provision usually would not be relevant in the context of non-violent offenses.

776085 v5

Hon. Judge George B. Daniels
September 8, 2016
Page 8

      Under this guideline, a "vulnerable victim is defined as one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.'" *United States v. Kerley*, 544 F3d 172 (2d Cir 2008)(citing USSG U.S.S.G. 3A1.1(b)(1). The defense admits that Lorraine Scroggins, paralyzed as a consequence of her own admitted past criminal drug activity wherein she was previously robbed selling drugs is vulnerable as a result of her condition. (Tr 550). However, in order for the enhancement to apply the vulnerability of the victim "must bear some nexus to the criminal conduct" and "the defendant generally must have singled out the vulnerable victims from a larger class of potential victims" for the crime. *United States v. Getto*, 586 Fed. Appx. 11 (2d Cir. 2014) *citing United States v. McCall*, 174 F.3d 47 (2d Cir. 1998); *United States v. Hershkowitz*, 968 F.2d 1503, 1506 (2d Cir. 1992)("While the focus must remain on the victim's individual vulnerability, the totality of the circumstances, including the status of the victim and the nature of the crime, must be taken into account in determining the applicability of the vulnerable victim enhancement." ). The record in this case does not demonstrate that Lorraine Scroggins was singled out at all, much less that she was singled out because she is handicapped. She was one of five individuals who testified they were robbed and one of four who received immunity for their testimony for her own criminal conduct. (Tr 549 – 550) Lorraine Scroggins' daughter, Desiree, is able bodied and testified *inter alia* that she helped her boyfriend, Martinez bag up marijuana for sale was a victim of the same robbery as her mother. (Tr 105; 176 ) Christopher Martinez, also able bodied testified *inter alia* that he sold the marijuana Lorraine supplied was also a victim, as was his able bodied mother, Sandra Martinez, who also testified under a grant of immunity that she stayed at the apartment from time to time. (Tr. 215- 218; 604 - 606). Moreover, there was nothing in the evidence to suggest that the robbers were aware of her condition, indeed according to the Government's theory of the case although the Martinez's may have known the defendant from years prior, (Tr 237 -238; 636-637), there was no evidence that Lorraine Scroggins knew Ralph Nolan or any indication that he knew her or of her.

      According to the immunized trial testimony of multiple witnesses, Lorraine Scroggins was the connection to a supplier of marijuana which she provided for her daughter, Desiree Scroggins and Desiree's boyfriend, Christopher Martinez to smoke and sell out of the apartment. (Tr 549 – 552). Ms. Scroggins admitted that she supplied the marijuana for retail distribution out of her apartment by her granddaughter's father and that it was her contact. (Tr 552 -553). Moreover, the trial testimony indicated that she was just one of four intended targets of this robbery – not singled out due to her particular vulnerability but included with the three other able-bodied victims robbed because they had drugs and money. While Lorraine Scroggins *may have "happened to b*e" handicapped and thus vulnerable, her particular handicap bore no nexus to this crime. USSG § 3A1.1 Application Note 2 (enhancement does not apply where e.g. defendant sold fraudulent securities by mail to the general public and victims "happened to be senile."). In *United States v. Crispo*, the Second Circuit noted that the "vulnerability inquiry" is

---

There may, however, be unusual circumstances in which substantial victim misconduct would warrant a reduced penalty in the case of a non-violent offense. For example, an extended course of provocation and harassment might lead a defendant to steal or destroy property in retaliation.

one that focuses on the victim's ability to protect him or herself from the crime and "should concentrate on whether additional deterrents are necessary to protect such a victim." *United States v. Crispo*, 306 F.3d 71 (2d Cir. 2002).  In this Hobbs Act federal robbery, Lorraine Scroggins' purchase and sale of illegal drugs together with her able bodied son-in-law and with the assistance of her daughter, is what made her vulnerable to the crime, not her lamentable physical condition.  To hold otherwise would be to hold that the entire class of physical challenged people are *per se* "vulnerable victims" and the enhancement applies with strict liability every time such person, regardless of their own conduct, is victim of a crime.  The application of the guideline requires more scrutiny to the facts and circumstances of each case than that.  The fact that Lorraine Scroggins, admittedly involved with drugs as far back as 1996 and the genesis of her paralysis, was one of the people in the apartment that day and thus a victim of the robbery, does not in and of itself "render the defendant's conduct more criminally depraved." *United States v. Dupre*, 462 F.3d 131 (2d Cir. 2000).  Accordingly, this two point enhancement should not apply.

