## THE TRIAL

The Government's theory was that the Defendant, Ralph Nolan, together with some of the victims' own relative, Shaun Odiot, robbed Lorraine Scroggins in her apartment, where she lived and sold marijuana in the Bronx with her daughter, Desiree and her daughter's boyfriend, Chris Martinez. (Tr. 61–65). The case hinged on the photographic identification procedures that pointed out Ralph Nolan. The defense theory was that this is a case of mistaken identification. Nolan was not present when the crime occurred and did not match the descriptions provided by the witnesses, which described the perpetrators as male Hispanics. (Tr 66 -76). The defense long acknowledged that "the accuracy of the identifications is the key issue in the case." (Walsh, Ex. 11 at p. 1). While the defense opened that the identifications were suspect and that Detective Deloren got the witnesses to look at Facebook photos, there was no defense presentation as to why the procedure was suspect, how it was suggestive, and of course, no expert witness was ever called to explain it to the jury because no expert witness was ever consulted. (Tr 72) Even after the witnesses testified to what was a patently suggestive law enforcement arranged identification procedure, the motion to suppress was never renewed.

**Lorraine Scroggins**, who testified under a grant of immunity, (Tr 546), was a bedridden quadriplegic as a result of a gunshot wound she received while selling drugs years earlier. (Tr 550, 591, 606). She and her daughter's boyfriend, Christopher Martinez, who also lived with her, were selling drugs from her apartment in the Fall of 2013 just prior to the time of this robbery. (Tr 215, 255-260, 549, 552-553). Her daughter, Desiree Scroggins, who helped her "baby-father bag up bud" (marijuana) and referred customers to him, was also present that day, and testified pursuant to an immunity order. (Tr 101, 103-105, 110, 176). Although they claimed to have only bought a "few ounces" for re-sale, all three witnesses asserted their 5th Amendment Right and were granted immunity, (Tr 206-208, 214, 546, 549), in exchange for their testimony, as did

Chris Martinez's mother, Sandra Martinez. (Tr 587-588, 604). Ms. Scroggins did not admit to the marijuana to law enforcement until many weeks after the robbery. (Walsh, Ex. 18, (DELOREN 3509-09); Tr 425–426, 492-497).

The only witness who did not invoke her 5th Amendment Right, was **Deyanira Beriguette**, Lorraine Scroggin's home attendant. (Tr 184, 109). She quit working at the Scroggin's the day after the robbery and although she was shown an array including Nolan, she did not identify him or anyone else. (Tr 363). She testified "there were two of them and both of them pointed their guns at me, at my head." (Tr 187). Although she said she got a good look at the robbers when they first came in, (Tr 190), she did not identify Nolan or anyone else in the photo array or at trial. (Tr 193). She was also the only eyewitness who was not shown Nolan's Facebook page. (Tr 363). Ms. Beriguette, originally from the Dominican Republic, testified at trial with the assistance of a Spanish language interpreter, (Tr 183), that the two robbers were speaking both Spanish and English, (Tr 188, 197), and that the victims described the robbers as "Hispanic" and "Puerto Rican" based on their accent. (Tr 192, 201). On direct examination she was asked if she could see the robbers' skin tone, she said, "yes" and described their skin tone as "not black" and "not white." *Id.* On the day of the robbery, she was interviewed with the assistance of a Spanish language translator by law enforcement and described the robbers as male Hispanics. (Tr 415).[12]

On December 16, 2013, three suspected robbers were captured on elevator surveillance travelling up to the 14th floor of 1428 Webster Avenue, 14C (Lorraine Scroggins apartment). One was related to Christopher Martinez and his mother, Sandra. (Tr 117, 426-427, 607; 622).

---

[12] Ms Beriguete denied that either robber wore a mask, stated that at least one addressed her in Spanish and one was wearing gray and the other a black sweatshirt. (Tr 199). She testified that although they were wearing hoodies but took it off and "but then I saw the color of his skin like that..." (Tr 200).

His name was Shaun Odiot and although he did not enter the apartment, the Government claimed he was a co-conspirator and had asked about Lorraine's drug selling at a few months before the robbery over Thanksgiving dinner. (Tr 606 - 607). Odiot was at the apartment the day of the robbery asking for marijuana (Tr 118–119, 630 ) and inquiring of Desiree if Chris Martinez had "bud for sale" (Tr 119, 179-180) but neither Odiot's sister, Sandra Martinez, or Desiree Scroggins mentioned that to the police until well over a year after the robbery. [13]

Among other things, twenty-two year old **Desiree Scroggins** admitted to having smoked marijuana the morning before the robbery, (Tr 130-131, 164), and that she smoked it regularly, and in fact, smoked it every day since the robbery up until her trial testimony. (Tr 165, 579). [14] She described a gun point robbery by two men (Tr 122 –128; 156, 159 ), very quickly being pistol whipped by one (she identified as the defendant) with a gun that she described as brown and silver, (Tr 123-124, 159-60), and admitted that she was nervous during this "terrifying event" (Tr 160, 162). She also believed she had blacked out for a period. (Tr 125-127) Immediately after the robbery, she and the others were interviewed by the police and everyone described the robbers as "male Hispanics," (Tr 159, 161-162, 414–416; 459; Walsh Ex. 20, 3503-01). No one told the police that they recognized one of the robbers (Tr 161), much less that

