*Wade*, the acceptance and acknowledgment of a well-developed and broadly established body of social science confirming the malleability, if not the fallibility, of eyewitness identification has been reiterated by the nation's highest courts. *See, Perry v. New Hampshire*, 132 S.Ct. 716, 728 (2012) ("We do not doubt either the importance or the fallibility of eyewitness identifications..." referencing studies showing that eyewitness misidentification are the leading cause of wrongful convictions and *amicus curiae* American Psychological Association research reflecting high incidence of inaccurate identifications); *see also, Young v. Conway*, 698 F.3d 69 (2d Cir. 2012) (citing extensively to multiple social science resources in upholding grant of petition and recognizing that "'social scientists, forensic experts, law enforcement agencies, law reform groups, legislatures and courts' routinely rely upon the research during legal proceedings regarding eyewitness testimony" and *citing* favorably *State v. Henderson*, 208 N.J. 208 (2011)(86 page Special Master report compiling expert testimony and hundreds of scientific studies on eyewitness identifications).

Even before *Conway*, as that Court noted, this Circuit and others had "previously approved lower courts drawing upon this body of literature in appropriate cases." *Conway*, 698 F.3d 79 (internal citations omitted); *see also, United States v. Smithers*, 212 F.3d 306, 312 n.1 (6th Cir. 2000) ("A plethora of recent studies show that the accuracy of an eyewitness identification depends on how the event is observed, retained and recalled. . . . One study has estimated that half of all wrongful convictions result from false identifications."); *Newsome v. McCabe*, 319 F.3d 301, 305 (7th Cir. 2003)(". . . Psychological research has established that the witness's faith is equally strong whether or not the identification is correct."); *United States v. Feliciano*, No. CR08-0932-01PHXDGC, 2009 WL 3748588, at *3 (D. Ariz. Nov. 6, 2009) ("[t]here is an increasing body of academic literature concerning the reliability of eyewitness testimony" and collecting literature); *United States v. Smith*, 621 F. Supp. 2d 1207, 1210 (M.D.

Ala. 2009) ("[A] s the body of evidence has grown showing the unreliability of some eyewitness testimony, courts have gradually recognized the potential value of expert testimony on this subject."); *see also, Perry v New Hampshire*, 132 S.Ct., 716 (2012)("In appropriate cases, some States also permit defendants to present expert testimony on the hazards of eyewitness identification evidence.")(*quoting State v. Clopten*, 2009 UT 84, A33("We expect...that in cases involving eyewitness identification of strangers or near strangers, trial courts will routinely admit expert testimony...")); *see also, People v. Le Grand*, 8 N.Y.3d 449 (2007)(holding in a case that turns on accuracy of eyewitness identification and little or no other evidence connecting defendant to crime, trial court abused discretion in excluding expert testimony). The Innocence Project reports that "eyewitness misidentification is the greatest contributing factor to wrongful convictions proven by DNA testing, playing a role in more than 70% of convictions overturned through DNA testing nationwide." Innoncence Project, Eyewitness Misidentification http://www.innocenceproject.org/causes/eyewitness-misidentification/ (last visited 9/30/16).

Given the absence of any other evidence connecting the defendant to the crime and Government's reliance on identification evidence, it was unreasonable for trial counsel not to even weigh the benefits against the risks of consulting an identification expert. By counsel's own admission, this decision was not a strategic one. (Walsh, Ex. 29 at ¶¶ 5 & 6). *Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); *See also, Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003) (distinguishing between reasonable strategic decisions and absence of any trial strategy in evaluating deficient performance on basis of failure to consult or call expert); *United States v. Mitchell*, No. CIV.A. 05-CV-823, 2007 WL 1521212, at *7 (E.D. Pa. May 21, 2007) (distinguishing cases where "counsel makes an informed decision

not to call an expert (who often is available) at trial" that is entitled to broad deference from cases where "the attorney's deficient performance is typified by his failure to consult with the necessary (or appropriate) expert in preparing a defense").

