1979). An expert witness could have guided defense counsel in a proper cross-examination of the witnessed to underscore the weaknesses in their identifications. Calling an expert to explain the science behind why such procedures undermine reliability and can exacerbate inaccurate identifications would have been useful to the jury, helpful to the defense, and the failure of counsel to do so undermined the reliability of the outcome of this trial.

5.    Retention Interval and Non-Identification (Penrod Rpt. at 37 -39; 47-49)

The eyewitnesses in this case were also presented with the photo arrays several months after the crime, which Dr. Penrod's research shows renders the identifications significantly less reliable. While it may be somewhat intuitive that memory declines over time, what is not as widely understood among lay persons is that recognition accuracy and memory decline most rapidly in the first hours and days following an event in comparison to the relative decline in the later days and weeks. *Id.* at 47- 49. Here, Lorraine Scroggins and Desiree identify Ralph's photo more than six weeks after the crime. Notably, it appears that this was the very first time since they called the Detective about Odiot fencing items and after they finally admitted they were robbed of marijuana that the Detective returned to their apartment with more photos to view. (Tr 425, Walsh, Ex. 18, 21). Since meta-analysis demonstrates there is "widespread disagreement among laypersons about the pattern of memory loss and the effect of the passage of time on identification performance," expert testimony "would provide jurors with scientifically-grounded guidance" to properly evaluate this issue or retention interval. Penrod Rpt. at 49.

Finally, Dr. Penrod's report underscores the probative value of a witness's failure to identify the suspect ("non-identification"). Penrod Rpt. at 37. In the past 30 years, research has shown that a non-identification can serve as a substantial indication that a suspect is not guilty, and in some studies have been shown to be more reliable than positive identifications. *Id.* Notably, one of the eyewitnesses to the robbery, Deyanira Beriguete, the home health aid did not

identify Nolan as the perpetrator. She was also the only eyewitness not exposed to Nolan's Facebook page, or related to the other four witnesses by blood, intimate partner relationship, or with reason to curry favor with law enforcement. She was the only one who did not seek immunity to testify at trial. Given the potential for biases in the Scroggins' and Martinezes' identifications, the home health aide's contrasting non-identification in the absence of such factors would have provided a further avenue of defense attack on the reliability of the testimonies of the other eyewitnesses.

### 6.    Witness Confidence and Confidence Malleability (Penrod Rpt. at 60 - 68)

By the time of trial, which was more than a year after their respective identifications, the witnesses expressed confidence in their identifications. Research indicates, however, that witness confidence is a poor indicator of the accuracy of the identification ("confidence-accuracy relationship") and that it is also susceptible to post-identification malleability. *Id.*; *See also, Conway*, 698 F.3d 69, 88 ("jurors may also have erroneously relied on certainty as an indicator of accuracy...[ ] Yet scientific research suggest that 'eyewitness confidence is a poor postdictor of accuracy.'" *citing* multiple scientific studies)).

Expert studies conclude that jurors over-value witnesses' assessments of their own reliability, and thus expert testimony surrounding this misconception could be helpful to the jury. *Id.*, *See also, Conway*, at 88 *citing Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009) (explaining that the problem "with eyewitness testimony is that witnesses who think they are identifying the wrongdoer – who are credible because they believe every word they utter on the stand – may be mistake"); *United States v. Brownlee*, 454 F.3d 131, 142-44 (3rd Cir. 2006) (discussing the counter-intuitive scientific findings on the weak to non-existent correlation between certainty and accuracy in identification); *United States v. Stevens*, 935 F.2d 1380 (3rd Cir. 1991)(expert testimony on the confidence versus accuracy factor should have been admitted); *but see United*

*States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999) (exclusion of expert testimony on confidence/accuracy not manifestly erroneous in day-time, observation drug sale by two undercover law enforcement eyewitnesses).

Dr. Penrod's analysis and research reflect that most people believe that confidence is diagnostic of accuracy and that there is consistent evidence to indicate that the confidence of a witness is "the most powerful single determinant of whether or not observers of that testimony will believe that the eyewitness made an accurate identification." *Id*. at 61. He also points out that witness confidence can be influenced by post-identification factors such as occurred here, including feedback from or about other witnesses and repeated questions (multiple viewing of the same photo). *Id*. Obviously, the witnesses were sharing the Facebook pages and their identifications with each other. Further, Desiree Scroggins' direct testimony reveals that the witnesses sought reconfirmation from each other. Desiree describes entering her mother Lorraine's room as her mother made the identification and said that's the guy, "the same guy that I pointed out was the same guy," (Tr 141) and later her mother asked her, "That's him, right?" (Tr 152) The witnesses desire and perhaps even instinct, to confirm their identifications with each other is fraught with the peril of bolstering a misidentification if not transforming a weak one into a confident one that should not be. Penrod notes from one study, "there were dramatic increases in the confidence that eyewitnesses expressed in their false identifications in the condition in which they were told that their co-witness identified the same person." *Id*. pp 65 – 66 (*citing* Luus & Wells)(1994). "Defendant's protection against suggestive identification procedures encompasses not only the right to avoid methods that suggest the initial identification but as well as the right to avoid having suggestive methods transform a selection that was only tentative into one that is positively certain." *Raheem v. Kelly,* 257 F.3d 122, 133 (2d Cir. 2001) *citing Solomon v. Smith* 645 F.2d at 1185.

