**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RALPH NOLAN,

                 Petitioner,

     -against-

UNITED STATES OF AMERICA,

                 Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: FEB 20 2018

<u>MEMORANDUM DECISION
AND ORDER</u>

16-cv-7831 (GBD)
14-cr-555 (GBD)

GEORGE B. DANIELS, United States District Judge:

On April 10, 2015, a jury convicted Petitioner Ralph Nolan of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count One); attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count Two); and brandishing a firearm during and in relation to the attempted robbery charged in Count Two, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Three). On August 11, 2015, this Court denied Petitioner's post-trial motion for a judgment of acquittal or, in the alternative, a new trial. (*See* ECF No. 80.) Before this Court is Petitioner's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 due to alleged ineffective assistance of Petitioner's trial counsel. (Mem. Law Supp. Mot. to Vacate ("Mot."), ECF No. 114.)[1]

For the reasons set forth herein, Petitioner's motion is DENIED.

## I. EVIDENCE AT TRIAL

According to the evidence at trial, Petitioner conspired with two individuals to rob marijuana from residents of an apartment in the Bronx. Petitioner attempted to commit the robbery on December 16, 2013 with an unidentified co-conspirator. They brandished firearms during the

---

[1] All citations to the record refer to docket entries in Petitioner's criminal case, 14-cr-555 (GBD).

course of the robbery. The adult eyewitnesses to the robbery were: Lorraine Scroggins (a quadriplegic); Desiree Scroggins (Lorraine Scroggins's daughter); Christopher Martinez (Desiree Scroggins's boyfriend); Sandra Martinez (Christopher Martinez's mother); and Deyanira Beriguete (the home health care aide for Lorraine Scroggins). The apartment residents were Lorraine Scroggins and Desiree Scroggins. Deyanira Beriguete, Christopher Martinez, and Sandra Martinez were in the apartment at the time of the robbery as well.

On the afternoon of the robbery, three men were seen on video entering the Bronx apartment building together. (*See* Tr. at 620:1–622:15.)[2] The Scrogginses, Martinezes, and Deyanira Beriguete were inside one of the building's apartments. Upon hearing knocks at the door, Deyanira Beriguete opened the door. (*See id.* at 414:24–415:10.) The Petitioner and another individual, armed with guns, entered the apartment. (*See id.* at 185:25–187:24.) The men demanded drugs and money from the apartment's occupants. (*See id.* at 130:6–9, 189:12–15, 225:12–17, 613:8–21.) The Petitioner struck Desiree Scroggins across the head with a gun. (*Id.* at 125:10–25.) The men tied up Deyanira Beriguete, Desiree Scroggins, and Christopher Martinez with cut "phone wires" or "cable wires."[3] (*See id.* at 126:25–127:21, 188:15–17; 223:8–17, 411:15–413:1; *see also id.* at 715:7–720:20 (police officer's testimony on cords recovered from the scene of the robbery).) Having found only a small amount of marijuana, the two robbers then left the apartment after stealing a video game system and cell phones. (*See id.* at 130:1–134:5, 136:5–11.)

---

[2] "Tr." designates a reference to the consecutively paginated trial transcripts at ECF Nos. 52, 54, 56, 58, and 60.

[3] Sandra Martinez testified that a robber unsuccessfully tried to tie her hands. (Tr. at 614:25–615:12.)

## A. The Identifications

Detective Deloren from the New York City Police Department ("NYPD") conducted an investigation of the incident. Many of the eyewitnesses described the two robbers as light-skinned and Hispanic, while Lorraine Scroggins and Sandra Martinez said that one of the robbers could have beeen Caucasian.[4]  A poster prepared by Detective Deloren indicated that the NYPD was looking for "2 male[] [H]ispanics" in connection with the robbery. (*See id.* at 471:8–472:22)

Four out of the five eyewitnesses ultimately identified the Petitioner as one of the two robbers. The same day of the robbery, Christopher Martinez was taken to the police station to view photos. (*Id.* at 419:4–6.) Petitioner's picture was not among the photos that Christopher Martinez viewed, and he did not make an identification that day. (*Id.* at 419:7–17.) The next day, Desiree Scroggins went to the police station to view photos and did not recognize anyone she saw either. (*Id.* at 420:1–6.) Petitioner's picture was not among the photos that she was shown. (*Id.* at 420:7–8.)

On January 6, 2014, Detective Deloren visited the Scrogginses' home to show them another stack of photographs that did not include Petitioner's photo given that he was not yet a suspect in the case and Detective Deloren did not know who he was at the time. (*Id.* at 423:16–19; 424:10–16.)  Detective Deloren showed the stack of photographs to Desiree Scroggins first and she did

---

[4] (*See* Tr. at 414:2–10, 16–23 (Detective Deloren's testimony that Lorraine Scroggins described the robbers as "possibly being male Hispanic, light-skinned," and that one of the robbers "could also possibly be white"); *id.* at 174:21–175:5 (Desiree Scroggins's testimony agreeing that "the person in the green sweatshirt was a tall white Hispanic man" with "[l]ight blue eyes"); *id.* at 414:11–15 (Detective Deloren's testimony that Desiree Scroggins "stated that the robbers were light-skinned . . . [p]ossibly American Puerto Rican"); *id.* at 182:4–13 (Desiree Scroggins confirming that after she saw Petitioner's photo from the photo array, she thought that he was "white Hispanic"); *id.* at 428:4–10 (Detective Deloren's testimony recounting Sandra Martinez's description of the robbers as "light-skinned male Hispanic," and that "it was possible" one of them "could be a white guy"); *id.* at 221:22–222:11 (Christopher Martinez's description of one of the robbers' appearance as "white" with "blue eyes," and that the other robber "was also like pale white"); *id.* at 348:10–349:3 (Agent Winston's reading of her notes, which reflect that Christopher Martinez described one of the robbers as "a light-skinned Hispanic male"); *id.* at 599:6–13 (Lorraine Scroggins's description to her son, Robert Jackson, of the robbers being "a guy about [his] complexion and a white guy").)

not make an identification. (*Id.* at 424:2–7.) He then left Desiree in the living room and went into the bedroom to show Lorraine Scroggins the stack of photos. (*Id.* at 424:21–24.) Lorraine did not make an identification that day either. (*Id.* at 425:7–8.)