      Accordingly, the offense level should not be increased by 2 points here.     **25**

## The Criminal History Calculation is Wrong and In Any Event is Overstated

      The Criminal History calculation in the probation report is also miscalculated. The PSR calculates a total of 9 and a Criminal History Category IV.   But, the total points should be 7 not 9.

      The PSR attributes  one point for a 2007 arrest for the unlawful possession of marijuana, however, this is incorrect.  PSR at ¶ 37   Ralph was issued a violation for his first time marijuana offense under NY PL § 221.05 (a violation and not a crime and for which no jail sentence is authorized).  (See Exhibit G).  The maximum penalty for this offense is $100 fine and any sentence of imprisonment is not authorized.   No points should be attributed for this non-criminal offense that does not carry any potential jail sentence even for a third time offender.

      Similarly, the sealed case the PSR references at PSR at ¶ 39 is for smoking a marijuana cigarette in public in violation of the same section PL 221.05 and is also a violation and not a crime under and for which Ralph was sentenced to a $25 fine.  (see Exhibit H).   The maximum penalty for this second marijuana violation is two hundred dollars and a sentence of imprisonment is not authorized.  No points should be attributed for this non-criminal offense that does not carry any potential jail sentence even for a third time offender.

      Accordingly, the total Criminal History should be **7** points and a **Category IV**.

      Sadly, despite the absence of any significant violence in his history or more than a single felony conviction imposed for damage to property, not a person, ¶ 43, Ralph is nevertheless a Criminal History Category IV.   No matter how this Court views the conduct in the instant conviction, his criminal history leading up to it is overstated and this Court should depart

Hon. Judge George B. Daniels
September 8, 2016
Page 10

downward on that basis.

      First, even assuming arguendo the probation officer's calculations are correct which they are not, the five of six offenses for which points are assigned involve non-criminal violations and misdemeanor conduct. Two are for smoking marijuana which is not criminalized in New York and arguably the most serious conduct alleged at ¶¶ 38 "Menacing (with a weapon) was for conduct that his father testified at trial did not occur (waiving a knife in a threatening manner), although it did involve a fight between father and son. (Tr. at 752). Per the attached exhibit, Ralph received a conditional discharge for this arrest originally, and eventually 30 days in jail for failure to meet the financial penalties. (Exhibit I). While his criminal history suggests Ralph may well benefit from counseling on substance abuse and anger management, it does not suggest an innately violent man or one with premeditated anti-social behavior prior to this conviction.[4] Of course, domestic violence is never to be taken lightly, it appears that the misdemeanor conduct always ended in a reconciliation of the two, and eventually the pair tried to make a new life together in the Bronx with Ralph's parents. That he failed to report regularly for Bronx probation thereafter in the disorganized chaos of his life on Union Avenue is lamentable but not felonious.

      Secondly, much of the conduct for which Ralph has been branded criminally is for conduct that in other communities might not even warrant a call to the police. For example, the "prior robbery" to which the jury was exposed during this trial without a limiting instruction or objection by defense counsel, occurred in 2004 almost ten years before the instant offense and when Ralph was just fifteen years old. It is not conduct to be proud of by any stretch but it was a fight between neighborhood boys, three against three, and no weapons were involved but the threat of fisticuffs for the money in their pockets at twelve noon during summer break from school. (Exhibit E4). This record is sealed, as it should be for juveniles, but nevertheless is what law enforcement referenced on the video-tape during Ralph's post-arrest interrogation. (Gov't Exhibit 402). The same is true of the YO conviction for petit larceny at the age of seventeen for which he ultimately went to Spofford Juvenile detention. (Exhibit J) In short, this is a messy record but not a violent one or reflective of an inherently bad, anti-social person who requires long term incarceration.

      U.S.S.G. § 4A1.3(b) provides a downward departure for criminal history category based on the nature and the circumstances of overstated prior criminal activity. Ralph's prior records consist of misdemeanor conduct save, one which was the lowest level felony there is, an E felony for damaging a police car while intoxicated and "being antagonized by a neighbor." ¶ 43. Even then, the circumstances suggest emotional volatility and a lack of anger management not, pre-meditated, planned or calculated anti-social behavior. For that outburst, he served just over three months in a local jail, the longest he was every sentenced or incarcerated

---

[4] When Ralph was fifteen years old, he received a probationary sentence as a juvenile offender and at 17 a Youthful Offender adjudication for petit larceny. Because of his age, this incident is sealed and did not enhance his criminal history. No other charge comes close to the seriousness or type of behavior in the instant charge. (Exhibit E and J).