---

[13] In fact, Desiree testified it was the week before trial, fifteen months after the robbery, that she for the first time told law enforcement she saw Odiot the day of the robbery. (Tr 179–181). Apparently, she had seen Odiot outside in the hallway with his sister Sandra Martinez, just before the robbery. (Tr 117-119). Sandra Martinez did not mention to the police anything about her brother being present the day of the robbery until she met with the Government over a year after the robbery and just weeks before trial. (Tr 708).

[14] Desiree Scroggins described committing a variety of crimes including check fraud, forgery, money laundering, drug dealing, shoplifting and a variety of larceny schemes for which she was apparently granted immunity. (Tr 104-105, 176, 177-178). The father of her children, Christopher Martinez, testified that Desiree smoked marijuana even while pregnant. (Tr 253).

it was a guy they knew from the old neighborhood as "white boy." (Tr 163-164).[15] She said one robber had a "black skuzzy hat over his eyes and a black hoodie over him..." (Tr 156).

On direct exam, Detective DeLoren testified that Desiree described the robbers as "light skinned...Possibly American Puerto Rican and one was taller than the other." (Tr 414). He said she said the one with the light eyes was about "six feet tall and that he could also possibly be white" when the Detective inquired if that was possible. (Tr 414). Reading from his notes on cross-examination, Deloren acknowledged, Desiree had also described one robber as wearing a hat or a "skully" and the other with a "half ski-mask." (Tr 459-460).

Desiree described Detective DeLoren's identification procedure conducted weeks later in her mother's apartment with her mother, Lorraine. Although she was never asked to mark any photograph, (Tr 512), after being asked if anyone looked familiar from the robbery from a stack of photos, she indicated that the defendant's photo "looked liked" a robber but that she wasn't sure. (Tr 138-140; 169; 507). She claimed to be about 75% sure. (Tr 140) She also said that after she viewed the photos that day DeLoren then "went into my mother's room and she [her mother] picked out the same photo." (Tr 140, 151 - 152)(emphasis supplied). When Desiree entered her mother's room, her mother Lorraine asked her, "That's him, right?" (Tr 152), clearly implying she knew which photo Desiree claimed looked like the robber. Desiree then described how she and her mother, with the detectives in the room, looked at the photos of the defendant on Facebook, (Tr 153, 170 -171), until the detective told them to stop because they could get in trouble. *Id.* This statement, the detective denied, (Tr 513) although he did admit he asked Desiree to look at the defendant's Facebook page to see if she recognized anyone else involved in the robbery, (Tr 523), and admitted he "encouraged" such conduct. (Tr 513 )

---

[15] Desiree Scroggins is a black woman. (Walsh, Ex. 20).

After she and her mother looked at the defendant's Facebook photos, Desiree now described her identification of the defendant as "positive." (Tr 154, 179). Not surprisingly, that same day Desiree showed the father of her child, Christopher Martinez, and his mother Sandra, defendant's Facebook page and told them about the identification. (Tr 172 -174, 177). Christopher Martinez, recognized the Facebook photo to be a kid he called "White Boy." (Tr 177) He also denied that White Boy would ever do such a thing. (Tr 173). Desiree Scroggins informed the Government, that on the same day she saw defendant's photograph, she showed Sandra Martinez the defendant's Facebook page. (Walsh, Ex. 15; Tr 147).

Defendant's trial counsel did not renew or move to suppress any of these identifications.

**Lorraine Scroggins**, permanently bedridden, described a gun wielding robber, "brown skinned" wearing a leather jacket and "hoodie" enter her bedroom, speaking Spanish on the telephone who threatened her with a "gun to the back of [her] head" and demanded drugs and money. (Tr 555-557).[16] The second robber, who she identified as the defendant, also had a gun, which he aimed at her while searching under the bed, (Tr 558, 571). Bedridden as a result of an earlier gunshot wound Lorraine was alone in a separate room from the other victims during the robbery. The day of the robbery she told law enforcement they were "possibly male Hispanic, light skinned...one taller than the other and also having light colored eyes, possibly blue or green." (Tr 414). She told law enforcement one wore a "hoodie and one glove." (Tr 463). By the time of trial, Lorraine Scroggins described him as "like white with color eyes." Unlike the first robber who "came in a lot of times," the second one, who she identified was the defendant, "came in about two times," (Tr 560), and Lorraine, "very scared" and "frightened," kept her head down because of the first robber's threats. (Tr 561, 576, 581, 579).

---

[16] Lorraine Scroggins is a black woman. (Walsh, Ex. 26).