"[C]ounsel has a duty to make reasonable investigations, and a decision not to investigate will be reasonable only 'to the extent that reasonable professional judgments support the limitations on investigation.'" *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005). Thus, while strategic choices made after a thorough investigation enjoy a presumption of effectiveness, an attorney's failure to investigate a viable theory of defense due to sheer oversight is not entitled to the same deference. *Id.* In the context of expert testimony, the standard for reasonable performance demands that attorneys engage in some form of investigation when assessing whether an expert would aid the defense. *See Dugas v. Coplan*, 428 F.3d 317, 332-33 (1st Cir. 2005) (noting in ineffective assistance analysis that counsel failed to undertake "benefit-peril balancing" with respect to hiring an expert); *see also Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001)("no excuse for the lawyer's failure to consult experts on hair, DNA, tread marks and footprints" in light of defense argument defendant not at the scene of crime). Sadly, that assessment was simply never done in this case.

Even if trial counsel had rejected the possibility of an expert after a considered analysis, however, the decision would have been unreasonable where the Government's evidence rested entirely on the testimony of eyewitnesses. This conclusion is especially true in this case because, as will be discussed below, counsel had ample notice that there was evidence the identifications were tainted by suggestive procedures. The Second Circuit has repeatedly held that in cases where expert testimony could have undermined key elements of the prosecution's case like this one, an attorney has a duty to contact an expert. *See Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001) (counsel "at least" had duty to contact expert and educate himself with respect to

psychological evidence that would have aided defense). Indeed, the more important a disputed issue is to the prosecution's theory, the less reasonable the attorney's failure to hire an expert to testify, or, at the very least, provide a background of the relevant area so that the attorney can effectively prepare a defense. *See Gersten*, 426 F.3d at 611-12 (failure to consult expert rendered performance ineffective expert could have undermined credibility of government's most important witness); *Pavel v. Hollins*, 261 F.3d 210, 223-24 (2d Cir. 2001) (failure to consult expert where prosecution's case relied on credibility of a single doctor was ineffective assistance); *Eze*, 321 F.3d 110 ("the decision not to call a witness must be grounded in some strategy that advances the client's interest.").

Of particular importance is the Second Circuit's holding in *Bell v. Miller*, 500 F.3d 149, 157 (2d Cir. 2007), where the Court ruled that counsel's failure to hire an expert to explain potential problems with the testimony of the prosecution's primary eyewitness. Although the eyewitness had shared a bathroom and kitchen with the defendant for one year, he initially described the assailant as a stranger. *Bell*, 500 F.3d at 155. In granting the defendant's habeas petition, the Second Circuit noted that an expert could have testified that the witness's identifications of the defendant were made under compromising circumstances, after the witness had potentially suffered from memory impairment. *Id.* at 157. Even though the defense counsel had the opportunity to cross-examine the eyewitness and to establish an alibi, the Second Circuit reasoned that there would have been no "appreciable downside" to also presenting expert testimony and there was "no tactical justification" for not doing so. *Id.*

As in *Bell*, trial counsel had no justification for failing to contact and call an expert that could cast substantial doubt on the reliability of the identifications and certainly no "appreciable downside" to presenting expert testimony to challenge the only evidence that placed Nolan at the crime. *Id.* Not only was the jury deprived of the opportunity to hear expert opinion on potential