Sadly, Ralph Nolan was not afforded that protection because his counsel proceeded without expert assistance at trial. The Government compounded defense counsel's ineffectiveness in the summation homing in on precisely what the scientific research shows are counter-intuitive inferences. Specifically, the prosecutor wholly exploited the weak to non-existent correlation between certainty and accuracy in identification when he argued with respect to Lorraine Scroggins' identification as follows:

"You saw her here in this courtroom. You saw her confidence. You heard about her confidence. It took a lot of guts for her to come in and do that." (Tr. 836).

### 7. Cumulative Impact of Factors (Penrod Rpt. at 68-69)

Finally, as Dr. Penrod's report reflects, all of these factors impacting accuracy and reliability can have a cumulative effect on identification performance. Dr. Penrod indicates that the research supports that several factors at one time will simultaneously influence witness performance, as opposed to the presence of one factor causing the others to be irrelevant. *Id.* Penrod indicates that there are studies were several factors are manipulated at once and it is regularly observed that they simultaneously influence witness performance. *Id.* Additionally, several studies that analyzed performance across hundreds of experimental conditions "found that even when statistically controlling for the effects of other variables most variables still explained significant portions of variability in performance." *Id.* For example and without limitation, studies reflect that attention variables and the duration of exposure per face were positively related to "hit-rate" performance. The number of targets studied and retention interval accounted for significant variance.

In short, an expert witness could have explained to the jury that there is substantial evidence in the scientific research that the effects of many of the factors at issue in the identifications in this case can have a cumulative effect on identification performance. Defense

counsel's failure to consult on myriad factors that affected the identifications in this case, coupled with his failure to call an expert like Dr. Penrod to expound on them to increase the jury's sensitivity to these factors, substantially prejudiced the defendant. The absence of such evidence, in a case that consisted solely of eyewitness testimony so prejudiced the defendant, there is more than a reasonable probability that absent the errors, the results of the proceedings would have been different. *Pham*, 317 F.3d 178, 182 *citing Strickland*, 466 U.S. at 668.

### C. Dr. Penrod's Testimony Is Relevant and Admissible Under Fed. Rule Evid. 702 and *Daubert*

There is little room for debate as to the admissibility of testimony from an expert with Dr. Penrod's credentials and the broad acceptance of the social science, peer-reviewed research and tested methodology under Federal Rule of Evidence ("FRE") 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).[24] FRE 702, generally understood to embrace albeit not codify *Daubert* requires that expert testimony 1) be based on "scientific knowledge" and 2) it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert,*

---

[24] Dr. Penrod's extensive experience in the field clearly qualifies him as an expert in eyewitness identification. In sum, he is currently a Distinguished Professor of Psychology at the John Jay College of Criminal Justice of the City University of New York and holds degrees in both law, Harvard Law School and Psychology, a Ph.D from Harvard University. Penrod Rpt. at 10. He has been a professor of psychology for over 35 years, during which he has authored or co-authored 50 eyewitness publications including 30 original research articles published in peer review journals, reviews, writings and a book on eyewitness research. *Id.* His studies have been cited by the Supreme Court as well as courts in other circuits. *See e.g., Perry v. New Hampshire*, 132 S. Ct. 716, 739 n. 5 (2012); *United States v. Owens*, 682 F.3d 1358, 1361 n.11 (11th Cir. 2012); *United States v. Smithers*, 212 F.3d 306, 328 (6th Cir. 2000). He teaches in the field in both law schools and graduate level psychology courses and has been the principal investigator on seven research grants including one from the National Institute of Justice – the research wing of the U.S. Dept. of Justice. Over the course of his career, Dr. Penrod has testified as an expert in over 150 cases in state and federal proceedings as an expert witness (mostly eyewitness issues). Penrod Rpt. at 10 – 11.

509 U.S. 579 (1993).[25] The purpose of the inquiry is to determine "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue. *Id.* at 592-93; *see United States v. Jordan*, 924 F. Supp. 443, 445 (W.D.N.Y. 1996) (admitting eyewitness expert testimony and listing factors in *Daubert* inquiry as i) "Has the theory or technique been tested? Or can it be?"; ii) "Has the theory or technique been subjected to peer review and publication?"; iii) "In the case of a technique, what is the known or potential rate of error?"; and iv) "'General acceptance'— though not required, is certainly useful where it exists"). As Dr. Penrod notes in his report regarding the basis of his testimony and the science "[v]irtually all of the empirical eyewitness research conducted by psychologists makes use of standard experimental methods employed in all the experimental sciences. A hallmark of this research is the falsifiablity/testability of research hypotheses that are tested using experimental research methods in which the variables or processes examined by researches are carefully controlled by the researchers in order to assess their causal effects on outcome variables..." Penrod Rpt. at 21-24. The research studies relied upon by Dr. Penrod in his proffered testimony typically have survived two levels of peer review, (21), and converging evidence indicates that considerable consensus does exist regarding the influence on eyewitness memory of a wide variety of factors. *Id.* at 23-24.