On January 27, 2014, Desiree Scroggins and Lorraine Scroggins separately identified the Petitioner through a twenty-two sequential photo array. (*Id.* 151:2–152:10, 564:7–567:2.) At the time that these identifications were made, Detective Deloren did not independently know who Petitioner was. (*Id.* at 432:2–4.) Detective Deloren showed the stack of photos to Desiree Scroggins in her living room and she identified the Petitioner as the robber. (*Id.* at 169:6–9; 432:12.) At trial, Desiree testified that when she saw Petitioner's photo she was "about 75, maybe 80 percent sure it was him." (*Id.* at 169:12–13.) Detective Deloren took the same stack of photos to Lorraine Scroggins's bedroom where she identified the Petitioner and marked his photo with an "X" later testifying at trial that she was "[a] hundred percent" sure it was him. (*Id.* at 433:25– 434:7; 564:21–25.)

After making the identifications, the Scrogginses accessed the Petitioner's Facebook page. (*See id.* at 152:17–154:1, 567:17–568:20.) There was some conflicting testimony as to what exactly happened that lead the Scrogginses to Petitioner's Facebook page.

Desiree Scroggins testified that after entering her mother's room, Desiree "looked up the guy that was with the green sweater on Facebook[,]" referring to Petitioner. (*Id.* at 153:5–6.) She testified that she obtained the Petitioner's name from her mother but that she did not know how her mother got the name. (*Id.* at 153:7–11.) She also testified that Detective Deloren was standing on the opposite side of her mother's bed and another detective was standing by the door while she and her mother looked on Facebook. (*Id.* at 170:24–171:3.) She said that Detective Deloren told them to stop because they would get in trouble. (*Id.* at 153:23–24.) After viewing the Facebook page, Desiree said that she "was positive that was the person who robbed [her]." (*Id.* at 154:11–

12.) On cross-examination, when asked whether he told Desiree and her mother that they were not supposed to look Petitioner up on Facebook, Detective Deloren said "actually, I would say quite the opposite. . . . I encourage it. . . . I think it's an invaluable investigative step." (*Id.* at 513:5–11.) When confronted with Desiree's contrary testimony, he responded: "I did not tell them that." (*Id.* at 513:12–16.)

Lorraine Scroggins testified that she saw Petitioner's name on the photo that she marked and that she was the one who looked him up on Facebook, not Desiree. (*Id.* at 583:2–3; 584:5–7.) She said that she was looking at the Facebook photos with her son, Robert Jackson, who was also in the room, and she said "[t]hat's him[,]" referring to the Petitioner. (*Id.* at 584:3–25.) She then asked Desiree to enter the room and take a look, and Desiree said "[t]hat was him, mommy, that hit me with the gun." (*Id.* at 585:3–6.) On cross-examination, Detective Deloren was asked whether he instructed Lorraine and Desiree to look on Facebook. He testified that he did not recall if he directed them but that after they made photo identifications, he "certainly directed them to view the defendant's Facebook photos and friends to see if they could identify the still-unidentified remaining suspect." (*Id.* at 519:14–25.) On cross-examination, Lorraine was asked whether Detective Deloren told her to take a look at the Facebook photos and see if she could identify somebody else as being involved in the incident and she responded "I don't remember him saying it to me." (*Id.* at 585:17–23.)

The defense called Robert Jackson as their witness. Jackson testified that after Lorraine pointed out a person from the stack of photos, given that she cannot type, she told Detective Deloren what name to search on Facebook and he did. (*Id.* at 598:3–13.) Jackson further testified that "once immediately, no longer than 20 seconds after she looked at the [Facebook] picture, that she said that was the guy that was in the house." (*Id.* at 598:17–20.)

According to Desiree, the same day that she and her mother made the identifications, Desiree showed Petitioner's Facebook page to Christopher Martinez and Sandra Martinez. (*Id.* at 172:18–174:11.) Sandra Martinez, however, testified that she did not "recall looking at the [Petitioner's] Facebook profile or any Facebook pictures" prior to making her identification on January 28, 2014. (*Id.* at 626:12–15.) Christopher Martinez, on the other hand testified that Desiree showed him Petitioner's Facebook page before he made his identification. (*See id.* at 266:10–267:2.). None of the eyewitnesses described what specific photos they observed on Petitioner's Facebook page.

Christopher Martinez recognized Petitioner as an individual from his former neighborhood with the nickname "White Boy," and stated that "the White Boy [he] knew wouldn't have done [the robbery]." (*Id.* at 172:20–173:6; *see also id.* at 237:21–239:7.)

On January 28, 2014, Sandra Martinez was shown a photo array containing the Petitioner's picture, and she identified him as one of the robbers. (*Id.* at 624:7–625:17.) She testified that she was "pretty confident" when she made the identification. (*Id.* at 625:23–626:3.) She "kn[e]w of" the Petitioner and was aware that "[e]verybody [in the neighborhood] used to call him White Boy." (*Id.* at 626:16–627:25.) On February 10, 2014, Christopher Martinez viewed the same photo array and also identified Petitioner as one of the robbers. (*See id.* at 234:6–237:19.) He testified that he was "confident" when he made the identification. (*Id.* at 240:15–17.)