Hon. Judge George B. Daniels
September 8, 2016
Page 11

until now. Because a Criminal History Category IV overstates this young man's criminal history, I respectfully submit that a two category departure to a Criminal History category of II is more appropriate.

## The Advisory Guideline Range

Based upon the above, that defendant's total advisory guideline offense level should be at **Level 25**. His revised Criminal History category should be **CH II** which yields an advisory guideline range of **70 - 87 months**. It is respectfully submitted, that for Ralph Nolan, such a range is more than enough to meet the needs of sentencing under 18 U.S.C 3553(a).

## Ralph Nolan's Personal Growth And Potential

Notwithstanding his heartbreak at being convicted and the loneliness he has suffered in jail without a single visit from his wife and only a handful from his family, Ralph has committed himself to improving his lot. Not long after his conviction he enrolled in the GOGI program to learn how to "Get Out by Going In." He completed an over-subscribed and relatively rigorous twelve week course of study at the MCC (Exhibit K) last summer. The GOGI program has been at the MCC for some time and recently was introduced at the MDC. (Exhibit L) It remains one of the very few options available to defendants in the MCC and MDC awaiting trial or sentencing.

Before that and while awaiting trial, Ralph enjoyed independent studies earning five certificates in Independent Studies on the Congo, Grizzlies and Howard Hughes (Exhibit M). He also continues to occupy his time drawing (Exhibit N) and taking the Art Classes at MDC while awaiting sentencing. (Exhibit O). And, for the first time has learned cursive penmanship while at the MDC. Finally Ralph secured a job at the MDC for which there is a waiting list. For months he has been working in the kitchen five days a week. Clearly, he is capable of hard work, learning and improving himself.

What speaks volumes about Ralph's personal growth, particularly since his arrest is his own painstakingly, hand-written letter to this Court. (Exhibit A). His letter demonstrates introspection, self-awareness and a commitment to better himself and "reset his path in life." *Id.* Perhaps through the "GOGI" program, he has recognized that substance abuse is only partly to blame for his shortcomings and while he pledges to remain clean and sober, he also apologizes for behaving as he characterizes it, as "a jerk." He acknowledges the difficulty of parenting and the pain he has caused those he loves most. In his correspondence to the Court, Ralph demonstrates not just a pitch for mercy, but the sensitive side of a young man who loved his children, his parents and yes, even his puppy who he begged law enforcement to please check on as he was arrested and taken away; a Facebook page photo the jury never saw. (Tr. 404) (Exhibit P). Ralph "carries a lot of guilt and shame for how he treated those who love [him]" and pledges to continue to work really hard at "repairing broken relationships." (Exhibit A).

## The Nolan Family

To be sure, there is no room for doubt in the Nolan household. To them their son and brother is unquestionably innocent of this crime - although they are the first to admit, he is no innocent. This is a hard-knuckled, working class family with very little material wealth, supported by government subsidies and more often down on their luck then in it. (See Exhibit E, Family Court Papers). They live in a six floor walk-up, two bedroom apartment with a kitchen table not big enough to seat more than two people and rooms divided by hung blankets to preserve their growing children's privacy to sleep, eat and study. They have bounced in and out of shelters and are not blessed with much education or sophistication. Their parenting of their eldest boy Ralph, as well as their other children may be as indelicate as their means of expression. But, they are far from shrewd and perhaps too revealing in their earnest demonstration of candor and truth.

No one speaks with such frankness about Ralph's past, his short-comings as a son and his extraordinary turn of fortune than his father and mother. Neither wastes a moment sugar-coating who their son is, where he has come from and the heartache that they have sometimes experienced raising him. And, both unequivocally deny that their son was either of the mindset at the time nor the personality to commit the armed Hobbs Act robbery of a quadriplegic. (Exhibits Q and R). Ralph's parents find it inconceivable that simultaneous to what they personally witnessed as a blossoming maturity, dedication and industry in their son arose an armed robber. This family had come full-cycle from a troubled teen who smoked marijuana and argued with his father, to a hard-working provider for a young, new family. They are as appalled by the conviction as they were rejoiceful in his return home with a family of his own. Ralph Nolan paid his son out of his own pocket as an apprentice, teaching him a skill and finally "working alongside of him," for a time he "will cherish forever." *(Id)* They are loyal, brutally honest and importantly, have not given up on their son who Ralph Nolan Senior pledges to welcome back to their home and to a job. (*Id.*).