At trial, Lorraine described being shown a stack of photos more than one month after the robbery on January 27, 2014 by Detective Deloren while in her bedroom, with her son Robert Jackson[17] and at some point, her daughter Desiree in the room. (Tr 563 – 567). On direct, she admitted to going onto the internet; (Tr 568); having learned the defendant's name from law enforcement and described her son, her daughter and herself viewing the defendant's Facebook page with the detective in the room. (*Id., Tr 582, 584).* Without defense objection, she was permitted to answer "yes" when asked if she was confident in her identification. (Tr 568, GX 203). In April 2014, law enforcement returned to Lorraine Scroggins' apartment where she was shown and "picked out the same picture" of the defendant that she had already seen, again. (Tr 569, Gov Ex 204, 316-318, 361-362). There was no cross-examination about how many times Lorraine had looked at the Facebook pages since she was first shown the defendant's page with Detective Deloren.

**Christopher Martinez**, 22 years old, also testified under grant of immunity and admitted to using and selling marijuana and "domestic violence."[18] He smoked marijuana daily since the age of about eight, and in fact had smoked it in the shower the day of the robbery. (Tr 215, 218, 248-253, 262, 579). He had been bagging up, selling and smoking as much as 2 -3 ounces of marijuana per week for Lorraine Scroggins prior to the robbery. (Tr 217-218, 255-260). He also described two robbers, both with guns, (Tr 263), both wearing hats, (Tr 222, 349 (skull cap)); both "light skinned Hispanics." (Tr 416). Although, Christopher Martinez claimed to have a good opportunity to see the perpetrator's face during the robbery, (Tr 239-240), that the

---

[17] Defense counsel did not segregate the witnesses, but instead permitted Robert Jackson to remain in the courtroom to listen to his quadriplegic mother testify in front of the jury from her stretcher before he was called as a witness himself. (Tr 545, 573)

[18] Christopher Martinez is a Hispanic male. (Walsh, Ex. 27).

defendant tied him up, threatened to shoot him in the ankle and was pointing the gun all around, including at his child, (Tr 224- 225 ), he claimed he did not recognize him during the robbery (Tr 222, 239). Indeed he did not tell police for well over two months that he recognized the defendant. During the robbery, his hands were was tied behind his back, he was on his stomach face down (Tr 127) or had a pillow in his face, while the robbers searched the apartment. (Tr 229- 230) He testified that "everything happened too fast." (Tr 239), and he "was in panic mode." (Tr 265). According to Christopher Martinez, he did not recognize the defendant who he called "White Boy" seven or eight years prior, (Tr 239, 314, 444) until Desiree showed him the Facebook photos of the person that she identified from the robbery before law enforcement showed him the defendant's mug shot photo on February 10, 2014. (Tr 240, 266-267, 310, 314, 443). He acknowledged that Desiree showed him the defendant's Facebook picture before he made his identification. (Tr 266 – 267).

Defense counsel still did not move to renew the motion to suppress the identifications.

**Sandra Martinez**, the mother of Christopher Martinez, a cocaine addict, (Tr 604-605), also testified pursuant to an immunity order. (Tr 587-588; 604).[19]  She too, observed two men "pointing guns" at her son, her granddaughter and her daughter, (Tr 611 – 613), demanding drugs and money that day.[20]  In contrast to Desiree Scroggins sworn testimony that she had showed Sandra the Facebook pictures, (Tr 172 – 174) , at first Sandra Martinez denied she had ever seen

---

[19]  Although there was minimal cross-examination about the witness's drug use or criminal history, apparently she illegally sold pills (Tr 706) and admitted she was using cocaine during the time she was speaking to law enforcement after the robbery. (*Id.*)  Ms. Martinez is a Hispanic woman. (Walsh, Ex. 28).

[20]  Even weeks later, consistent with the 911 call and the initial accounts, on January 23, 2014 when confronted by the detective about her brother, Odiot, Sandra Martinez described the robbers as male Hispanics, 5 foot five and six feet tall, one thin, with black leather and the taller, "heavy" in green jacket. (Walsh, Ex. 22).

a Facebook photo of the defendant. Later, on cross-examination she admitted that she had seen them but denied it was before she identified him in a photo array. (Tr 626, 701). Desiree Scroggins told the Government and testified that she had shown Sandra Martinez the defendant Nolan's Facebook photo the day she herself first saw it January 27, 2014. (Tr 173 , Walsh, Ex. 15). Although at trial she claimed she knew "white boy" from when she lived on Merriam Avenue "like 15 years before" the trial, she did not recognize him at the time of the robbery because her "eyes and [her] mind was too much on the gun. And I had my daughter in law bleeding – my granddaughter." (Tr 628, 691). She reiterated throughout her testimony that she was focused on the gun during the robbery. (Tr 634, 691) When asked if she had a good opportunity to see the defendant's face, she answered: "Vaguely." (Tr 628, 710). She was "focused on the gun that's in my granddaughter's face." (Tr 634). She admitted at trial that after the robbery, she did not tell the police either robber looked familiar, (Tr 643) and indicated that the experience was "traumatic" and of course, she spoke to her son and Desiree about it afterward. (Tr 700).