problems with the identifications, trial counsel did not have the benefit of expert knowledge when preparing his cross-examinations of the Government's witnesses on a host of scientific issues that influence the reliability of eyewitness memory such as weapon-focus, multiple perpetrators, cross-race identifications, simultaneous all-suspect photo-arrays, non-blind investigations, prior exposure, unconscious transference, mis-recognition; retention interval, the probative value of non-identification and witness confidence and accuracy. *See* Point B. *infra* at pp 37-54; *see also Ferensic v. Birkett*, 501 F.3d 469, 481 (6th Cir. 2007) (habeas petition granted based on counsel's failure to call eyewitness expert and reasoning that "'other means' of attacking eyewitness identifications do not effectively substitute for expert testimony on their inherent unreliability"); *Sturgeon v. Quarterman*, 615 F. Supp. 2d 546, 569 (S.D. Tex. 2009) (granting habeas petition based on ineffective assistance where the defendant was "denied the opportunity to present [expert] evidence regarding the reliability of the identification made by the State's sole eyewitness"); *see also, Moore v. Keller*, 917 F.Supp. 2d 471 (E.D.N.C. 2012)(habeas court found state court trial counsel's failure to consult or call an expert witness in case based solely on eyewitness identification violated *Strickland*) *rev. by Moore v. Hardee*, 723 F.3d 488 (4th Cir. 2013)(reversing under heightened "doubly deferential" review required of state court adjudications under AEDPA statute of ineffective assistance claims and noting trial court's discretion to exclude expert evidence under local state law). Given the importance of eyewitness testimony in Nolan's case which was apparent from initiation, trial counsel's refusal to contact or call an eyewitness expert fell below the reasonableness standard in *Strickland*.

B. The Failure to Consult or Call an Expert
   in Eye-witness Identification Was Prejudicial

Trial counsel's failure to consult and *per force* failure to call an expert also satisfies the prejudice prong of the *Strickland* test. The fact is "certain circumstances surrounding a

crime...may impair the ability of a witness [ ] to accurately process what she observed. **Many of these factors are counterintuitive and therefore, not coterminous with "common sense."** *Conway*, 698 F.3d 69, 78 (2d Cir. 2012) (emphasis supplied); *United States v. Smithers*, 212 F.3d 306, 315 (6th Cir. 2000) ("there is no question that many aspects of perception and memory are not within the common experience of most jurors and in fact, many factors that affect memory are counterintuitive"); *see also, Kampshoff*, 698 F.2d 581, 584 ("[W]hile juries may be led by their experience to believe their eyes, and, by inference, what they hear from those who have seen, the experience of law and psychology has been that eyewitness testimony may sometimes be the least trustworthy means to identify the guilty."); *but see; United States v. Mohamed*, 2016 U.S. Dist. LEXIS 7394 (EDNY 2016)(finding in that case that expert testimony about factors affecting memory such as distance, exposure time, time overestimation, lighting, weapon focus and head coverings "within the common knowledge" of suppression court and precluding expert witness).

Had an expert like Dr. Steven Penrod been called to testify, he could have provided relevant and helpful testimony concerning each of the identifications and expounded on the very same social science relied upon by the Second Circuit in *Conway* in supporting its holding that the identification there did not have a source independent of the earlier tainted procedures. *Conway*, 698 F.3d at 80-82 (citing social science research in multiple areas impacting identifications including disguise, weapon focus, stress, own-race bias, "mugshot" exposure effect, "mugshot" commitment effect and time lapse effect).

Dr. Penrod's report describes how the circumstances of this crime could have impaired the witness' perception/memory and how the identification process itself could have influenced their selections. *See generally*, Walsh, Ex. 32 (Penrod Report pp. 24-69) (hereinafter "Penrod Rpt."). Without trespassing on the ultimate question of guilt or innocence or whether any

particular witnesses was credible, an expert like Dr. Penrod could have educated and sensitized the jury, both generally and specifically, about factors that influence memory and thus, eyewitness identification accuracy Such evidence would have provided a critical aid to the jury when it made "its assessments of eyewitness evidence and witness credibility" in this case. Penrod Rpt. at 11 ("I am not commenting on the credibility of any witness nor expressing an opinion about the reliability of any identification in this case ...;" *see generally*, Penrod Rpt. at 32- 69. Dr. Penrod's proposed testimony would have undercut the lynchpin of the Government's case: that it would be impossible for four different witnesses to all mistakenly identify Nolan as the perpetrator (Tr 765 "... not one, not two, not three but four of the victims took that witness stand and told you he was [the robber]."). The Penrod report clarifies that a significant percentage of exonerated defendants were convicted in cases with three or more eyewitnesses identifying the accused. Penrod Rpt. 34 – 37, at 36 (noting from multiple analyses and studies that multiple suspect identifications ..."can, under some conditions, add nothing or very little to the probability the suspect is actually guilty.")