In *United States v. Antione Chambers*, 13 Cr 345 (LGS) also tried in 2014, Hon. Lorna G. Schofield, USDC SDNY granted a defense application for an expert testimony on eyewitness identifications. (Walsh, Ex. 33(Schofield Order at p 2) However, after the court found the same

---

[25] Fed. R. Evid. 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Detective Deloren's testimony surrounding the identification procedure in *Chambers* not credible in the middle of the trial, the court granted the defense motion to strike the relevant identification testimony and instructed the jury, to disregard it. (Walsh, Ex. 34 at p. 711). Accordingly, the expert testimony was no longer relevant and the expert was not called to testify.

A published opinion in this Circuit found the testimony of an eyewitness expert admissible on issues of the reliability of the identification markedly similar to those in this case. Recognizing the helpfulness of the testimony and the reliability of the science even as long as a decade ago, the court in *United States v. Jordan*, permitted eyewitness expert testimony on issues including the impact of stress, retention interval, level of confidence in accuracy, post-event suggestivity, weapon focus, and victim motivation. *United States v. Jordan*, 924 F. Supp. 443, 448 (W.D.N.Y. 1996). Distinguishing *United States v. Serna*, 799 F.2d 842 (2d Cir. 1986)(exclusion of testimony proper in cooperator case where expert conceded "many of his conclusions coincided with common sense;" testimony consisted of "general pronouncements" on unreliability and expert "ignorant" of facts of case) the *Jordan* court explained:

> This victim['s] experience was marked by significant stress: she was directly confronted by a gun-wielding robber. The time for observation was short in duration—the whole robbery took place in minutes and there were two robbers causing significant commotion. Moreover, the [victim]'s first identification of the defendant was made 47 days after the robbery—a significant passage of time. Thus, there are many issues surrounding her identification: what is the impact of her being under significant stress? what is the impact of the 47 day delay in the accuracy of her identification? what is the significance of her confidence in her identification? what is the significance of the presence of a gun? These are matters on which [expert] testimony might assist the jury.

*Id.* at 449. Additionally, surveying eyewitness expert testimony cases in other jurisdictions, the *Jordan* court concluded that those courts that excluded experts did so in inapposite cases, such as those with an incomplete or unsubstantial foundational proffer[26] or "where the eyewitness

---

[26] *See United States v. Brien*, 59 F.3d 274 (1st Cir. 1995) *cert denied* 516 U.S. 953 (1995) (noting increased acceptance of eyewitness identification experts and expressly noting given an

identification is only a small part of the Government's case," which "suggest[ed] that where a prosecutor relies wholly on eyewitness identifications, such expert testimony should probably be admitted."[27] *Id.* at 47. Clearly, the eyewitnesses evidence here was no small part of the Government's case, in fact, it was the entire case. As the Government argued on summation; "The most devastating evidence against this defendant is the testimony of those victims. There were four identifications of the defendant, four." (Tr 765). The annexed 70 page report by Dr. Penrod is hardly just a pronouncement on generalities but meticulously details how the science informs the jury determination regarding reliability and accuracy in areas that in places defy common-sense and, like the factors in *Conway*, may even be "counterintuitive." *Conway,* 698 F.3d at 78.

Other Circuits have admitted expert eyewitness testimony in cases where experts testified regarding the same psychological factors bearing on identification accuracy and reliability, some of the precise issues in this case. *United States v. Smithers*, 212 F.3d 306, 315 (6th Cir. 2000) (chronicling dramatic transformation in treatment of expert testimony and holding that district court's preclusion of expert testimony on conformity effect among different eyewitnesses, the dynamics of photo identifications and the confidence-accuracy relationship was reversible error);

appropriate proffer some or all of the testimony likely admissible); *United States v. Rincon*, 28 F.3d 921, 926 (9th Cir.) (noting that where the eyewitness identification expert's opinion is based upon scientific knowledge which is both reliable and helpful to the jury in a given case, then it should be admitted) *cert denied* 516 U.S. 953 (1995).

[27] *See United States v. Alexander*, 816 F.2d 164 (5th Cir. 1987)(reversing as clearly erroneous decision to exclude expert testimony on photographic comparisons where entire case turned on photographic identification); *United States v. Smith*, 736 F.2d 1103 (6th Cir. 1984) (finding that expert testimony met FRE 702 standard, helpful to jury particularly with respect to common assumptions about eyewitness reliability and error to exclude it although harmless error where evidence included 3 eyewitnesses and a defendant's palm print and other significant inculpatory evidence); *United States v. Moore*, 786 F.2d 1308 (5th Cir. 1986) (finding no abuse of discretion to exclude testimony where eyewitness only small part of Government's case).