The fifth eyewitness, Deyanira Beriguete, who was the home care attendant, was unable to identify any of the robbers following the robbery. (*Id.* at 192:24–193:9.)

## B. Shaun Odiot

The trial evidence also established a link to a third individual, Shaun Odiot. Shaun Odiot is Sandra Martinez's brother and Christopher Martinez's uncle. (*See id.* at 605:23–606:3.) He had served seventeen years in prison and some of the eyewitnesses described him as a "dangerous

guy."[5] Although he was not physically present in the apartment during the robbery, Shaun Odiot was seen at the Bronx apartment building looking for marijuana on December 16, 2013. Desiree Scroggins testified that she had seen Shaun Odiot in the hallway talking to Sandra Martinez ten to fifteen minutes before the robbery and that he had asked Desiree if she knew if anyone had marijuana. (*Id.* at 179:4–25.)[6] Indeed, surveillance footage confirms Shaun Odiot entered the building with the two robbers on the day of the robbery.[7] After learning of his identity, Detective Deloren ran a search using Shaun Odiot's building address for anyone who had been arrested using that address in the past and compared it to the general descriptions provided by the victims. (*Id.* at 428:25–429:4.) The photos compiled from this search included a photo of the Petitioner; this was the photo array that was shown to Desiree and Lorraine Scroggins when they first made positive identifications on January 27, 2014. (*Id.* at 429:7–16.)

During his recorded post-arrest statement (the "Post-Arrest Statement"), Petitioner acknowledged that he knew Shaun Odiot and of his history of committing robberies, and that Shaun Odiot purchased a cell phone as a gift for him when he was sixteen years old.[8]

### C. Ralph Nolan, Sr.

In the middle of trial, the defense informed the Government that it intended to call Petitioner's father, Ralph Nolan, Sr., to testify that the Petitioner worked with him the morning of the robbery in preparation for a job that they had the following day. (*See id.* at 666:2–4.) The

---

[5] (*See* Tr. 632:11–16.)

[6] (*See also* Tr. at 606:21–607:16 (Sandra Martinez "bumped into" Shaun Odiot "towards the front of the [apartment] building" on the day of the robbery, and he "told [her] that he was going to buy some marijuana").)

[7] (*See* Tr. at 620:1–622:15; 622:16–25.)

[8] (*See, e.g.*, Tr. at 781:10–17 ("[In] the defendant's post-arrest statement . . . [h]e admitted knowing Odiot, and he admitted knowing that Odiot did robberies. . . . And he said that the last time he saw Odiot, Odiot bought him a cell phone.").)

Government objected to the introduction of any alibi evidence arguing that the defense failed to give written notice despite the Government's demand. (*Id.* at 660:9–12.) The defense argued that Mr. Nolan, Sr. was not testifying as an alibi witness because he would not be able to account for his son's whereabouts the afternoon of the robbery. (*Id.* at 666:15–20.) The defense proffered that Mr. Nolan, Sr.'s testimony was relevant because it would corroborate the Petitioner's Post-Arrest Statement that he was working with his father during that period of time. (*Id.* at 666:18–25.) After hearing further argument outside the presence of the jury, this Court permitted Mr. Nolan, Sr.'s testimony, over the objection of the Government, for the purpose requested by defense counsel.

Among the video recordings admitted into evidence was a surveillance videotape showing the two robbers walking up a flight of stairs as they exited the Bronx apartment building. On the surveillance videotape, one robber can be seen wearing a green-hooded sweatshirt and carrying a bag full of items over his shoulder. At trial, Mr. Nolan, Sr. testified that Petitioner did not own a green-hooded sweatshirt, and that the robber carrying the bag could not be the Petitioner because his "son has a bop to his step" such that "when he walks, he's got a bounce." (*See id.* at 748:12–750:18.) He further testified that Petitioner's ethnicity is "Irish Canadian," that Petitioner does not speak Spanish, and that Petitioner worked with him in 2013 "install[ing] wiring for voice and data" in buildings. (*Id.* at 736:19–738:22, 741:6–9.)[9]

## II.   JURY INSTRUCTIONS AND VERDICT

After the close of summations, this Court provided the following charge regarding eyewitness identifications to the jury:

---

[9] Three of the eyewitnesses had been tied up by the robbers using cut "phone wires" or "cable wires." (*See* Tr. at 126:25–127:21, 188:15–17; 223:8–17, 411:15–413:1; *see also id.* at 715:7–720:20 (police officer's testimony on cords recovered from the scene of the robbery).)

Now, ladies and gentlemen, one of the most important issues in this case is whether Ralph Nolan is the same person who committed the crimes charged in the indictment. . . .

Identification testimony is, in essence, the expression of an opinion or belief by the witness. The value of the identification depends on the witness's opportunity to observe the person who committed the crime at the time of the offense, and the witness's ability to make a reliable identification at a later time based on those observations.

You must decide whether you believe the witness's testimony, and whether you find beyond a reasonable doubt that the identification is correct. You should evaluate the testimony of a witness who makes an identification in the same manner as you would any other witness.

In addition, as you evaluate a witness's identification testimony, you should consider the following questions, as well as any other questions you believe are important:

You should ask whether the witness was able to observe and had an adequate opportunity to observe the person who committed the crimes charged. Many factors affect whether a witness has an adequate opportunity to observe the person committing the crime. The factors include the length of time during which the witness observed the person, the distance between the witness and the person, the lighting conditions, how closely the witness was paying attention to the person, whether the witness was under stress while observing the person who committed the crime, whether the witness knew the person from some prior experience, whether the witness and the person committing the crime were different races, and any other factors you regard as important.

You should ask whether the witness is positive in the identification, and whether the witness's testimony remains positive and unqualified after cross-examination. If the witness's identification testimony is positive and unqualified, you should ask whether the witness's certainty is well-founded. You should ask whether the witness's identification of Ralph Nolan after the crime was committed was the product of the witness's own recollection. You may take into account both the strength of the latter identification and the circumstances under which that identification was made. You may wish to consider how much time passed between the crime and the witness's later identification of the defendant.