It is an understatement to say that his siblings are heartbroken by Ralph's incarceration and conviction. The charges and the behavior are not the brother they know. His youngest sibling, age 13, in trying to come to terms with the testimony of four immunized witnesses for the Government against her brother, puzzles in her own adolescent way what so many adults are confounded by often in the federal system; "how is it that a family full of people who breaks the law all the time is allowed to [go] free but yet my brother who is being a good person and trying to make a better life for his family is in jail." (Exhibit S). Her memory is of a loving brother who "take me and his step daughter to school and picking us up and working with my dad to make money to put a roof over his family's head and start a new life wit his family…" - a big brother, who despite his faults is simply not capable of this crime. *Id.* Ralphs' brother echoes his little sister's frustration with Ralph's current fate, attesting that their brother Ralph is simply not the type who would commit such a crime with a gun "he doesn't even own" and who, in this boy's eyes, was earning "a lot of money" working with their Dad. (Exhibit T ). He is candid in his heartache and tears in his letter to the Court and touchingly reminisces about a simple boy hood on the bike trail to White Plains and basketball at the school yard before Ralph was

Hon. Judge George B. Daniels
September 8, 2016
Page 13

arrested. This teenage boy's loss of faith in justice and the agony and frustration that he must bear witness to through his parents' and brother's eyes is heart-wrenching.

## The Applicable Legal Standard

As this Court is well aware, in 2005, the Supreme Court issued its decision regarding the United States Sentencing Guidelines (the "Guidelines"). *See, United States v. Booker*, 543 U.S. 220, (2005) ("*Booker*"). *Booker* rendered the guidelines advisory rather than mandatory and at long last restored a modicum of discretion previously entrusted to sentencing courts prior to the imposition of the mandatory regime. As the Supreme Court explained, in determining what sentence to impose judges must consider all of the factors outlined in 18 U.S.C. § 3553(a); the guidelines are merely one factor to be considered together with all the other relevant sentencing factors outlined in 18 U.S.C. § 3553(a). *Booker, supra*, 125 S. Ct. at 764-765. The Supreme Court has made it clear that Courts can again impose sentences at variance with the guidelines even in "the mine run cases." *See, Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States,* 552 U.S. 39 (2007); *Kimbrough v United States*, 552 U.S. 85 (2007); *see also, United States v. Cavera*, 550 F.3d 180 (2nd Cir. 2008); *United States v. Townsend*, 618 F.3d 915, 921 (8th Cir. 2010)("[A] district court need not justify an extraordinary variance with an extraordinary or equally compelling justification....")(internal citation omitted).

The Supreme Court has repeatedly reiterated the non-binding nature of the Guideline scheme, holding,[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 130 S. Ct. 657 (Jan 26, 2009)(emphasis in the original). *See also, Spears v. United States*, 129 S.Ct. 840 (Jan 21, 2009) (per curium)(District Courts are entitled to reject and vary categorically from guidelines based on policy disagreement with those guidelines); *see also United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir 2010); *United States v. Corner*, 598 F.3d 411, 415 (7th Cir 2010)(*en banc*); *United States v. Carr,* 557 F.3d 93, 106 (2d Cir. 2009) ("*Kimbrough* stands for the proposition that the sentencing Court has discretion to deviate from the Guidelines-recommended range based on the court's disagreement with the policy judgments evinced in a particular guideline." ). Pursuant to *Booker* and its progeny, in imposing sentence, the court must consider not only the applicable advisory guideline range, but all of the factors outlined in 18 U.S.C. § 3553(a).