According to DeLoren at trial, Sandra described both robbers as light skinned Hispanics but when asked "if it was possible one was white" she said it was. (Tr 428) In addition to viewing defendant's Facebook photos, Sandra Martinez, like Lorraine Scroggins, was shown the defendant's photograph by law enforcement multiple times. (Tr 311 – 313, GX 202, 441), including on January 28, 2014 the day after Desiree and her mother looked at Ralph Nolan's Facebook account with the detective. (624-625, GX 201) Sandra and her son, Christopher Martinez were shown the exact same photo array, with defendant in the same position number "3." (Tr 234-237, 359). Although Desiree claimed her boyfriend called 911 after the robbery, (Tr 136), Christopher Martinez and his mother Sandra testified that Sandra called. (Tr 234, 619).

The caller on the Sprint Report of the 911 call described the robbers as two male Hispanics. (Walsh, Ex. 24)(Sprint Report of 911 call).[21]

The investigation, including the first photographic identifications proceedings surrounding the December 16, 2013 robbery, were conducted by **Detective Deloren**. After the robbery, Deloren circulated a wanted poster describing "two male Hispanics armed with firearms." (Tr 471-472, Def. Trial Exhibit ("DX") C)(Walsh, Ex. 23). At trial, without objection, Deloren was permitted to testify how Ralph Nolan became one of the multiple suspects in the photographic identification procedure he conducted with the Scroggins on January 27, 2014. (Tr 425 – 428). Testifying to double layers of hearsay, without objection by defendant's counsel, Deloren relayed his out of court conversation with Desiree Scroggins of January 21, 2014 describing her earlier conversation with a friend who had observed Odiot fencing items from the robbery. (Tr 425-426). Telegraphing the defendant's criminal record to the jury and again, without defense objection, Deloren explained how he "searched [Odiot's] address for anybody that had been arrested using that address in the past and compared it to the general descriptions provided by the victims" and compiled a stack of photos that included a photograph of the defendant, Ralph Nolan. (Tr 429). Defense counsel did not object to his client's criminal record being put before the jury in this way, and in fact compounded it later when he cross-examined about the substance of the arrest, (Tr 504). He furthered compounded this blunder by eliciting that law enforcement had multiple photos of his client, including one as recent at 2011. (Tr 506-507). This would not be the last time the jury was left with the impression that Ralph Nolan had a significant criminal history.

---

[21] The 911 Sprint report describes 2 male Hispanics; "2 M H.....1 wrng a green hoody with green eyes 5X9 2nd perp wrng blk leather...ski mask...blk jeans...both wrng construction boots." (Walsh, Ex 24).

Deloren did not testify nor was he cross-examined if he provided any instructions to the witnesses, but explained that when he showed the photos to Desiree, she stated that the defendant's picture "really looks like him" but she was not certain, and was never asked to mark the photo. (Tr 431-432). The detective explained that immediately after Desiree, he showed the photos to her mother, Lorraine, who "due to her condition, [the detective] actually had to manipulate the photographs," (Tr 433) and "put a pen in her hand [to] help her make an X." (Tr 434). There was no cross-examination regarding how she could manipulate the Facebook photographs and ipad as he claimed if she was unable to mark the photo.

Unsure if he directly told them the defendant's name or if they read it off the photo as he showed them, (Tr 435), the detective admitted that Desiree and her mother undoubtedly had the name and then proceeded to manipulate the iPad to view the defendant's Facebook page while he instructed them to check for "friends" to see if they could identify the other suspect. (Tr 436). Before any cross examination whatsoever, the detective was permitted to explain for three pages of testimony on direct examination, the circumstances of the *Chambers* case wherein the court did not credit his testimony. (Tr 437-439, 449) (Walsh, Ex. 16). The only objection by defense counsel was to the single question as to whether the detective had testified truthfully in Chambers. (Tr 437).

With respect to the Facebook photos, just as he did in the *Chambers* case, the detective admitted that here he "encouraged" the witnesses to view Facebook. (Tr 513) and knew that Desiree had shown the Facebook to the Martinez's. (*Id.*, 523).

A. The Defense Case

By the time the defense called **Robert Jackson** to the witness stand he had already listened to his mother's testimony in court before the jury. (Tr 545, 573), because counsel failed to move to exclude him from the courtroom. (*See* footnote 16). Under defense subpoena for the

next day, he explained that he was there with his mom and "on his mom's behalf so she could feel comfortable." (Tr 599). He also testified he had not spoken to defense counsel before that day, but on cross, admitted he spoke to a defense investigator. (Tr 600). Jackson was present when his mother testified first about the identification procedure on January 27, 2014 with her daughter Desiree (Tr 567), when she claimed she went on the internet "probably after that date," (Tr 567) and then later when on cross-examination, she denied that the police showed her the Facebook page but that they looked at it together after the identification. (Tr 568, 582 – 583), and that she viewed it with her son and later her daughter. (Tr 584).