In addition, Dr. Penrods' expert testimony could have been helpful to a layperson jury on the issue of confidence and accuracy. *See Conway, supra.* at 88 (noting that "because jurors confound certainty and accuracy, cross-examination is less likely to be effective in discrediting eyewitnesses" (internal citations omitted.) These issues, and the aspects of this particular crime, some of which are summarized from the annexed report by Dr. Penrod's report below, would all be ripe for expert explication and helpful to the jury in assessing the reliability of the identifications that took place in this case.

1. Weapon Focus, Multiple Perpetrators and Stress (Penrod Rpt. at 32 - 41)

Dr. Penrod could have testified that the presence of weapons ("weapon focus"), stress, and multiple perpetrators ("identify tracking of multiple perpetrators") during the robbery each

could have affected the eyewitness's ability to identify the correct suspect. The testimony of all five eyewitnesses indicates that both robbers were armed with guns, one victim was struck with a weapon and the witnesses were focused on the guns to varying degrees.[22] Dr. Penrod's analysis of "weapon focus effect" on identifications indicates that it is statistically significant and that there is substantial disagreement among lay persons about that impact. Studies show that the exposure to a weapon or even a "surprising object" can draw attention away from the perpetrator and accuracy rates drop under such circumstances. *Id.* at 34. "The nature of the relationship between weapon presence and identification accuracy is an empirical, scientific question – eyewitness expert testimony would provide jurors with scientifically-grounded guidance on this issue and, increase juror sensitivity to weapon focus." *Id.* at 33. Because the meta-analysis of multiple studies shows that lay people do not necessarily appreciate that weapon focus could impair identification performance, testimony from an expert such as Dr. Penrod, would have been helpful to supporting a defense that rested on undermining the reliability of eyewitness identifications. *Id.* at 32 - 33. This is also true of stress and the phenomenon of multiple perpetrators. *Id.* at 34, 39-41.

"Just as a weapon can divide the attention of a witness, multiple perpetrators can divide their attention and identification accuracy and accuracy of descriptions have been shown to

---

[22] **Desiree Scroggins**, (Tr 123 – 124, 127 – 128; 156, 159). Desiree described the gun as" brown and silver" (Tr 123-124) and believed she had blacked out for a period after being struck with it. (Tr 125 -127; 160). **Lorraine Scroggins** also described both robbers as being armed with guns, one of whom threatened her with a "gun to the back of [her head]" (Tr 555-558; 571). **Christopher Martinez** also described two gun wielding robbers (Tr 263) and testified to his and his child and family being threatened with it, (Tr 225 – 226, 229 ), threats of a shot to his ankle or leg. (Tr 225). **Sandra Martinez** described two men "pointing guns" at her son, her granddaughter and her daughter (Tr 611 – 613); She was "focused on the gun that's in my granddaughter's face" (Tr 634), and admitted she did not recognize a robber because her "eyes and [her]mind was too much on the gun." (Tr 628, 691). **Deyanira Beriguette** who did not identify anyone from the identification proceeding, including Ralph Nolan, testified "there were two of them and both of them pointed their guns at me, at my head." (Tr 187).

declines as the number of perpetrators increases." *Id.* at 34 *(internal citations omitted).* According to the research reflected in Dr. Penrod's report, multiple studies demonstrate that the presence of two or more perpetrators results in fewer correct identifications and more incorrect decisions when compared to single perpetrator conditions. *Id.* Layperson's misunderstanding or at least potential underestimating of the impact of this phenomenon, which is not unlike the weapons focus issue, underscores how an expert could be helpful in providing guidance as to how to evaluate the identification evidence in this case. "[T]he double perpetrator disadvantage is not simply due to a difficulty in separating the facial characteristics of two people that are encountered simultaneously, which therefore cannot be encoded and stored accurately. [ ] Instead, we suggest that this effect might reflect the need to divide attention between two concurrent culprits, which limits the depth or detail of the stored descriptions that can be formed for these persons. [ ]" *Id.*, at 34 quoting Megrey, Am., Bindemann M (2012) *Identification Accuracy for Single and Double Perpetrator Crimes: Does accomplice gender matter?"* British Journal of Psychology, 103 (439-453, 448 (internal citations omitted)). The division of attention between multiple perpetrators and the weapons focus factor are relevant to every eyewitness in this case. For example, Lorraine Scroggins, among the others, described two robbers coming in and out of her bedroom multiple times. (Tr 560 – 561, 576, 579, 581). She, like the others were all undoubtedly influenced by this division of attention, as they were by their varying degrees of stress.