*United States v. Stevens*, 935 F.2d 1380 (3d Cir. 1991) (reversing in part but admitting eyewitness identification expert testimony on correlation between confidence and accuracy, because this area is one not readily understood by jurors and thus, appropriate for expert amplification); *United States v. Brownlee,* 454 F.3d 131(3rd Cir. 2006)(district court's preclusion of expert testimony on the weak correlation between confidence and accuracy, as well as other factors, required a new trial); *United States v. Lester*, 254 F. Supp. 2d 602, 613 (E.D. Va. 2003) (testimony regarding weapon focus, impact of stress, relationship between confidence and accuracy admissible); *United States v. Graves,* 465 F. Supp. 2d 450, 455-57 (E.D. Pa. 2006) (expert testimony admissible on the significance of distinguishing features of defendant's photograph compared to other individuals in the photo array, in addition to issues including the confident-accuracy relationship, simultaneous presentation of suspect photo array and cross-race identification); *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 843 (N.D. Ill. 2013) (permitting in civil §1983 action expert testimony on effect of witness stress and unduly suggestive identification techniques including using an all-suspect photo array and noting that "[e]vidence that the attack took place in a manner that made identification difficult is probative because it calls into question whether [the witness] could have made the identification confidently without outside influence"); *United States v. Feliciano*, No. CR08-0932-01PHXDGC, 2009 WL 3748588, at *3 (D. Ariz. Nov. 6, 2009) (collecting literature on eyewitness testimony and admitting expert eyewitness testimony under FRE 702 and *Daubert* on exposure time, weapon-focus, time delay, disguise, and cross-race identification).

In sum, Dr. Penrod's testimony would have helped explain how the eyewitness recollections required careful scrutiny based on scientifically verifiable principles applicable to the particular circumstances of this robbery and these identifications, notwithstanding their professed subjective confidence. Dr. Penrod's testimony would have supported a defense theory

of misidentification. It would have shown that the identifications became less reliable be in short, cause the witnesses were guided by a "non-blind" law enforcement agent who employed suggestive procedure. Additionally, the reliability of the identifications was further compromised by the multiple viewings of the same Facebook and photos, which re-enforced the witnesses otherwise individually tainted identifications through their acknowledged communications with each other.

Penrod's proposed expert testimony about the questionable reliability and accuracy of the identifications is further supported by the Hispanic home health's aid Beriguete's non-identification, notwithstanding her equal opportunity to view the perpetrators, particularly when she opened the door for them. This is particularly true in light of her isolation from the other four related witnesses after the robbery, and thus her lack of exposure to the Facebook photo, and other influencing factors (ie: unconscious transference) impacting the other identifications.

Particularly in light of the absence of physical evidence in this case, Dr. Penrod's testimony regarding the accuracy and reliability of the eyewitnesses' identification's would have had far more than a reasonable likelihood of altering the outcome. *See Bell v. Miller*, 500 F.3d 149, 156 (2d Cir. 2007) (failure to call expert met prejudice prong because "[i]mpeaching [the eyewitness's] memory was therefore all in all for the defense. Armed with the insight and advice of a medical expert, a lawyer could have vastly increased the opportunity to cast doubt on this critical evidence.") (citing *Strickland*, 466 U.S. at 696 ("a verdict ... only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support")).

D. The Jury Charge and Cross-Examination Did Not Cure the Prejudice

Neither the Court's charge nor the ineffective cross-examination in this case make up for the lack of expert testimony on these identifications. See *Perry v New Hampshire*, 132 S.Ct. 716

(2012)(noting protections such as effective assistance of counsel and confrontation among safeguards in system protecting against questionable reliability of identification evidence); see also, *United States v. Mitchell*, 05-cv-823 2007 WL 1521212 (E.D.P.A. 2007) (Counsel's unconstitutionally defective performance for failure to call fingerprint expert not prejudicial due to effective cross-examination of state experts). Perhaps, nowhere is the lack of expert preparation more manifest than in the ineffective cross-examination of the law enforcement witnesses. Rather than challenge the suggestivity of the multiple Facebook viewings with informed, leading questions to demonstrate the taint, instead defense counsel cross-examined both professional law enforcement witnesses with open-ended questions inviting precisely the common misperceptions about eyewitness identification that the science has shown leads to misidentification and wrongful conviction. The prejudice is manifest:

| | |
|---|---|
| Defense Counsel: | If somebody makes an id of an individual and previously to making that id they were shown Facebook pages of one individual, would that have an effect on whether or not the id in the photo array was accurate or not? |
| Agent: | I don't think so. |
| Defense Counsel : | You don't think it mattered that they looked a Facebook photographs beforehand? |
| Agent: | I don't think it effects their id, no. |
| Defense Counsel: | **And why is that?** |
| Agent: | **I would think that the person that was the victim of the crime would be able to identify the person, especially if they had seen them, if they knew them before.** |