You may also consider whether the witness gave a description of the person who committed the crime, and how the witness's description of the person who committed the crime compares to the defendant. You may also consider whether the witness was able to identify other participants in the crime. If the identification was made under circumstances that may have influenced the witness, you should examine that identification with great care.

Some circumstances which may influence a witness's identification are whether the witness was present with more than one person or just Ralph Nolan; whether the witness made the identification while exposed to suggestive influences of others; and whether the witness identified Ralph Nolan in conditions that created the impression that he was involved in the crime.

You should ask whether the witness failed to identify Ralph Nolan at any time, identified someone other than Ralph Nolan as the person who committed the crime, or changed his or her mind about the identification at any time.

If, after examining all of the evidence, you have a reasonable doubt as to whether Ralph Nolan is the individual who committed the crime charged, you must find Ralph Nolan not guilty.

(*Id.* at 874:15–17, 875:3–877:15.) The jury began its deliberations on April 9, 2015. The following afternoon, the jury returned a verdict of guilty on all three counts in the indictment. (*Id.* at 906:6–22.)

## III. PRE-TRIAL MOTIONS

### A. The Post-Arrest Statement

The Government notified the defense of its intent to introduce only the first portion of Petitioner's Post-Arrest Statement. The defense thereafter filed a letter arguing that Rule 106 of the Federal Rules of Evidence, the so-called "rule of completeness," required that the entire video in which Petitioner repeatedly denied his guilt, be introduced. (Letter to the Court by Mitchell Dinnerstein dated March 19, 2015, ECF No. 16, at 1.) In response to the Government's contention that the additional portions of the Post-Arrest Statement are not necessary, the defense argued that "to limit the video statement would present an unfair picture of the conversation between Mr. Nolan and the agents." (Letter to the Court by Mitchell Dinnerstein dated March 24, 2015, ECF No. 21, at 1.) In the latter portion of the Post-Arrest Statement, the defense sought to introduce that the Petitioner, (1) "talk[ed] about his whereabouts," (2) denied ever being in the area where the crime occurred, and (3) said that the gun he was holding in a Facebook picture was an "inoperable BB gun." (*See id.* at 1–2.)

The defense recognized that portions of the statement the Government offered included discussions of the Petitioner "smoking marijuana, fighting with his domestic partner, and a ten year old juvenile robbery where he received a probationary sentence," but offered to forgo any objections under Rule 404 of the Federal Rules of Evidence "so that the jury can see the entirety of Mr. Nolan's statement." (*Id.* at 2.)

On March 27, 2015, the Government filed a motion *in limine* for the admission of (1) a picture posted on Petitioner's Facebook page depicting him holding a firearm (the "Facebook Gun Photo"); and (2) testimony that the Petitioner "was known in the past as a drug addict who often had arguments with his family members." (*See* Mot. in Limine ECF No. 25, at 1.) This Court held a hearing a few days later where the parties argued their positions on the admissibility of the full Post-Arrest Statement videotape and the evidence raised in the Government's motion *in limine*. (*See generally* April 1, 2015 Transcript, ECF No. 62.) The Government opposed defense counsel's request to play the entire video and pointed to portions towards the end where the Petitioner is seen crying, arguing that those portions only serve to garner sympathy for the Petitioner. (*Id.* at 7:24–8:7.) The defense argued that the Post-Arrest Statement contained challenging points for both sides and "the jury should be able to see the entire statement and make whatever determination they wish to make from it." (*Id.* at 8:22–25.)

In weighing the probative value against the potential prejudice in allowing the Government to introduce the Facebook Gun Photo[10] and evidence about Petitioner's drug use, this Court noted that any potential prejudice is minimized by the admission of the entire Post-Arrest Statement in which those issues were discussed. (*See id.* at 9:7–10:4.) As this Court explained, when the agents asked Petitioner about the Facebook Gun Photo, the video shows "[Petitioner] giving explanations

---

[10] None of the eyewitnesses testified that they saw a Facebook Gun Photo when they viewed Petitioner's Facebook page.

. . . about when he had the gun or what the gun was, whether it was a BB gun" and "[a]lso, he clearly . . . acknowledges his drug use." (*Id.* at 9:19–25.) The defense "agree[d] it gets in." (*Id.* at 11:1–4.) Noting that the "government will make whatever argument they want" and if those arguments are "inappropriate," the defense "will make the objection." (*Id.*) At trial, the jury was shown the entire video of the Post-Arrest Statement.

### B. Motion to Preclude In-Court Identifications

On April 5, 2015, the defense moved to preclude in-court identifications of the Petitioner by four eyewitnesses: Lorraine Scroggins, Desiree Scroggins, Christopher Martinez, and Sandra Martinez. (*See generally* Mot. to Suppress, ECF No. 40.) The defense argued that Detective Ellis Deloran used impermissibly suggestive identification procedures rendering all out-of-court identifications unreliable and tainting all prospective in-court identifications by the witnesses. (*Id.* at 1.) According to the motion, defense counsel had learned that at least two of the eyewitnesses viewed Facebook pictures of the Petitioner to "possibly reinforce their original tentative identifications," while the other two witnesses may have viewed Petitioner's Facebook page prior to making their identifications. (*Id.* at 2.)