In determining an appropriate sentence, this Court must consider all of the factors enumerated in 18 U.S.C. 3553(a). It is respectfully submitted that a non-guideline sentence for Brian, is sufficient to comply with the purposes enumerated under 18 U.S.C. 3553(a). As is well known to Your Honor, the Court should consider in imposing sentence are addressed chronologically (as enumerated in the statue) as follows:

1. The nature and circumstances of the offense and the history and characteristics of the defendant;

2. The need for the sentence imposed;
   A. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   B. To afford adequate deterrence to criminal conduct and,
   C. To protect the public from further crimes by the defendant;
   D. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3. The kind of sentences available;
4. 5. The sentencing guidelines and any pertinent policy statements;

6. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

7. The need to provide restitution to any victims of the offense.

Further, courts have been instructed to impose "a sentence *sufficient, but not greater than necessary*" to meet the objectives of sentencing. *See* 18 U.S.C. § 3553(a)(emphasis added). A consideration of the factors listed above leads to the conclusion that the minimum sentence permitted under the law is appropriate in this case.

## What Sentence to Impose

*Booker* requires the district court to tailor sentences to reflect an application of the 18 U.S.C. § 3553(a) factors, with the expectation that post-*Booker* sentences will achieve more "individualized justice." *See United States v. Crosby*, 397 F.3d 103, 114 (2nd Cir. 2005). This Court must make an "individualized assessment" of Ralph Nolan's case and Ralph Nolan the young man. *Gall*, 552 U.S. at 50; *see also id.* at 52 ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *quoting Koon v. United States*, 518 U.S. 81 (1996)).

In 2013, the year this robbery took place, Ralph Nolan was just 25 years old. Both medical science and the law have recognized that young people, whose part of the brain involving "behavior control continue to mature through late adolescence." *Graham v. Florida*, 560 U.S. 48, 68 (2011)(holding that the 8th amendment prohibits life without parole for juveniles and citing the Amicus Brief for American Medical Association and American Psychological Association). "As compared to adults, juveniles have a "'lack of maturity and an underdeveloped sense of responsibility;'" they "are more vulnerable or susceptible to negative

influences and outside pressures, including peer pressure..." *Id., quoting Roper v. Simmons,* 453 U.S 551 (2005). That maturation process, which is different in each individual is particularly delayed in boys, effects impulse control and in combination with the well-known influence of one's peers can lead to a culture of group think, a lack of reflection and even a tolerance for petty criminal conduct reflecting on Ralph's rap sheet. *See, Johnson v. Texas,* 509 U.S. 350 91993)("lack of maturity and underdeveloped sense of responsibility...often result in impetuous and ill-considered actions and decision.").

Ralph's own father acknowledged that his son struggled and was negatively influenced by others. Of course, his youth, learning disabilities and poverty do not absolve Ralph of responsibility, but his behavior and criminal transgressions as an adolescent and even just post-adolescent in his early twenties "is not as morally reprehensible as that of an adult," *Johnson, supra.* (internal quotations omitted), and the defense submits, is a combination of factors this Court should rightfully consider in imposing a sentence. 18 U.S.C. 3553(a)(1). Moreover, given Ralph's relative youth, he is in all likelihood "more capable of change than [an] adult," with a "greater possibility" that his "character deficiencies will be reformed." *Graham, supra.* at 72. That he has completed the GOGI program while incarcerated, applied himself to self-study and pursued his drawing and writing talents bear witness that he has already commenced a rehabilitation and reeducation process while housed in the urban jails of MCC and MDC.

Ralph lost his Uncle John while he was incarcerated at the MDC this year. John was his father's identical twin brother, and just 48 years old when he was stricken by a sudden and massive heart attack. The pain of mourning alone without the comfort of gathered loved ones or the ritual of funeral and burial struck me when I visited Ralph that very next day. But, Ralph expressed his agony over his helplessness to be of any comfort to his own father at a time of his profound loss.

Ralph has committed himself directly to the cause of rehabilitation having experienced too close and too personally the countless young lives wasted behind bars waiting only for an occasional two hour social visit in the cafeteria. Of course, he still seeks redemption and exoneration but he writes a personal plea to "attend the fbop drug abuse program when it is offered so that he can have even more tools to stay clean and sober." Exhibit A-.

This Court is entirely within its authority to impose a non-guideline sentence which will enable Ralph to reenter society, rejoin his family and an honest day's work at his father's side and commit himself to self-reliance and independence on the correct side of the law. *See, Nelson v. United States,* supra. ("[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be presumed reasonable."). (*See generally,* 18 U.S.C. 3553(a)3, 4 & 5).

Finally and perhaps most significantly in relation to this young man, promotion of respect for the law does not only come from a Court's readiness to dole out harsh punishment or seek retribution for crimes against society. Indeed, the exercise of awesome, mercy-dispensing powers at sentencing to bestow leniency upon the young and disadvantaged who have never enjoyed a peaceful moment of grace, may in fact be the most powerful of the Court's tools in the promotion of respect for the law and justice. (*See generally,* 18 U.S.C. 3553(a)2. A).