Although defense counsel had tape recorded statements of Robert Jackson and Lorraine Scroggins inconsistent with Lorraine Scroggins trial testimony he did not present it to the court pre-trial in support of the motion to suppress, offer it to renew the motion, nor use it to impeach her with it during the trial. (Walsh, Ex. 10) Instead, the defense called Robert Jackson, out of turn, immediately after he sat in court and heard his own mother's testimony. (Tr 591). Jackson testified consistently with his mother's trial testimony, that she was shown some photographs and pointed out a person from "six photographs in like a pile of papers" and after that, "they, went on, she had an ipad on her lap and they went into Facebook ." (Tr 597-598). Explaining that his "mom can't type" Jackson testified that the Detective typed but his "mother told the detective what to type in" because his mother saw the name. (Tr 598) Robert testified that his mother "seen the photos first. And then like about two minutes later, they looked on the ipad and through the Facebook photos." (Tr 598) This was contradicted by the recorded statement provided to the defense investigator wherein Jackson indicated his mother was at first ambivalent and unsure when viewing the photos until she was shown Facebook photos on the computer. (Walsh, Ex. 10). At trial Jackson testified his mother picked out the defendant's photo first and then went on Facebook. (Tr 601) He described his mother's spastic reaction with muscular contractions and

her "jumping up" when she viewed the Facebook photo. (Tr 601). Defense counsel did not use the tape to refresh or impeach Jackson with his prior inconsistent statement and the defense investigator was never called as a witness.

B.  The Alibi

On the last day of trial, the defense called the defendant's father, **Ralph Nolan (Senior).** The government objected to any alibi evidence from the day of the robbery due to a lack of notice given by the defense even after an explicit demand. (Tr 660). The defense proffered he had intended to call the father to testify that he had worked with his son the morning of the robbery to prepare for a job they worked together the next very day on December 17, 2013. (Tr 666 - 684). The Government objected to the testimony as "back door alibi" without notice and the Court, finding it otherwise irrelevant, prohibited the testimony that the defendant had been working with his father on the very morning the robbery took place, or the day after the crime.

Nevertheless, the defense called the witness who established that his son an "Irish Canadian" worked with him "installing wiring for voice and data;" (Tr 736-38, 741), that he did not own a jacket or sweater like those shown in a video of the suspects taken on the day of the robbery, (Tr (748-750), and that his gait did not match the men on caught on video exiting the apartment complex.  (*Id.*).  In the course of the father's testimony defense counsel permitted prosecution cross-examination that the father had called the police on his own son for a violent assault with a chair and a bed frame. (Tr 751 - 753).  Counsel failed to object to this line of inquiry.

By the time the jury retired to deliberate, they had ample reason to conclude that the defendant had a substantial criminal history from the reference to a prior robbery in his post-arrest videotaped statement; from the detective's testimony about how the defendant's photo was selected for the identification proceedings; from the defense cross-examination of the detective

about a trespass arrest and another arrest photo from 2011; and finally from the testimony about an assault on his own father with a chair and bed frame. All of this evidence was admitted without objection or limiting instruction and some inexplicably elicited by the defense.

C. The Charge

The Court gave a specific instruction on eyewitness identification, (Tr 874 – 77), but no limiting instruction was given regarding the defendant's criminal history or prior bad acts, nor did defense counsel request one. Ironically, the Government not the defense included a proposed limiting instruction on "similar act evidence," but it was never charged. (14 Cr 555(GBD) (Doc. No. 26, Request No. 27).

D. Summations

**The Government** made quick use of the central issue in the case; the identifications. In summation the Government hammered home:

> The only issue that's really in dispute is whether Ralph Nolan was one of the robbers and not one, not two, not three but four of the victims took that witness stand and told you he was. (Tr 765)

The Government drilled home the identifications and the number of them. (*Id.*, "The most devastating evidence against this defendant is the testimony of those victims. There were four identifications of the defendant, four.") The Government shrugged off any issue of suggestivity of the Facebook photographs, calling the argument "nonsense," (Tr 769) and arguing that "Facebook didn't change their minds. They already knew he did it." (*Id.*). The absence of any defense expert explanation or sophisticated understanding of the taint of suggestivity permeated the Government's summation sometimes even begging the question. (Tr 769 ("[Defense counsel] somehow suggest that seeing Facebook pictures of Ralph Nolan after that means they didn't pick him out? Nonsense, you know that."); (Tr 770 ("Desiree Scroggins testified that she showed a Facebook picture of Ralph Nolan to Sandra Martinez before Sandra looked at the

photo array…. Why does it matter?" ); (Tr 771 ("Did Christopher see a Facebook picture of Ralph Nolan before he looked at his? Yes. … but again, same thing as Sandra Martinez, why does it matter?")). In addition, without defense objection or limiting instruction, the Government exploited during summation the unobjected to, stipulated Facebook photo of the defendant posing with a bb-gun in his hand and captured on the post-arrest video statement, a particularly devastating tactic in this his trial for an armed home invasion robbery. (Tr 787 - 788).