Stress also impacts a witness' sensory perception and/or subsequent recollection. (Penrod Rpt. at 39 - 41). Multiple studies repeatedly demonstrate that memory accuracy is much lower overall for those exposed to high stress including a 2004 meta-analysis of stress effect studies conducted on 27 tests which included work published between 1974-1997. (*Id.* at 40 (internal

citations omitted). Even "increased violence in video-taped reenactment studies has been shown to lead to decrements in both identification accuracy and eyewitness recall." *Id.*, at 39.

In this case, the witnesses described being threatened by weapons, tied up, assaulted, observing a loved one be assaulted and of course, the underlying stress of eventually confessing to law enforcement why their apartment was targeted for an armed robbery. Desiree Scroggins admitted that she was nervous during this "terrifying event. " (Tr 160, 162). She also believed she may have even blacked out for a period. (Tr 125- 127). Her mother, Lorraine, described being threatened with a gun to the back of her head, (Tr 555-557, 771) testifying that she was "very scared" and "frightened" in fact keeping her head down because of the threats. (Tr 561, 576, 581, 579). Sandra Martinez likewise described a very stressful experience, holding her granddaughter on her lap throughout the robbery, describing the experience as traumatic and how "she was focused on the gun that's in my granddaughter's face." (Tr. 634, 700). For his part, Chris Martinez described being no less stressed than the women who were robbed, three of them related as either mother, daughter or girlfriend, while he was tied up and threatened at gun point. (Tr 223-230, 265).

The "Yerkes-Dodson Law" described by Dr. Penrod in his report suggests that stress at the higher levels, such as that felt by an individual under extreme danger or duress, debilitates perceptual skills and reduces correct identification rates. Penrod Rpt. at 39-40. Such information is highly relevant to the jury's evaluation of the eyewitnesses' abilities to perceive and recall what they described as a terrifying event. Expert testimony about the impact stress can have on identification performance based on scientifically-grounded guidance could have increased juror sensitivity to this issue and been helpful particularly given that studies reflect that there is still significant disagreement among laypersons about this factor and the actual impact of high stress. *Id.* at 36.

### 2. Cross-Race Identification and Obscured Views (Penrod Rpt. at 41-47)

As is visible on the video of his post-arrest statement in evidence, Ralph Nolan is a white male. (GX 402) (Walsh, Ex. 13). He is of "Irish Canadian" descent, (Tr 736-38), in fact, witnesses suggested that they referred to him with the racial slur, "white boy" years prior. (Tr 239, 314, 444, 628, 691). Although defense counsel failed to bring out the cross-racial identifications at trial perhaps due to his failure to consult an expert or grasp the significance of the issue, both Desiree and Lorraine Scroggins are black according to multiple police reports. (Walsh, Ex. 20 & 26). The Martinez's and the home health attendant from the Dominican Republic who spoke only Spanish, are Hispanic. (Tr 183, 196, 414 - 415, Walsh, Ex. 27 & 28). This factor is of significance not merely because at least initially all the witnesses described the robbers as Hispanic, even though Ralph Nolan is white, but also because three of the five eyewitness who described the perpetrators as Hispanic are themselves Hispanic, and the other two are black. (Tr 159 – 162, 264, 414-416, 459 - 460)(Walsh, Ex. 20, 22, 23, 24, 25).