(Tr 350 emphasis supplied )

*******************

| | |
|---|---|
| Defense Counsel: | Now, before the six pack did those two [Martinezes] look at Facebook? |
| Detective: | To my knowledge, no, and it would not have made any difference anyway. |
| Defense Counsel: | **Wouldn't make a difference?** |
| Detective: | No, because the defendant, the suspect is known to them. Had I known that information, had I had that information at that time, I could have gone to Sandra with a single photo of     Ralph Nolan and shown her because they are acquaintances. |

*********************

...they just kind of said that they were afraid, that you know...**it took the photograph to kind of click but at the same time**, I felt that it makes a lot of sense that they would not identify anybody until they were shown a photograph of that real person, that they would withhold information in this case, as they did, knowing what I know now.

(Tr 515 emphasis supplied)

*********************

| | |
|---|---|
| Defense counsel: | But what you did ask her is to look at the Facebook page and see if you can find anybody else who might have been involved? |
| Detective: | yes |
| Defense Counsel: | **Isn't that implying to her that she got the right person?** |
| Detective: | **If that is what she implies, I can't control what she thinks.** |

**(Tr 523 emphasis supplied)**

The detective's answer to the open ended questions on cross examination endorsed the propriety of suggestive procedures. It also underscores the potential unconscious transference in the identifications by the Martinez's who may have simply recognized the defendant from another setting, not the robbery. The explanation defending the suggestivity of the non-blind proceeding was accordingly left unchallenged. The jury was left with no alternative explanation, much less a credible scientific explanation to be skeptical of the procedures that produced the multiple identifications of the defendant. The cross-examination was wholly ineffective on the most salient issue in the case. [28] The agent went on to testify on cross examination that it would not have affected law enforcement's judgment about Lorraine Scroggins photographic

---

[28] These are just some of the open-ended questions defense counsel put to the professional law enforcement witness which prejudiced the defendant. At one point, defense counsel opened the door for the detective to bolster some identifications by asking him on cross-examination: "Why not?" (Tr 517), regarding why the detective did not rearrange the position of the defendant's photo in the array between showing arrays to witnesses. *Id.*

identification of Nolan on April 30, if she had known Lorraine had been looking at his Facebook page. (Tr 363) Because of counsel's ineffectual cross examination and the failure to call an expert witness, the jury was left with the unchallenged impression by a professional law enforcement witness that there was nothing suggestive about the multiple Facebook viewings or even that multiple showings of the same photo of the defendant multiple times to multiple witnesses. As the Government drove home on summation, "Why does it matter?" (Tr 770-771). In this case, the lack of an expert witness to answer precisely that type of lay person's misconception was hardly remedied by defense counsel's cross-examination. In fact as, indicated by the excerpt above, counsel's ineptitude compounded the prejudice.

While there was some cross-examination regarding the weapon and stress, defense counsel raised nothing on cross nor did he present argument concerning any of the following: cross-racial identification; multiple viewings of the same photo; multiple perpetrators (dividing attention); mis-recognition or un-conscious transference; multiple suspect arrays; the impact of disguise (hats) or retention interval. Further, counsel presented nothing by way of his cross examination or argument that would inform the jury's evaluation of the evidence about the established science that there is a lack of correlation between witness confidence and accuracy. Even effective cross-examination, which was not accomplished in this case, that brings out the presence of weapon focus or stress and other factors, in the absence of evidence based expert testimony sensitizing a jury to just how these factors alone or cumulatively influence identification accuracy is unlikely to be genuinely useful in an eye-witness only case.

Defense counsel's ineffective cross-examination of the eyewitnesses and the law enforcement witnesses in this case alone supports a finding of ineffective assistance of counsel. *See Harris v. Senkowski*, 298 F.Supp.2d 320 (E.D.N.Y. 2004) (collecting cases and finding ineffective assistance of counsel in failure to confront and cross-examination key eyewitness in

cross-race single witness id case). Here, the ineffective cross examination underscores the prejudice innate in counsel's failure to consult an expert to assist him in the defense of this case, and his failure to call an expert at trial. Far from ameliorating the absence of expert testimony, the extremely ill-conceived, non-leading questions on cross-examination in several instances compounded it.