On April 6, 2015, prior to jury selection, this Court heard extensive oral argument regarding Petitioner's motion to suppress the in-court identifications. (*See generally* April 6, 2015 Transcript, ECF No. 52.) This Court noted that if it precluded the in-court identifications, it would also preclude evidence of any suggestive out-of-court identification procedures raised in the motion. (*Id.* at 49:1–50:14.) As this Court explained,

> If [witnesses are] not permitted to make in-court identifications, then I assume that you're not going to make any inquiries on cross-examination about whether or not the person that robbed them is your client, and I don't know how you can do that, and that the only thing that is going to be in this case will be their initial identifications of your client without whatever contradictory subsequent identification, misidentification, circumstances under which they

> made the identification. Again, as I say, I just want to make sure I
> understand what you want, because, be careful, you may get it.

(*Id.* at 46:24–47:9.) After further argument, defense counsel ultimately withdrew his motion conceding "that the most appropriate thing is for the jury to hear everything" and that "it should all come in." (*Id.* at 48:22, 50:12–14.)

## IV.    INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner moves to vacate his sentence pursuant to 28 U.S.C. § 2255 on grounds of ineffective assistance of counsel. The Sixth Amendment provides that in "all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel." U.S. Const. amend. VI. Petitioner claims that his Sixth Amendment right to effective assistance of counsel was violated when trial counsel (1) did not consult or call an expert in eyewitness identification; (2) failed to suppress the identifications of the eye-witnesses; (3) did not preclude certain prejudicial evidence (*e.g.* prior crimes evidence and a photograph of the Petitioner holding an alleged firearm); and (4) did not properly notice an alibi witness. (Mot. at 86.)

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court laid out the two-pronged test a petitioner must meet to prevail on an ineffective assistance of counsel claim. A defendant must (1) show that counsel's conduct fell below "an objective standard of reasonableness" under "prevailing professional norms," and (2) "affirmatively prove prejudice." *Id.* at 688, 694.

In analyzing the first prong, courts are to make every effort to "eliminate the distorting effects of hindsight," "evaluat[ing] the conduct from counsel's perspective at the time." *Id.* at 689. The Supreme Court recognized, the "difficulties inherent in making [this] evaluation" and therefore instructed courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial

13

strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Courts are to bear in mind that "[t]here are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689 (internal citation omitted).

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. Thus, the second prong of *Strickland* requires Petitioner to show that his attorney's "deficient performance prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687, 694. In other words, counsel's errors must have been "so serious as to deprive the defendant of a fair trial." *Id.* at 687. Although "by no means insurmountable," the ineffective assistance standard under *Strickland* is "highly demanding." *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

## A. Failure to Consult or Call Eyewitness Identification Expert

Petitioner argues that given the sole issue at trial was whether Petitioner was the person who committed the crime, "it was unreasonable for trial counsel not to even weigh the benefits against the risks of consulting an identification expert." (Mot. at 34.) Petitioner relies upon a declaration submitted by his trial counsel in which the attorney states that not consulting and calling an expert "was not a strategic decision nor a tactical one." (Susan Walsh Declaration ("Walsh Decl."), Ex. 29, ECF No. 115, ¶¶ 5–8.)

This Court recognizes some of the dangers inherent in eyewitness identifications. However, "[w]here identification evidence is at issue, . . . no such special considerations justify a departure from the presumption that juries will follow instructions." *Watkins v. Sowders*, 449 U.S.

341, 347 (1981). Indeed, "the proper evaluation of evidence under the instructions of the trial judge is the very task our system must assume juries can perform." *Id.* Moreover, "[c]ounsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification including reference to . . . any suggestibility in the identification procedure." *Manson v. Brathwaite*, 432 U.S. 98, 114 n.14 (1977) (internal citation omitted); *United States v. Ruggiero*, 824 F. Supp. 379, 396 (S.D.N.Y. 1993) ("[T]he reliability of the identification evidence can be ensured through the 'time-honored process of cross-examination'—'the device best suited to determine the trustworthiness of testimonial evidence.'") (internal citation omitted). "These methods are generally presumed to enable the jury to assess the credibility and reliability of each witness." *Smith v. Smith*, No. 02-cv-7308 (WHP) (JCF), 2003 WL 22290984, at *14 (S.D.N.Y. Sept. 29, 2003) (report and recommendation).

Even accepting trial counsel's post hoc contention that his failure to consult and call an expert witness was neither strategic nor tactical, this failure does not give rise to prejudice under *Strickland*. Trial counsel cross-examined each eyewitness regarding their identification, made arguments in summation about the reliability and credibility of the eyewitnesses, and this Court instructed the jury at length regarding considerations related to eyewitness testimony. *See Howard v. Clark*, 608 F.3d 563, 573–74 (9th Cir. 2010). *Strickland*, 466 U.S. at 697 ("The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed.").

At trial, defense counsel vigorously cross-examined each eyewitness regarding the identification procedures and what occurred the day of the robbery. These cross-examinations touched on issues relating to credibility, reliability, and any inconsistencies in the witnesses' testimony, all of which was before the jury for its assessment. For instance, defense counsel

elicited the following testimony from Desiree Scroggins on cross-examination: she testified that (a) when she first noticed Petitioner, she focused on his gun which caused her to scream (Tr. at 159:10–17); (b) she was knocked unconscious and when she woke up she was dizzy and was tied up (*id.* at 160:10–16); (c) that she was terrified (*id.* at 160:19–20); (d) she had smoked marijuana the day of the robbery (*id.* at 164:10–12); (e) a week before the trial, she told the Government for the first time that she had seen Shaun Odiot in the hallway talking to Sandra Martinez ten to fifteen minutes before the robbery and that he asked her whether Christopher Martinez had marijuana to sell to him (*id.* at 179:4–25); and (f) Sandra Martinez asked Desiree not to tell the police that she saw her with Shaun Odiot outside in the hallway. (*Id.* at 181:3–6.)