I ask on Ralph Nolan's behalf that the Court weigh all the circumstances surrounding this young man's life in fashioning a sentence of individualized justice for him especially taking into account his upbringing, his capacity to learn and his demonstrated ability to be a caring and respectful young man evidenced by his reconciliation with an estranged father and most notably, in his letter to the Court.

## Count Three Should be Dismissed under *Johnson* [5]

This Court Should Dismiss Count Three 18 U.S.C 924 (c) because the attempted Hobbs Act robbery charge underlying that offense/count categorically fails to qualify as a crime of violence with the meaning of the statute and the residual clause is unconstitutionally vague under *Johnson v. United States*, __ U.S.__, 135 S.Ct. 2551 (2015). Therefore, count three does not state a claim and must be dismissed pursuant to Fed. R. of Crim. Pro. 12(b)(3)(v) and (b)(1). Generally a motion to dismiss must be brought before trial, Fed. R. Crim. P. 12(b)(c), however a motion that the indictment fails to charge an offense or "that the court lacks jurisdiction may be made at any time while the case is pending." *Id*. "A case is no longer 'pending' within the meaning of 12(b) after the judgment becomes final," which has not yet occurred in this case, accordingly, the motion to dismiss is properly before this Court. *United States v. Thongsouk Theng Lattanaphom.*, --- F.Supp. 3d --- (2016) WL 393545 (E.D. Cal. Feb. 1, 2016)(internal citations omitted).

Under the Supreme Court's recent precedent in *Johnson* attempted Hobbs Act robbery categorically fails to constitute a crime of violence because it can be accomplished by placing one in fear of future injury to his person or property which 1) does not require threat of violent physical force and 2) does not require the intentional threat of the same. *See, Descamps v. United States* 133 S.Ct. 2276 (2013)(the categorical approach requires that courts "look only to the statutory definitions..." in determining whether the offense qualifies as a crime of violence'"). Additionally, in light of *Johnson* deciding substantial the same statutory text as at work here, the "residual clause" within 924(c)(3)(B), is unconstitutionally vague and cannot

---

[5] To the extent that this Court is bound by the United States Court of Appeals decision in *United States v Hill*, No 14-3872 Cr, for the purposes of preservation the defense respectfully submits that the *Hill* Court's decision was incorrectly decided. Particularly, the 5th, 6th, 7th and 9th circuits recognition which have determined that 16(b), which appears materially the same as the statute here, is void for vagueness after *Johnson* were correctly decided. *See United States v. Gonzalez-Longoria*, 813 F.3d 225 (5th Cir. 2016); *Shuti v. Lynch*, __F.3d__. 2016 WL 3632539 (6th Cir. July 7, 2016); *Dimaya v. Lynch*, 803 F.3d 1110, 1119 (9th Cir. 2015); *United States v. Vivas-Ceja*, 808 F.3d 719, 722-23 (7th Cir. 2015). Moreover, the facts of this case are distinguishable in as much as this case charges the inchoate crime of *attempted* robbery which was not before the court in *Hill*. *See, United States v. Barrett,* No. 14-2641 (challenging conspiracy to commit Hobbs Act robbery under *Johnson*).

Hon. Judge George B. Daniels
September 8, 2016
Page 17

sustain a conviction. [6] In sum, to qualify as a "crime of violence" under the force clause of § 924(c)(3)(A), Hobbs Act robbery must categorically require (1) the presence of *violent physical force* and (2) the *intentional* employment thereof. The minimum conduct necessary to satisfy the elements of Hobbs Act robbery does not require either the use of violent force or the intentional use of such force. Robbery can be accomplished with a degree of physical force that is far short of the strong, great, and violent force required by 924(c)(3)(A). *See i.e.: United States v. Torres-Miguel* 701 F.3d 165 (4th Cir. 2012)(only a small amount of physical force is required to commit robbery, including Hobbs Act robbery). This quantum of force falls short of the "strong," "great," and "violent" physical force required under 924 (c)'s force clause. *Johnson v. United States*, 559 U.S. 133, 140 (2010) (holding that use of "physical force" means use of "violent force" -- that is, "great physical force" or "strong physical force . . . capable of causing physical pain or injury to another person") (emphasis in original); *United States v. Castleman*, 134 S. Ct. 1405, 1412 (2014) (explaining that the amount of force involved in "'a squeeze of the arm [that] causes a bruise'" falls short of the "strong" and "violent" force required under the ACCA's force clause In addition , because a Hobbs Act robber can be accomplished by fear of injury, it does not require an intentional threat and thus cannot qualify under 924(c). *See Garcia v. Gonzales*, 455 F.3d 465 (4th Cir. 2006). Moreover, even if the conduct were intentional, which placing another person in fear of bodily *injury* does not necessarily involve the deployment of strong and violent physical force. As a categorical matter, the minimum conduct necessary to accomplish Hobbs Act robbery does not require the use, attempted use, or threatened use of physical force against the person or property of another, and thus, the offense does not qualify as a "crime of violence" under the force clause.