On rebuttal, the Government argued "[t]his is an identification case….That's the most important thing here…Four people, four individuals came into this courtroom. They took the witness stand and they identified the defendant, and they told you that he robbed them. If you believe even a single one of those four witnesses, the defendant is guilty. Just one." (Tr 827 – 828; Tr 834 ("You know what matters in this case? The identifications")) The government argued the Scroggins' identifications were before the Facebook viewing, that Facebook photos was an "invaluable investigative tool" and that it was no moment that the Martinez's were shown the Facebook pages since they knew the defendant anyway. (Tr 830 – 832). The Government highlighted it was the defense own witness who solidified the *id*, "…Robert Jackson, his witness, who did nothing but make it crystal clear that his mother's identification was rock solid, and it was only after that point that she looked at Facebook." (Tr 831).

Again and again, the Government replayed the post-arrest video-taped statement during summation which was replete with prejudicial references to defendant's so-called "prior robbery" and the inflammatory photo of defendant posing with a "gun." Tr 781, 782, 787 – 788). And, for good measure, the Government vouched for the reliability of the identifications, underscoring that Lorraine Scroggins conveyed a high level of confidence. "You saw her here in this courtroom. You saw her confidence. You heard about her confidence. " (Tr. 836).

For its part, the defense relied almost exclusively on the jury charge to challenge the identifications, (Tr 798) and while the defense raised the question; "did the Government influence those witnesses to make the identifications," there was no evidence presented to support the theory, much less argue it. (Tr 799; Tr 807 ("[T]he Facebook photos could and I submit to you, did, influence the accuracy of the identification." ) The defense agreed that there was but "one issue" in the case, "did they get the right guy?" but the summation did nothing to challenge the id's in fact at one point arguing "It doesn't matter what the identifications are like...." (Tr 824) Nor did the defense explain how the Government influenced the witnesses even conceding at one point, "we don't know what's in the Facebook photos" and inexplicably suggesting that perhaps they was a clearer picture of Mr. Nolan and his eyes on Facebook. (Tr 813) Meanwhile, the defendant's Facebook photo holding a handgun was before the jury without defense objection. (Tr 325 - 327)

The issue was not lost on the jury whose requested read back of "Desiree Scroggins testimony where she describes going into her mother's room and they discuss that they had chosen the same man" and "Robert's [Jackson's] testimony." (Tr 897). The jury returned a guilty verdict on all counts before the testimony was even read back. (Tr 905-906)

### E.  The Lack of An Expert Witness

Trial counsel was aware since the day he was appointed to represent the defendant that the sole issue in the case was identification. (Walsh, Ex 29, Sworn Declaration of Trial Counsel at ¶¶ 3 & 4). He knew that the only issue before the jury was whether Ralph Nolan committed the crime. (*Id.*) During the charge conference he suggested that it would be satisfactory if the jury was told that the only issue in the case was one of identification and the charge could begin and end there. (Tr 762) Yet, he never consulted an expert on the issue of identification before or during the trial and he never called an expert on the issue of identification. (Walsh, Ex. 29 at ¶

5). Neither decision was a strategic or a tactical one. (*Id.* at ¶ 6) And, as defense counsel eventually realized far too late, "that was a terrible mistake." (Walsh, Ex. 1, Trial Counsel's Letter to Court). What is more, defense counsel had ample notice of the problems with the identifications based on defense investigation, (Walsh, Ex. 10) and the sister courts' findings about the detective's tactics and lack of credibility in both *Chambers*, 13 Cr 345 (LGS) and *Cooper*, 05 Cr 1139 (DAB).

### F. Post-Trial Motions

Defense counsel argued in post-trial motions the scientific, legal and historical reality that "misidentification is the leading cause of wrongful convictions across the country. " (Walsh, Ex. 30, Defense Post-Trial Motion at p 14, *citing State v. Henderson*, 27 A3d 872 (2001)). But, while the defense argued that "the scientific evidence to this effect cannot be ignored," sadly, the defense did just that in the preparation and trial of the case. (*Id.*) While citing to leading scholarly articles on mistaken identification and challenging the improper bolstering of identifications with Facebook photos throughout the post-trial motion for a Judgment of Acquittal pursuant to Fed. R. Crim P. 29(c), the defense put none of this information before the Court pre-trial and worse, put none of it before the jury to explain the  established science surrounding misidentification, and to sensitize it to the factors that cause it and how even good faith efforts by law enforcement can compound it. (*Id.* at pp 14, 18, 21). Worse, the defense conceded that "[t]he evidence, if construed most favorably to the Government, may find that the evidence [sic] was sufficient to uphold the conviction," (*Id.* at 3), and in reply confirmed that "the Rule 29 standard may not have been met." (Walsh, Ex. 30).