Case law and decades of scientific studies indicate that people are far better at identifying and recognizing people of their own race. Penrod Rpt. at 41 – 45; *See, United States v. Harris*, 298 F. Supp. 2d 320 (EDNY 2004)(when an identification "is cross-racial, it is 'much less likely to be accurate than same race identifications." *quoting Arizona v. Youngblood*, 488 U.S. 51,72 n.8 (1988) (Blackmun J. dissenting) (additional internal citations omitted)). In fact, as Dr. Penrod reports, scientific studies suggest that mistaken identifications occur in significantly higher percentages when the perpetrator and the witness are of different races. *Id*. Recent studies demonstrate that even increased cross-race contact has little statistical significance in reducing this bias. *Id*.

In this case, expert testimony from Dr. Penrod would have been particularly helpful in terms of evaluating the reliability of these identifications with regard to the issue of cross-race.

First, the first two witnesses who identified Ralph Nolan as the perpetrator are black women who first reported to the police that the robbers were Hispanic. (Walsh, Ex. 20 & 26) Tr 413 - 414, 471) Indeed, the wanted poster first prepared and distributed by the detective in this case after interviewing the victims described the robbers as "Hispanic Males." (Tr 471 – 472, Def.X C (Walsh, Ex. 25) as did the Sprint report of the 911 call. (Walsh, Ex. 24). While the later descriptions morphed to emphasize characteristics of the defendant; "possibly white" or even "light skinned" it is important to note that whether the perpetrator was white or Hispanic – they were cross-racial identifications as far as the first two identifying witnesses were concerned; the Scroggins, who are black. Setting aside the fact that Christopher Martinez suggested disbelief when Desiree first shared the Facebook page with him, that "white boy" would ever do such a thing, (Tr 267), the fact is that "own race bias" would reflect a better ability for both Martinezes and the home health care worker to identify a "Hispanic" than any other race of perpetrator. Significantly, the Hispanic home health worker from the Dominican Republic, who spoke to law enforcement and testified with the assistance of a Spanish speaking interpreter, (Tr 183, 415), did not identify Ralph Nolan at all from the array she viewed. (Tr 363 - 364)(Walsh, Ex. 9). She described the perpetrators as "Hispanic," elaborating at trial "that they were not black and they were not white." (Tr 192, 415). Given the questions surrounding the accuracy of cross-race identification, the probative value of this singular witness's non-identification is even greater in light of the "own-race bias" phenomenon supported by the scientific research. (Penrod Rpt. at 37 – 39, analyzing the probative value of non-identifications). None of this was put before the jury in direct testimony from an expert, through cross-examination or even argument.

While it may seem intuitive that "disguises" impact and impair facial recognition, what is lesser understood is that studies show that face matching accuracy is worse when actors are disguised even simply with hats, (Penrod Rpt. at 45) and that multiple studies show that changes

to the hair have a negative impact on recognition. (*Id.* at 41) Dr. Penrod's report reflects one study in particular showing the poor ability of research participants ability to identify a known celebrity was only about 12% accurate when only the eyes are shown. *Id.* In this case, several eyewitnesses indicated that the robbers were wearing some sort of hat, ("hoodie," "skully") or headgear which was also reflected in the photos from the elevator video surveillance the Government moved into evidence. (Tr 128, 156, 200, 222, 349, 555-557); (Walsh, Ex. 25).

        3.    Prior Exposure, Mis-recognition, Unconscious Transference and Multiple Suspect Arrays (Penrod Rpt. at 49-56)

Dr. Penrod further explains in detail that prior exposure to an innocent person or person's image can significantly enhance the risk of misidentification ("prior exposure"). (Penrod Rpt. at 51). All of the identifying witnesses in this case had multiple prior exposures to Ralph Nolan's image, possibly even his person years earlier, prior to making their in-court identifications. Setting aside the high likelihood that the witnesses looked at the defendant's photos more than once, particularly since it was "encouraged" by the detective, at least Lorraine Scroggins and Sandra Martinez also had multiple photographic viewings of the same photo of defendant conducted by law enforcement. (Tr 312, 316-317). The research compiled in Dr. Penrod's report caution against this practice for a number of reasons based upon studies showing that once a person is exposed to an image the likelihood of selecting the same again due to a "commitment" to the prior choice is greater and that mug shot exposure between exposure to the target and a subsequent lineup test (or presumably in court) has a negative effect on eyewitness memory. *Id.* at 52 (*citing Goodsell, et. al.*) ("This study provides additional evidence that once an eyewitness has made an identification, no further identifications should be attempted because access to memory for the perpetrator is diminished.")