Additionally, nothing in the court's instructions to the jury remedied the damage hammered home in the rhetorical questions of the Government's summation labeling the defense arguments challenging the identifications "nonsense." (Tr 769). *See United States v. Veal*, 1999 U.S. App. Lexis 13324 (2d Cir. 1999) (upholding exclusion of eyewitness expert where a detailed instruction given to the jury and inadequate proffer of proposed testimony "basically consisted of general pronouncements about the lack of reliability of eyewitness identification" ). To be sure, the *Veal* court found "[e]xpert testimony may be appropriate on the subject of eyewitness identification because of "dangers" associated with the reliability of the evidence," but did not find it error in that case where there was an adequate charge and the case involved police officer identification of the defendant. *Id.* , *see also, United States v. Luis*, 835 F.2d 37 (2d Cir. 1987). The absence of any expert explanation to aid the jury in understanding the risk of taint through suggestivity is highlighted in the Government's summation which sometimes even directly begged the question. "Desiree Scroggins testified that she showed a Facebook picture of Ralph Nolan to Sandra Martinez before Sandra looked at the photo array…. **Why does it matter?**" Tr 770 ( emphasis supplied); (Tr 769) ("[Defense counsel] somehow suggests that seeing Facebook pictures of Ralph Nolan after that means they didn't pick him out? Nonsense, you know that."). In the face of the inept cross-examination and the absence of an expert witness, coupled with the Government's pointed summation in this case, the jury instruction was not enough to purge the prejudice.

E. Counsel Was Ineffective When He Withdrew
the Motion to Suppress Identification Evidence

As the intersection of the law and psychology underlying the susceptibility of eyewitness

identifications further develops, it has long been established that a defendant has the Due Process

right to be free from impermissibly suggestive pre-trial identification procedures. *United States v*

*Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992) (*quoting Simmons v United States*, 390 U.S. 377,

384 (1968). Unfortunately, the Sixth Amendment guarantee of the effective assistance of

counsel that courts rely on to temper that threat, also failed the defendant in this case pre-trial.

*Perry v. New Hampshire*, 132 S.Ct. 716 (2012). Defense counsel was ineffective for

inexplicably withdrawing the motion to suppress identification evidence which was tainted by

suggestive police procedures, (Tr 50), and later by failing at every turn to renew it as the error

was compounded repeatedly as the trial unfolded.

As early as February 3, 2015, defense counsel was aware from its own investigation that

law enforcement had improperly suggested Nolan's photo from a photo array. Robert Jackson,

Lorraine Scroggins' son was present when his mother was shown Ralph Nolan's photo by

Detective Deloren. He described to a defense investigator seeing the photos on Facebook and in

particular:

> RJ: All right. [The Detective] He had, um, a lineup where everybody...So, I am
> sitting here with her [Lorraine Scroggins]. He showed her the pictures. She said,
> "oh, could look like this guy here" Right? so then he was like, "Wait. So Let me
> show you something else."
> Q: Did your mom seem sure that it was him at that point in time?
> RJ: She was, she was like looking at it like, "oh, it could be him...."
> Q. Maybe it could be him?
> RJ It could be him.
> Q. Okay
> RJ So they – he showed - he grabbed the ipad here and he was looking
> through some from friends or wherever the case may, wherever he had
> got them from and as soon as a- soon as that hit that a picture popped up she was
> like oh, jumped up in bed and said, "that's him."
> Q: That's him.

RJ: That's him. So, he went back to the and he said, "This guy right here that we looking at on Facebook is this guy right here " on that – "on the lineup sheet."

Q: So the Detective pointed out that the guy on the Facebook is the guy in the photo array?

RJ Is this guy right here......

(Walsh, Ex. 10, Audiotape at 39:30 ).

Lorraine Scroggins confirmed that is how the procedure occurred and indicated at one point during the taped interview, "[The Detective] went on Facebook and I guess he probably typed the name in and I saw it and when I saw it, I was like that's him." This interview confirmed that at least one witness was told the name of the suspect and shown the Facebook photographs of Ralph Nolan by the investigating detective before making a positive identification. *(Id.)* This procedure was akin to a single photo show-up and the taint poisoned the identifications that followed.

No other Facebook photographs from the all-suspect 22 photo array were shown to the witnesses. This law enforcement conduct alone provided at least a good faith basis to challenge the procedure as "impermissibly suggestive as to give rise to a very substantial likelihood of misidentification" *Jarret v Headley* 802 F.2d 34, 40-41 (2d Cir. 1986) *(quoting Simmons* 390 U.S. 377, 384 (1969).[29]

By April 1, 2015, days before trial defense counsel learned from 3500 material that Desiree Scroggins also did not make a positive identification until after she viewed Facebook pages with her mother and the Detective, and that the two witnesses were privy to the name and

---

[29] What is more, the "identification" came six weeks after the robbery and just one week after Desiree called the detective to report Odiot, her baby's father's uncle was seen fencing their property and finally admitted that it was their marijuana that was robbed. (Tr 425-427, 490-497, Walsh, Ex. 18, 21). Nevertheless, defense counsel did not move for a pre-trial hearing until months later on the eve of trial. By the time of this January 27th identification procedure, the Scroggins had every reason to curry favor with the detective.

identifying information of the defendant. (Walsh, Ex. 11). [30] By then, defense counsel also learned that two judges had failed to credit this lead Detective's testimony in other cases. In fact, one had found the Detective's testimony not credible involving his administration of an identification procedure. It resulted in that court striking the identification testimony from the case. (*U.S. v Chambers*, 13 Cr 345 (LGS) (striking identification testimony due to unconstitutionally suggestive taint of same detective's procedure) *on direct appeal* No. 16-163.