On cross-examination, Sandra Martinez denied that she told Desiree not to tell the police that she saw her with Shaun Odiot the day of the robbery. (*Id.* at 635:24–636:3.) She also testified that on Thanksgiving before the robbery, she heard Shaun Odiot say that it would be a shame if someone robbed Ms. Scroggins. (*Id.* at 688:18–21.) She further testified that it took her well over a year to tell the Government this information, (*id.* at 707:15–24), and that she had indeed seen her brother the morning of the robbery. (*Id.* at 708:1–8.) She admitted that she failed to disclose this information to the Government because she was afraid the Government would think she was involved in the robbery. (*Id.* at 697:24–698:7.) In terms of what she saw the day of the robbery, Sandra Martinez testified that during the robbery her focus was on the gun and that she vaguely saw the face of the robber who was wearing the green sweatshirt. (*Id.* at 691:3–5; *see also id.* at 710:7–8 ("I said I really didn't see his face, because I was too occupied on the gun that was in my granddaughter [sic] and my face.").) She further said that she heard the robbers speaking in Spanish, (*id.* at 709:14–17), but on redirect she retracted that statement. (*Id.* at 712:13–15.) Sandra Martinez admitted that when she was speaking with detectives after the robbery she had been using cocaine. (*Id.* at 706:24–707:1.)

A close look at the cross-examination of just these two eyewitnesses reveals that, similar to the other witnesses, defense counsel tested the reliability of their identifications (*e.g.* dizziness, weapon focus, use of drugs), and their credibility (*e.g.* inconsistent stories, not disclosing pertinent information to the Government). It is evident that the jury was privy to any concerns the defense had with the eyewitnesses' testimony as well as the defense's theory of the case. Indeed, in summation, trial counsel underscored that "[w]hat [this case is] really about is . . . the identification of [the defendant] as being the person who committed the crime, whether those four individuals were mistaken or whether or not they got it right." (*Id.* at 793:23–794:2; *see also id.* at 798:13–14 ("There's one issue, it's about identification. Did they get the right guy.").)[11]

Further, in summation, trial counsel emphasized some of the issues Petitioner now argues should have been addressed through expert testimony. For instance, defense counsel discussed the trauma that the witnesses faced and how the effects of stress could have influenced the accuracy of their identifications. (*Compare id.* at 809:20–24 (arguing that "stress affects an ability to observe. . . . If you're traumatized, as these people were, it would simply affect whether or not they could make an accurate identification"); *with* Mot. at 39–43 (arguing that the expert "could have testified that the presence of weapons ("weapon focus"), [and] stress . . . during the robbery . . . could have affected the eyewitness's ability to identify the correct suspect.").) Moreover, in touching upon cross-race identification issues, trial counsel also pointed to the fact that Deyanira Beriguete, the only eyewitness who did not identify Petitioner but instead insisted that the robbery was committed by two male Hispanics, is Hispanic herself. (*Compare* Tr. at 804:18–22; *with* Mot. at 43 ("Case law and decades of scientific studies indicate that people are far better at identifying and recognizing people of their own race.").)

---

[11] The Government also emphasized in its summation that this was in essence an "identification case." (Tr. at 765:6–7, 827:7–9 ("The only issue that's really in dispute is whether Ralph Nolan was one of the robbers.").)

Further obviating the need for eyewitness expert testimony, this Court provided detailed jury instructions on identification evidence. The Second Circuit has held that a "district court may properly address the dangers of unreliable eyewitness identification testimony by giving a jury charge appropriate to the circumstances of the case." *United States v. Veal*, No. 98-1539, 1999 U.S. App. LEXIS 13324, at *3 (2d Cir. June 16, 1999) (finding district court did not abuse its discretion in excluding eyewitness expert testimony because the court provided "a very detailed" jury instruction "regarding the evaluation of eyewitness identification evidence."). Covering the issues now raised by Petitioner's proffered expert, the jury charge included instructions on factors the jury should consider in assessing eyewitness testimony such as: (1) suggestivity ("whether the witness made the identification while exposed to suggestive influences of others"); (2) retention interval ("how much time passed between the crime and the witness's later identification of the defendant"); (3) witness confidence ("[i]f the witness's identification testimony is positive and unqualified, you should ask whether the witness's certainty is well-founded"); (4) stress ("whether the witness was under stress while observing the person who committed the crime"); (5) cross-race identifications ("whether the witness and the person committing the crime were different races"); (6) non-identification ("whether the witness failed to identify Ralph Nolan at any time"); (7) multiple perpetrators ("whether the witness was able to identify other participants in the crime"); and (8) prior exposure effects ("whether the witness knew the person from some prior experience"). (Tr. at 875–77.)

Petitioner's flawed argument is premised on the assumption that the proffered expert testimony on eyewitness identification would have been admitted into evidence. However, "[t]here is no clearly established right under the federal Constitution to call an expert witness concerning the reliability of eyewitness testimony." *Smith* v. *Graham*, No. 10-cv-3450 (JPO) (THK), 2012 WL 2428913, at *6–7 (S.D.N.Y. May 7, 2012); *see also Hearns v. Artus*, Nos. 08-

cv-192 (NGG), 08-cv-218 (NGG), 2010 WL 2653380, at *11 (E.D.N.Y. June 23, 2010) ("The Supreme Court has never addressed the issue of whether a defendant has a constitutional right to present expert testimony on the subject of eyewitness identification. Therefore, the Appellate Division cannot have unreasonably applied federal law in rejecting [petitioner's] claim that the trial court erred in not permitting him to present such testimony.") (internal citation omitted). Indeed, "[t]he decision to admit or exclude an expert's testimony has traditionally been within the discretion of the trial judge." *Smith*, 2003 WL 22290984, at *14 (citing *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985). "If the trial court found that an expert's testimony would confuse the jury or would be cumulative of other evidence in the case, it would be within its discretion to refuse to admit the testimony." *Smith*, 2003 WL 22290984, at *14; *see also Moore v. Hardee*, 723 F.3d 488, 497 (4th Cir. 2013) ("We decline to hold that by failing to call a witness whose testimony the state trial court had full discretion to exclude, [defendant's] counsel rendered constitutionally deficient performance.").