---

[6] **18 U.S.C. § 1951(b)(1)**
The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.
**18 U.S.C. § 924(c)**
Section 924(c)(1)(A), in pertinent part, provides:
. . . any person, who, during and in relation to a crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, shall, or who in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence . . .
Under § 924(c)(3), "crime of violence" is defined as follows:
(3) For purposes of this subsection, the term "crime of violence" means an offense that is a felony and –
    (A) has an element the use, attempted use, or threatened use of physical force against the person or property of another, or
    (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

776085 v5

In addition, the residual clause of § 924(c)(3)(B) is void for vagueness under *Johnson*, and thus cannot support attempted Hobbs Act robbery as a predicate offense. "The residual clause offers no reliable way to choose between . . . competing accounts of what 'ordinary' . . . involves." *Johnson*, at 2558. This alone establishes the residual clause's unconstitutional vagueness. The Court also noted that the residual clause lacks a meaningful gauge for determining when the quantum of risk under the "ordinary case" of a particular statute is enough to constitute a "serious potential risk of physical injury." *Id.* at 2558. The indeterminacy, unpredictability, and arbitrariness inherent in both "ordinary case" analyses is more than the Due Process Clause tolerates. *See id.* Thus, *Johnson* not only invalidated the ACCA residual clause, it expressly invalidated the "ordinary case" analysis and statutory provisions that compel such an analytical framework. *Johnson* renders § 924(c)(3)(B) unconstitutionally vague. Section 924(c)(3)(B) is essentially the same as the ACCA residual clause. To be sure, the clauses are not identical. But the minor textual differences between them – between risk of injury and risk of force – does not affect the constitutional analysis.[7] *Johnson* turned not on the type of risk, but rather on how a court assesses and quantifies the risk. That inquiry is the same under both the ACCA and § 924(c). Both statutes require courts first to picture the "ordinary case" embodied by a felony, and then decide if it qualifies as a crime of violence by assessing the risk posed by the "ordinary case." As discussed above, that is the approach the Supreme Court overruled in *Johnson*. Section 924(c)(3)(B), like the ACCA residual clause, requires the "ordinary case" analysis to assess the risk involved in a predicate offense, and how risky that ordinary case is. Since this is the identical analytical step that brought down the ACCA residual clause, the residual clause of § 924(c)(3)(B) cannot survive constitutional scrutiny under the Due Process principles reaffirmed in *Johnson*. As a consequence, § 924(c)(3)(B) cannot be used to state a § 924(c) offense based upon Hobbs Act robbery.

Thank you for your time and consideration.

Respectfully submitted,

Susan J. Walsh

cc: Cooper, AUSA (by ECF and Email)

---

[7] *See Jimenez-Gonzales v. Mukasey*, 548 F.3d 557, 562 (7th Cir. 2008) (noting that "[d]espite the slightly different definitions," the Supreme Court's analyses of the ACCA and § 16(b) "perfectly mirrored" each other); *see also United States v. Gomez-Leon*, 545 F.3d 777 (9th Cir. 2008); *United States v. Coronado-Cervantes*, 154 F.3d 1242, 1244 (10th Cir. 1998); *United States v. Kirk*, 111 F.3d 390, 394 (5th Cir. 1997); *United States v. Bauer*, 990 F.2d 373, 374 (8th Cir. 1993) (describing the differences between the statutes as "immaterial" and concluding that the interpretation of U.S.S.G. § 4B1.1, which uses the ACCA language, "is controlled by" a decision that interprets § 16(b)).