It is not surprising that, the Court denied the motion on its merits and as being moot and framed defense counsel's ineffectiveness succinctly in the written decision. "[D]efendant cannot now complain that the government's responses to the witnesses' exposure to the defendant's

Facebook page were improper, where the defendant initially moved to preclude in-court identification testimony by the [witnesses] and subsequently withdrew the motion in its entirety." (Walsh, Ex. 31, Decision on Post-trial Motion, August 11, 2015 at 12, fn 23,). The Court, of course, was correct but not only did counsel withdraw the motion and fail to properly challenge the proceeding, he actually compounded it by asking non-leading questions to a professional law enforcement witness, Agent A. Winston, providing an open-ended opportunity for law enforcement to explain. (Tr 350).

### G. Eyewitness Identification Expert

As the defense belatedly acknowledged in the post-trial motions, there was indeed a plethora of social science expertise and legal authority available to assist in this defense at either pretrial to prepare and/or to assist the jury in scrutinizing the accuracy and reliability of the identifications at trial. This particular case presented a host of relevant issues for which expert testimony would have been helpful to the jury in evaluating the evidence. Distinguished Professor of Psychology at John Jay College of Criminal Justice of the City University of New York, Steven Penrod, who holds a J.D. from Harvard Law School and a PH.D in social psychology also from Harvard University, is one such expert who, having testified in over 100 cases in federal and state venues (mostly eyewitness issues) and the author or co-author of close to 50 eyewitness publications including 30 original research articles published in peer reviewed scientific journals is an example of just one expert qualified and able to have assisted the defense had he been consulted or called as a witness. (Walsh, Ex. 32 at 10, (Expert Report by Dr. Steven Penrod (hereinafter "Penrod Rpt." )).

Dr. Penrod examined portions of the case file including 3500 material, discovery and the transcript in this case to identify factors that could have contributed to a misidentification in this case and about which he would be "and would have been prepared to testify at the trial of

defendant Nolan." *Id.* at 11. Dr. Penrod's comprehensive 71 page report (executive summary pp. 1-9) notes generally the phenomenon of eyewitness identification errors, the growing body of scientific research on eyewitness reliability, the need for expert testimony to help jurors and how the research and testimony meet admissibility criteria. (Penrod Rpt. at 10-24, referencing Report Sections II-VI). Specific to this case, Dr. Penrod notes research findings relating to the factors in this case - subject matters in particular that are relevant in the present case, and particular witnessing and crime factors that influence the accuracy of identifications. (*Id.* at 24-60, referencing Report Sections VII-X). Of particular note in this case those factors include; weapon focus; stress; cross-race identification, disguise/obscured views, multiple perpetrators; retention interval; (mis-)recognition of familiar faces; unconscious transference and the probative value of identifications and non-identifications. (*Id.* at 32-55) In addition to those factors Dr. Penrod's analysis of the present identifications additional factors that impact the case involving the procedures themselves including line-up instruction bias; multiple suspect arrays; prior exposure effects; suggestive identification procedures and (non)blind presentations and second identifications attempts. (*Id.* at 49-60). Also relevant here and about which Dr. Penrod could testify includes the issue of witnesses' confidence about the accuracy of their identification and confidence malleability. (*Id.* at 60-68). Finally, Dr. Penrod discusses the cumulative impact of particular factors on identification performance reliability. (*Id.* at 68 – 69).

Although counsel's post verdict arguments demonstrate that he was obviously aware of the science surrounding misidentification, he utterly failed to procure the assistance of an expert in derogation of his fundamental duty to provide effective representation for his client.

**ARGUMENT**

## I. PETITIONER WAS DENIED HIS RIGHT TO
THE EFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment to the United States Constitution provides that in "all criminal prosecutions, the accused shall enjoy the right …to have the assistance of counsel." U.S. Const. amend. VI. The right to counsel is "the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). Under the federal constitution even a single error or omission may constitute ineffectiveness. *Kimmelman v. Morrison*, 477 U.S. 365 (1986); *United States v. Cronic*, 466 U.S. 648, 657 n. 20 (1984).

In order to prevail on a claim of ineffective assistance of counsel, a petitioner must satisfy a two-prong test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). A plaintiff establishes that he received ineffective assistance where (1) "his attorney's conduct falls outside the wide range of professionally competent assistance" and (2) "there is a 'reasonable probability' that, but for counsel's inadequate representation, the result of the proceeding would have been different." *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992), *cert denied*, 508 U.S. 912(1993)(*quoting Strickland*, 466 U.S. 668, 694); *United States v. Brown*, 623 F.3d 104, 112 (2d Cir. 2010). "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman*, 477 U.S. at 374 (1986).