In addition, several studies illustrate a phenomenon known as "unconscious transference," whereby an eyewitness identifies someone not based on the incident but because they have transferred an identity "to that of another person from a different setting, time or context." *Id.* at 55 – 56. As noted, two witnesses, Christopher and Sandra Martinez stated months after the robbery and after they made their identifications that they knew the defendant from years prior when he lived in the same neighborhood. (Tr 172 -173, 237- 239; 266-267; 313-314, 444, 626-627). These statements stood in stark contrast to the fact that neither witness indicated that they recognized either robber before they were shown pictures of Ralph Nolan weeks after their robbery. (Tr 163, 442, 628, 634). Here again, expert evidence would have been crucial to the defense. Social science research reveals "factors other than actual familiarity can influence the perception of familiarity and (mis)-recognition." Penrod Rpt. at 53 - 54. Witnesses can confuse the circumstances from which they recognize faces, and thus a familiar face from one context can be mistaken for the perpetrator's face from the crime. This is shown in studies where witnesses in cases where they "claim[] to know the perpetrator regularly make identification errors." *Id.* at 54 (*citing* Memon *et al.*). "It turns out that prior familiarity can actually reduce the reliability of an eyewitness identification." *Id. citing Coleman* et al.

Additional research casts significant doubt on the independence and reliability of the identifications made by the eyewitnesses in this case due to the multiple suspect arrays conducted with Desiree and Lorraine Scroggins. First, Dr. Penrod's report details how witnesses are more likely to make mistaken identifications when they are shown an array of all suspects ("simultaneous all-suspect array" with no "fillers").[23] The report underscores that, according to

---

[23] Detective Deloren was permitted to testify that he had included Ralph Nolan's photograph in a photo array based on a search "for anybody that had been arrested using that address…" (Tr 429). The obvious implication was that Ralph Nolan had been arrested prior to this case and thus had a mug shot included in the array.

Department of Justice guidelines, investigators are instructed to limit the number of suspects in each photo-array as a way to verify that witnesses are making accurate identifications. (*Id.* at 50; *see* also Eyewitness Evidence: A Guide for Law Enforcement, U.S. Dept. of Justice at p 29, available at ttps://www.ncjrs.gov/pdffiles1/nij/178240.pdf). In other words, placing individuals who are not suspects in a photo-array acts as a safeguard against the possibility that the witness is simply guessing the identity of the perpetrator. "To do otherwise, as was apparently done in this case, completely defies the logic of having a multi-person array." *Id.* at 50. Dr. Penrod explains that "[i]f everyone in the array is a suspect (and in the worst-case scenario, they are all innocent) an innocent person will be selected every time a choice is made. The protections afforded to innocent suspects are dramatically diluted in an all-suspect array – it is akin to showing six show-ups all at once. " *Id.*

Unfortunately, no such safeguard was present in Nolan's photo-array and due to counsel's ineffectiveness, no questions regarding this logic much less, the DOJ standards were ever put to the law enforcement witnesses on cross-examination or through expert testimony to underscore the infirmity of the procedures utilized in this case.

4. Suggestivity and (Non)-Blind Presentation (Penrod Rpt. at 57-60)

After Desiree Scroggins made a "tentative identification" from the all-suspect array, (Tr 521) stating that Nolan's photo looks like the perpetrator, (Tr 161, 431 ), at best, Detective Deloren tilted the investigation toward Ralph Nolan's photo and the subsequent identifications, particularly Lorraine Scroggin's just minutes later, were tainted by "non-blind presentations." (Tr 139-140,152-153,432- 434, 584-585). As Dr. Penrod notes, medical researchers testing the effectiveness of new medicines, have long ago completely abandoned the use of non-blind research out of concern that researchers may unwittingly communicate their expectations of how/if the medicine works. Penrod Rpt. at 59. Social science studies suggest that such non-