Although defense counsel finally moved on April 5, 2015 to "preclude any in-court identification" defense counsel did not proffer the recorded statement by Robert Jackson in doing so. Counsel acknowledged that "the accuracy of the identifications is the key issue in the case," at oral argument and eventually proffered some of the Jackson information. But, during the course of oral argument before the Court had heard the full panoply of suggestivity that tainted these identifications, defense counsel inexplicably withdrew the pre-trial motion to suppress the identification evidence. (Tr 50). Thus, the most potent, indeed the only direct evidence of his client's involvement in this crime, was left unchallenged pre-trial. The withdrawal of the motion deprived the defendant of effective assistance of counsel and the concomitant failure to move to suppress was "unreasonable under prevailing professional norms and ...was not sound strategy." *Kimmelman*, 477 U.S. at 381.

---

[30] Apparently, just five days before trial during the pre-trial litigation on the identifications, all of the Government's witnesses had still not admitted they had shared the Facebook photographs with each other prior to making their identifications. *See*, Walsh, Ex. 35, (Government's Pretrial Motion in Opposition), "Ms. Martinez does not recall being shown any photographs of the defendant ...prior to making that identification on January 28, 2014" but by the time of trial days later, both she and Desiree Scroggins testified otherwise. (Tr 172-174; 177; Tr 701 *see also*, Tr 147, *See also*, Walsh, Ex. 15, 19 (Gov't Letters to Trial Counsel). Not coincidentally, the Government proffered to the Court that Sandra Martinez's son also did "not recall being shown a photograph of the defendant prior to making the identification on February 10, 2014," but by the time he testified he and his girlfriend Desiree Scroggins, admitted the obvious – of course, she had shown him and of course, he saw it. (Tr 172-174; 240, 266 ).

The primary purpose of a pre-trial identification hearing is to ensure the reliability of identifications, which are particularly susceptible to influence and mistake, but which remain among the most powerful pieces of evidence in use at trial. *Manson v. Brathwaite*, 432 U.S. 98, 111-112 (1977). "The prudence of such a hearing has been emphasized by many decisions in the Courts of Appeals, most of which have in various ways admonished trial courts to use that procedure." *United States v. Saldana*, No. 05 CR 1335 (LMM), 2006 WL 1376933 at *1 (S.D.N.Y. May 17, 2006); *Watkins v. Sowders*, 449 U.S. 341, 349 (1981) (although pre-trial hearing not required in every case, a "judicial determination outside the presence of the jury...may often be advisable [,and] [i]n some circumstances...may be constitutionally necessary.") By withdrawing the motion defense counsel forfeited the opportunity to challenge the constitutionality of the police conduct outside of the presence of the jury. There is no conceivable strategy or tactic for such a withdrawal and the failure to give the Court the opportunity to adjudicate the suggestivity of at least the Scroggins' identifications was prejudicial.

A pretrial identification procedure violates Due Process if it is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" *Jarret v. Headley* 802 F.2d 34, 40-41 (2d Cir. 1986) (*quoting Simmons* 390 U.S. 377, 384 (1969). At least the procedures involving the Scroggins identifications and the Facebook photographs met that standard. Courts apply a two part test to determine the admissibility of an identification. *Manson v. Brathwiate*, 432 U.S. 98 (1977). First, they must determine if "the pretrial procedures unduly and unnecessarily suggested that the defendant was the perpetrator." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). And, if the court finds that the pretrial procedure was suggestive, it must then determine whether the identification was nonetheless reliable under the

totality of the circumstances. *Raheem, supra* at 135, *citing Neil v. Biggers*, 409 U.S. at 199 (additional citations omitted). The same standard applies to the in-court identifications.

The procedures employed by Detective Deloren in this case, especially with respect to Desiree and Lorraine Scroggins, were impermissibly suggestive and not otherwise independently reliable under the totality of the circumstances. Had defense counsel insisted on challenging them outside the presence of the jury, there is more than a reasonable probability that these two identifications would have been suppressed, most likely all four because the corrupting effects on each subsequent identification was manifest, particularly as they were compounded by multiple, subsequent procedures using the same photos again to the same witnesses. (Tr 312; 317).

There is ample reason to conclude that the identification procedures were suggestive. First, the procedure on January 27, 2016 came just one week after Desiree Scroggins called the Detective, in part, to confess the real reason the apartment was targeted for a robbery. (Tr 425, Walsh, Ex. 18, 21) Having already viewed photographs and not identifying anyone, this was the first procedure administered following the admission by the Scroggins regarding Odiot and their marijuana and the Detective's confrontation of the Martinez's regarding their relative. (Tr 425-427, 490-497, Walsh Ex. 18, 21). The Scroggins had every reason to curry favor with the police.