In addition, Courts regularly deny admission of expert testimony on eyewitness identification. *See Washington v. Schriver*, 255 F.3d 45, 59–60 (2d Cir. 2001) (finding that exclusion of expert testimony did not rise to level of constitutional error because the issues the expert would have testified to were presented to the jury in other ways); *United States v. Serna*, 799 F.2d 842, 850 (2d Cir. 1986) (upholding exclusion of expert testimony regarding reliability of eyewitness identifications because it would have confused jury); *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (upholding the district court's determination that the proffered psychologist's testimony "would have confused the jury's assessment of the [eyewitness'] credibility"). Thus, even if trial counsel had proffered an expert witness on the topic, such testimony may have been excluded on the basis that it would have confused the jury or was

duplicative given defense counsel's cross-examination and summation arguments, as well as this Court's jury instructions on the issue of eyewitness identification.

The cases Petitioner relies upon are distinguishable. In *Bell v. Miller*, 500 F.3d 149, 151–52 (2d Cir. 2007), the victim-eyewitness identified the petitioner after suffering severe trauma and blood loss, and being heavily sedated for eleven days. The Second Circuit found defense counsel ineffective for failing "to consider consulting an expert to ascertain the possible effects of trauma and pharmaceuticals on the memory of the witness." *Id.* at 157. In that case, the failure amounted to ineffectiveness "where the memory of [the eyewitness was] obviously impacted by medical trauma and prolonged impairment of consciousness, and where the all-important identification [was] unaccountably altered after the administration of medical drugs." *Id.* Here, there were no issues related to medical trauma or heavy sedation of an eyewitness necessitating expert medical opinion on memory impairment.

Moreover, *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001), cited by Petitioner, had nothing to do with identification experts. In that child abuse case, the Second Circuit granted habeas relief due in part to counsel's failure to "contact[] an expert, either to testify or (at least) to educate counsel on the vagaries of abuse indicia." *Id.* at 201. However, unlike here, "such pre-trial investigation and analysis [related to child sexual abuse] will generally require some consultation with an expert." *Pavel v. Hollins*, 261 F.3d 210, 2224 (2d Cir. 2001) (citing Beth A. Townsend, *Defending the "Indefensible": A Primer to Defending Allegations of Child Abuse,* 45 A.F.L. Rev. 261, 270 (1998) ("It is difficult to imagine a child abuse case . . . where the defense would not be aided by the assistance of an expert.")).[12] As noted, courts routinely exclude expert testimony regarding eyewitness identification.

---

[12] Petitioner cites *Ferensic v. Birkett*, 501 F.3d 469 (6th Cir. 2007) for the proposition that the habeas petition was granted "based on counsel's failure to call eyewitness expert[,]" (Mot. at 37), however, that is incorrect. There, the court granted habeas relief because the trial court unreasonably sanctioned the

Petitioner fails to show that he was prejudiced by defense counsel's failure to consult or call an eyewitness identification expert.

## B. Withdrawal of Motion to Suppress

Petitioner further argues that defense counsel was ineffective for withdrawing the suppression motion. (Mot. at 64.) However, "eliminat[ing] the distorting effects of hindsight," as this Court is required to do under *Strickland*, 466 U.S. at 689, it is clear that withdrawing the motion was a tactical decision made by defense counsel.

Defense counsel moved to preclude the eyewitnesses from making in-court identifications arguing that the "suggestive identification procedures . . . rendered all out-of-court identifications of Mr. Nolan unreliable." (Mot. to Suppress at 1.) However, he did not move to suppress any out-of-court identifications because he wanted to put before the jury evidence regarding the eyewitnesses' unreliability and how the identifications were conducted. This is evidenced by the fact that even though the Government was not going to call Detective Deloren as a witness at trial when the motion was argued before this Court, defense counsel contemplated calling him as a fact witness at trial in order to elicit testimony about the identification procedures used. (*See* Tr. at 45:12–16.) Based on these arguments this Court explained:

> You can't have it both ways. You've got to make a decision here.
> Do you want to keep out all of these conflicting identifications, or
> do you want me to let them in? You can't have it both ways. It's
> either evidence that you're going to rely upon to show that the jury
> should not credit either the initial or any subsequent identification,
> or it's not coming in beyond the initial identifications and the initial
> identifications don't come in if you can give me some basis to
> suppress the initial identifications.

defendant by *excluding* his prepared expert on eyewitness issues, for failure to comply with a scheduling order. "Finding that the state court unreasonably sanctioned a defendant by excluding prepared expert testimony is far different from requiring counsel to present an expert on eyewitness identification in order to render effective assistance." *Moore v. Hardee*, 723 F.3d 488, 497–98 (4th Cir. 2013).

(*Id.* at 45:17–46:5.) Realizing that there were no issues at least as to Desiree Scroggins's initial photo array identification, and weighing his options, defense counsel ultimately withdrew his motion because he concluded the evidence "should all come in." (*Id.* at 45:6–10; 50:12–14.)

Indeed at trial, defense counsel pressed his strategy that the eyewitness identifications were unreliable due to Detective Deloren's procedures and as noted, *see supra* Section IV.A, cross-examined each on these issues. "Judicial scrutiny of counsel's performance must be highly deferential" and Petitioner here fails to "overcome the presumption that, under the circumstances, [defense counsel's actions] 'might be considered sound trial strategy.'" *Jamison v. Berbary*, No. 01-cv-5547 (RMB) (AJP), 2002 WL 1000283, at *10 (S.D.N.Y. May 15, 2002) (quoting *Strickland*, 466 U.S. at 689).