While courts give deference to an attorney's strategic decisions that are "conscious, reasonably informed" and "made by an attorney with an eye to benefitting his client," defense counsel's repeated inaction without tactical justification may well be considered objectively unreasonable. *Cox v. Donnelly*, 387 F.3d 193, 199 (2d Cir. 2004). A petitioner may rebut the suggestion that the challenged conduct reflected merely a strategic choice by showing that

counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

As for the prejudice prong, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003) (*quoting Strickland* 466 U.S. at 668). Put another way, "[g]enerally, a Petitioner suffers prejudice if there is a reasonable probability that his reliance on counsel's ineffective assistance affected the outcome of the proceedings." *Pham*, 317 F.3d at 182.

While some errors have an "isolated, trivial effect" on the outcome, "some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture." *Strickland,* 466 U.S. at 695-96. As the Second Circuit has reiterated, "[t]he reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." *United States v. Mazzuca*, 570 F.3d 490 (2d Cir. 2009) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n. 9 (internal citations omitted)); *see also Henry v. Poole*, 409 F.3d 48 (2d Cir. 2005)("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case."). The Court looks instead, to whether "the probability of a different result is 'sufficient to undermine confidence in the outcome' of the proceeding.'" *Dominguez Benitiz*, 542 U.S. at 83 (*quoting Strickland*, 466 U.S. a 694.) "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, *even if the errors of counsel cannot be shown by a preponderance* of the evidence to have determined the outcome." *Henry*, 409 F.3d at 64 (emphasis in original)(citing Strickland, 466 U.S. at 694). "This standard is not a stringent one." *Thomas v. Varner,* 428 F.3d 491 (3d Cir. 2005) (internal quotations omitted).

Accordingly, in determining the existence *vel non* of prejudice, the court must consider the totality of the evidence before the judge or jury. *Kimmelman*, 477 U.S. at 381. In this particular case, one aspect of counsel's performance was so fundamental and so harmful as to establish prejudice standing alone. But other oversights were so glaring as to make this case a unique example of cumulative error. Those other errors will be addressed below. But counsel's dereliction with respect to his handling of the eyewitness identification, which was the core issue in the case, and the only evidence that connected the defendant to the commission of the crime, was demonstrably prejudicial. *See, Massillon v Conway*, 574 F. Supp.2d 381 (S.D.N.Y. 2008) ("If a verdict or conclusion was only weakly supported by the record, it is more likely to have been affected by counsel's errors..." citing *Gersten v. Senkowski*, 426 F.3d 588, 611 (2d Cir. 2005)).

## A. The Failure to Consult an Expert in Eye-witness Identification Deprived Defendant of his Sixth Amendment Right to the Effective Assistance of Counsel

From the outset, defense counsel was aware that the eyewitness identifications were the heart of the Government's case against Ralph Nolan. *See* (Walsh, Ex. 29)(Declaration of Trial Counsel) ("The case raised a sole issue; identification...I was aware that this was the sole issue from the time of my appointment.") As early as arraignment on July 28, 2014 the complaint claimed that "three of the individuals who were present in the apartment during the robbery...independently reviewed photo arrays, and each identified a picture of Ralph Nolan...."), (Walsh, Ex. 3) *see also* (Walsh, Ex. 11("[T]he accuracy of the identifications is the key issue in the case)); (Walsh, Ex. 1 ("the case raised a sole issue, that is, was Ralph Nolan the person who committed the crime.")). Further, the "proverbially untrustworthy" nature of eyewitness identification had long been recognized and forewarned by high courts. *United States v. Wade*, 388 U.S. 218, 228 (1967)("the annals of criminal law are rife with instances of

mistaken identification") *see also, Kampshoff v. Smith*, 698 F.2d 581 (2d Cir. 1982) ("There can be no reasonable doubt that inaccurate eyewitness testimony may be one of the most prejudicial features of a criminal trial...the experience of law and psychology has been that eyewitness testimony may sometimes be the least trustworthy means to identify the guilty.") (internal citations omitted).

Although trial counsel was abundantly aware that "[t]he only question was whether Nolan was the 'right man' he did not consult nor call as a defense witness "an expert who could have testified regarding the fallibility of eyewitness identifications." (Walsh, Ex. 1). As trial counsel candidly acknowledged, "that was a terrible mistake." (*Id.*) The mistakes were neither strategic nor tactical. (Walsh, Ex. 29) That failure, in a case built solely on eyewitness testimony, rendered his performance ineffective. Trial counsel's omission fell "outside the wide range of professionally competent assistance'" *Scully*, 982 F.2d at 803 (*quoting Strickland*, 466 U.S. 668, 694). And, "there is a reasonable probability that" but for his error, "the result of the proceeding would have been different." *Pham*, 317 F.3d at 182 (*quoting Strickland* 466 U.S. at 668)

The problems with the accuracy of eyewitness testimony were recognized by the Supreme Court almost forty years ago:

> The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification Mr. Justice Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient criminal procedure.'

*United States v. Wade,* 388 U.S. 218, 228 (1967). In the decades since *Wade,* the prevalence of research on eyewitness inaccuracy renders trial counsel's failure to contact an expert on the subject to investigate possible theories of defense even less reasonable. Since

32