blind, even non-malevolent administrators of identification procedures may manipulate or even inadvertently "steer" an identification without the witness realizing it. *Id.* at 59 - 60. In short, an investigator's knowledge of the suspect affects the presentation of evidence to eyewitnesses, causing influence on the identification ("non-blind investigation"), even in the absence of purposeful suggestivity - such as sharing only one of 22 suspects Facebook page, as was done here. (Tr 152-153, 431-435, 582-583, 598 ).

The research demonstrates that even ordinary communication cues from a non-blind investigator can steer the witness into identifying a particular suspect. *Id.* at 60 (when administrator permitted "high contact" with witness and presented a target-absent simultaneous line-up, witnesses were more likely to identify the innocent suspect" than when administrator has minimal contact out of view of witness to limit communication of cues.) As noted, the identification procedures for Lorraine Scroggins, and both Martinezes were non-blind, a factor that an expert witness like Dr. Penrod could have communicated to the jury to aid them in evaluating the identifications, even if the jury rejected the notion that the suggestivity was purposeful.

Robert Jackson's taped statement to the investigator and Lorraine Scroggins' testimony underscored that the detective's actions in this case, much like his actions in the *Chambers* case, transcended subtle cues and unconscious signals to single Nolan out from the other suspects. (Exhibit 10). When Lorraine Scroggins said that it "could be" Nolan, the detective showed her Nolan's Facebook profile, something he did not repeat for any of the other suspects in the photo array. Only after viewing Nolan's Facebook page did Lorraine Scoggins make a definitive identification. (Walsh, Ex. 10). The same is true of Desiree Scroggins initial tentative "identification" in January 2014, measured at "70 – 75%" certainty, (Tr 140, 521, Walsh Ex. 14), never written down or documented (T 432, Walsh, Ex. 3), and which blossomed into certainty

by the time of trial, more than a year later and after at least two additional Facebook viewings in the interim, and obviously discussion with her boyfriend and the others. (Tr 147; 172-174; 177). Such conduct by law enforcement is condemned under the law precisely because of the suggestivity diagnosed in the social science. "Conduct such as showing the witness isolated pictures of the person the witness has selected, *see eg. Solomon v. Smith* 645 F.2d 1179 (2d Cir. 1981), or endorsing the correctness of the selection, *see, e.g. United States v. Leonardi*, 623 F.2d 746, 755 (2d Cir., *cert denied* 447 U.S. 928 (1980), *United States v. Moskowitz* 581 F.2d 14 (2d Cir.) *cert denied* 439 U.S. 871 (1978) 'may tend to reinforce an otherwise weak or tentative identification.'" *Thai*, 29 F.3d 785. All of this conduct occurred in this case with respect to both Desiree's identification, described by the detective himself as "tentative," (Tr 521), and, of course, with respect to Lorraine Scroggins' whose son, Robert Jackson's pre-trial interview indicated she was unsure until the detective showed her the Facebook photo.

In addition, this same "non-blind" bias, among other factors, tainted the other two identifications in the case. Lorraine and Desiree Scroggins showed Nolan's Facebook profile to Christopher and Sandra Martinez prior to their identifications. (Walsh, Ex's 15, 19; Tr 147, 172-173, 240, 266-267). If even "merely telling a witness that he/she will have a chance for a second viewing may be sufficient to affect the accuracy of the identification," (Penrod Rpt. at 56, *citing Duckworth & Kreiner*, 2009), surely actually showing a second viewing of the same person should.

In addition, the repeated showing of Nolan's photo again to Lorraine Scroggins and Sandra Martinez by Agent Winston after their purported identifications with Detective Deloren, (Tr 312; 317), only reinforced their otherwise already suggestive identifications. The use of successive photo arrays with only the suspects' photograph repeated has been criticized in the Second Circuit since the late 1970's. *United States v. DiPalermo*, 606 F.2d 17, 21 (2d Cir.