Second, the procedure that the Government eventually characterizes as an "identification" by Desiree Scroggins, was never recorded as such, or even documented at all. Unlike the other three witnesses, she did not nor was she ever asked to mark, circle sign or draw on any photo to indicate its resemblance to a robber. (Tr 431-432) . Her identification was not even noticed in the criminal complaint filed in federal court by Agent Winston. (Walsh, Ex. 2). In fact, when Agent Winston became involved in the case on January 30, 2014 she records and characterizes the identifications which supposedly occurred just days prior as "tentative." (Walsh, Ex. 21). At

best, Desiree's "identification" was that the defendant's photo resembled one of the robbers and of that she was only 70 - 75% certain. (Tr 139-140, Walsh, Ex. 14).

Moreover the procedure she, her mother Lorraine, and her brother Robert Jackson described indicate that the detective suggested the photo, whether his intention was purposefully malevolent or not. First, Robert Jackson's statement to the defense investigator, affirmed also by his mother at the time, indicates that the identification by Lorraine Scroggins came after the Detective "grabbed the ipad" and showed the Facebook photo for Ralph Nolan to Lorraine Scroggins and then told her in no uncertain terms which mugshot matched the Facebook profile; "This guy right here that we looking at on Facebook is this guy right here, on the lineup sheet." (Walsh, Ex. 10).[31] Such a procedure is akin to saying "take a real good look" at this particular photo in its biased suggestivity and should not be permitted. *See Thoma v. Varner*, 428 F.3d 491 (3rd Cir. 2005) (granting writ where detectives request witness to "look real good" at defendant's photo and counsel fails to request suppression or object).

Desiree Scroggins testimony at trial also supports the notion that the proceeding was unduly suggestive. Even assuming her later actions ripened into an "identification," her initial

---

[31] To be sure, Robert Jackson altered his testimony regarding the chronology of the Facebook viewing and the identification by the time he testified at trial. (Tr 597-598, 601 ) However, this testimony came after defense counsel permitted the young man to remain in the courtroom to hear and observe his mother's testimony from her stretcher before the jury. (Tr 545, 573, 599 ). "At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony." Fed. R. Evid. 615. The decision not to sequester this key impeachment witness from listening to his mother's testimony for the Government before testifying for the defense, alone raises grave questions about counsel's effectiveness. Such a decision, particularly for such a physically vulnerable witness related by blood to the defense witness, does not reflect a "conscious, reasonably informed strategic decision." *Cox*, 387 F.3d 193, 199. Counsel's utter failure to confront either Lorraine Scroggins or Robert Jackson with the prior statements on tape demonstrates it. That defense counsel did not proffer this evidence to the Court pre-trial in support of the motion, sequester the witness nor impeach either inconsistent statements fell below the standard of professionally competent assistance. *Strickland*, 466 U.S. 668, 694. But for, these errors alone, but particularly in combination with the other errors, clearly suggest that the result of the proceeding would have been different. *Id.*,

viewing of the photographs which she characterizes as "70%" or "75%" certain, surely was not an identification. (Tr 140) Had it been, the Detective would have had Desiree mark the photo as he did with Lorraine and as the federal agent did with the Martinez's. Instead, the Scroggins were permitted to confer with each other on the identification, confirm if they each picked "the same guy that I pointed out was the same guy," (Tr 141), and ask each other; "That's him, right?" (Tr 152 ). Standing alone, it was suggestive to permit witnesses to confer and collaborate on their selections. But the fact that the only suspect as to which the Detective shared a Facebook photo page was that of the defendant Ralph Nolan makes the suggestivity unmistakable.

Irrespective of which conflicting chronology the Court ultimately credits, Robert Jackson's recorded interview, or the trial versions that suggests the identification came before the Facebook photo was displayed, these identifications were suggestive. "Defendant's protection against suggestive identification procedures encompasses not only the right to avoid methods that suggest the initial identification but as well as the right to avoid having suggestive methods transform a selection that was only tentative into one that is positively certain." *Raheem v. Kelly* *citing Solomon v. Smith* 645 F.2d at 1185. Even if the witnesses had at first tentatively identified the defendant's photo from a 22 all-suspect array, subsequent conduct displaying only one Facebook photo, sharing the name of the accused and the repeated showing of the same photograph to the same witness again, tipped the balance. Even "[a]n otherwise fair pretrial identification procedure may be rendered impermissibly suggestive through subsequent actions or remarks by government agents." *Thai*, 29 F.3d 785 *citing U.S. v. Jarvis* 560 F.2d 494, 500 (2d Cir. 1977) *cert denied* 435 U.S. 934 (1978). "Conduct such as showing the witness isolated pictures of the person the witness has selected, *see eg Solomon v Smith* 645 F.2d 1179 (2d Cir. 1981) or endorsing the correctness of the selection, *see, e.g. United States v. Leonardi*, 623 F.2d 746, 755 (2d Cir., *cert denied* 447 U.S. 928 (1980), *United States v. Moskowitz* 581 F.2d 14 (2d