Although "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction," *Jamison*, 2002 WL 1000283, at *10, this Court bears in mind that "[t]here are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689–90 (internal citation omitted). As such, the record does not suggest that defense counsel's overall performance at trial fell below an objective standard of reasonableness. *See Key v. Artuz*, No. 99-cv-161JG, 2002 WL 31102627, at *9 (E.D.N.Y. Sept. 16, 2002) (finding defense counsel's withdrawal of a motion to suppress videotaped confession did not render his overall performance ineffective, and noting that "[d]efense counsel initially intended to offer the videotape in his own direct case to support his theory that both confessions were unreliable" and although he decided not to play it himself, he made this argument in summation after the prosecution played the videotape); *cf. Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (finding counsel's complete failure to conduct *any* pretrial discovery "unreasonable, . . . [and] contrary to prevailing professional norms" and explaining that counsel failed to do so "not based on 'strategy,' but on

counsel's mistaken beliefs that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense").[13]

### C. The Admission of the Facebook Gun Photo, Other Crimes Evidence, and Failure to File Alibi Notice

Petitioner also argues that defense counsel was ineffective because he "raised no objection" to the introduction of a Facebook picture depicting Petitioner posing with what appeared to be a handgun or to evidence of Petitioner's prior robbery conviction. (Mot. at 74.) However, yet again, the introduction of this evidence was the result of defense counsel's strategic decision to have the jury view Petitioner's complete Post-Arrest Statement.

As previously discussed, when the Government sought to introduce portions of the videotape, defense counsel argued that under the "rule of completeness," the entire interview should be shown to the jury. Although the Facebook Gun Photo appeared in the video, and there were discussions regarding Petitioner's ten-year-old robbery, defense counsel saw the value in presenting the whole video to the jury because in it the Petitioner vigorously denied being involved in the crime, discussed his whereabouts, and is seen crying towards the end. Ultimately, the defense got what it wanted and the entire video was played before the jury. In addition, any prejudice that may have resulted from the admission of the Facebook Gun Photo and discussions about Petitioner's prior robbery, was mitigated by the fact that in his Post-Arrest Statement, Petitioner explained that the handgun in the photo was an inoperable BB gun and that the prior crime was related to a fight amongst kids.[14] Like the decision to withdraw the suppression motion,

---

[13] Petitioner also argues that by withdrawing the suppression motion "defense counsel forfeited the opportunity to challenge the constitutionality of the police conduct outside of the presence of the jury." (Mot. at 67.) However, "there is no absolute right to a *Wade* hearing." *Smith*, 2003 WL 22290984, at *7. "Due process does not require a state 'to conduct a hearing outside the presence of the jury whenever a defendant contends that a witness' identification of him was arrived at improperly.'" *Id.* (quoting *Watkin*, 449 U.S. at 349).

[14] Petitioner points to trial counsel's alleged failure to seek a limiting instruction regarding this evidence, but even such an action could have been a strategic litigation decision made by counsel since it is not

defense counsel's decision to put this evidence before to the jury was a tactical decision that does not fall below the wide range of reasonable professional assistance.

Finally, Petitioner argues that he received ineffective assistance because defense counsel failed to file an alibi notice. (Mot. at 84.) However, this argument too fails because Petitioner's father, Ralph Nolan, Sr., could not serve as an alibi witness in the first place since he was unable to account for Petitioner's whereabouts on the afternoon of the robbery. Although the father did not testify as an alibi witness, the defense was allowed to call him and, indeed did so, to testify about Petitioner's work history, employment with his father around the time of the robbery, and other matters.[15]

### D. Prejudice

Even if trial counsel's actions were professionally unreasonable, that alone does not warrant setting aside the judgment unless "but for counsel's unprofessional error, the result of the proceeding would have been different." *Strickland*, 466 U.S. 668 at 687. Petitioner erroneously argues that "[t]he only direct evidence that connected [him] to this crime was the highly suspect identifications of four witnesses." (Mot. at 87.) That is not the case. At trial, the evidence indicated that not only was Petitioner identified in a photo array by several of the victims, two of them recognized him as an individual known to them from their old neighborhood. In Petitioner's Post-Arrest Statement, he admitted that he had been friendly with Shaun Odiot, who was seen on the building surveillance tape entering the building with the robbers and who was suspected of

---

uncommon to forgo limiting instructions as to not call attention to harmful evidence. *PRL USA Holdings, Inc. v. United States Polo Ass'n*, 520 F.3d 109, 117 (2d Cir. 2008) ("Counsel often prefer not to propose a limiting instruction because the instruction may call the jury's attention to the harmful evidence.").

[15] Again, Petitioner attempts to rely on trial counsel's post-trial declaration where he states that his failure to file alibi notice was not a tactical decision, (Walsh Decl., Ex. 29 ¶¶ 9–10); however, that is immaterial given that ultimately any "errors" that defense counsel may have committed did not cause Petitioner prejudice. The same goes for any alleged error from failure to call as a witness Joey Nolan, Petitioner's cousin and alleged BB gun owner.

facilitating the robbery. Petitioner's father testified that Petitioner had been working with him installing wiring. The phone and cable wires in the apartment were cut during the robbery and some of the victims were restrained by being tied up with phone or cable wires. All of this evidence, including the evidence about the unreliability of the eyewitnesses and their conflicting stories, was before the jury. Considering how "highly demanding" the *Strickland* standard is, it is not the case that "counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. 668 at 687.

## V.    CONCLUSION

Petitioner has failed to show that he received ineffective assistance of counsel. As such, no evidentiary hearing is needed and his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 is DENIED.


Dated: New York, New York
      February 20, 2018

                                        SO ORDERED.

                                        *George B. Daniels*

                                        GEORGE B. DANIELS
                                        United States District Judge